1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  MARGARITA ROSALES and ANGELICA )      1:09-cv-00707-AWI-JLT
    ROSALES, on behalf of themselves and all )
12  others similarly situated,            )      FINDINGS AND RECOMMENDATION
                                          )      DENYING PLAINTIFFS' MOTION FOR
13                    Plaintiffs,         )      CLASS CERTIFICATION
                                          )
14        v.                              )      (Doc. 33)
                                          )
15                                        )
    EL RANCHO FARMS and DOES 1-20,        )
16                                        )
                      Defendants.         )
17  _____  )

18        Plaintiffs Margarita Rosales and Angelica Rosales[1] ("Plaintiffs") seek certification of four

19  classes pursuant to Federal Rule of Civil Procedure 23.  (Docs. 33-37).  On October 21, 2011,

20  Defendant El Rancho Farms ("Defendant" or "El Rancho") filed an opposition to the motion (Doc.

21  40), to which Plaintiffs replied on November 14, 2011 (Docs. 43-46).

22        The Court has read and considered the pleadings and the oral arguments of counsel presented

23  on December 7, 2011.  For the reasons set forth below, the Court recommends Plaintiffs' motion for

24  class certification be **DENIED**.

25  ///

26

27        [1] The true and correct name of "Angelica Rosales" is "Maria Lorena Corza Alvarado," though she is known as
    "Lorena Corza."  Ms. Corza reports she used the name of her daughter, "Angelica Rosales," while working at El Rancho.
28  Therefore, the Court will refer to plaintiff "Angelica Rosales" as "Lorena Corza."

1

## I.  PROCEDURAL HISTORY

On March 5, 2004, Arnaldo Lara, Mario Laveaga, Mirna Diaz, Paula Leon, and Raul Diaz, individually and acting for the interests of the general public, ("Lara Group") initiated an action in the Kern County Superior Court against Rogelio Casimiro, doing business as Golden Grain Farm Labor.[2]  The Lara Group added "Angelica Rosales" as a named plaintiff and El Rancho Farms as a defendant in their second amended complaint on September 12, 2005.  This action was removed to the Eastern District on December 21, 2005.

On November 9, 2005, Plaintiffs' counsel initiated an action against table grape growers based in Kern County, including D.M. Camp & Sons; El Rancho Farms; Castlerock; Marko Zaninovich, Inc.; Sunview Vineyards of California; Guimarra Vineyards Corp.; Stevco, Inc; and FAL Inc.[3]  *See Doe v. D.M. Camp & Sons*, 624 F.Supp.2d 1153 (E.D. Cal. 2008).  When the action was initiated, the plaintiffs were unnamed former and current employees of the defendants.  *Id.* at 1156.  The Court acknowledged the *Doe* matter was related to *Lara*, as well as several other cases imitated against grape growers.  *Id.*

Defendants to the *Doe* action, including El Rancho Farms, filed motions to dismiss the operative complaint, which were granted by the Court on March 31, 2008.  (*Doe*, Docs. 81, 168).  Likewise, motions to sever the action were granted, and the Court required the plaintiffs to file amended pleadings against each defendant to effectuate the severance.   On May 29, 2008, "Angelica Rosales" and Margarita Rosales were identified as plaintiffs in the Third Amended Complaint against El Rancho Farms.  (*Doe*, Doc. 173).  On March 31, 2009, the Court ordered Plaintiffs to re-file their suit in a new case number within twenty days to finalize the severance.  (*Doe*, Doc. 241).

---

[2] The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  The record of state court proceeding is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records. *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th. Cir. 1980). Therefore,  judicial notice is taken of the original Complaint and the Second Amended Complaint in *Lara, et al v. Casimiro, et al.,* Case No. S-1500-CV-252445- SPC.

[3] For the same reasons set forth in n.1, the Court may take judicial notice of its own records.  Therefore, judicial notice is taken of the Court's docket in *Doe v. D.M. Camp & Sons*, case number 1:05-cv-01417-AWI-SMS.

On April 20, 2009, Plaintiffs filed their complaint against Defendant El Rancho Farms for the following:  violation of the Agricultural Workers Protection Act, 29 U.S.C. § 1801, *et seq*; failure to pay wages; failure to pay reporting time wages; failure to provide rest and meal periods; failure to pay wages of terminated or resigned employees; knowing and intentional failure to comply with itemized employee wage statement provisions; penalties under Labor Code § 2699, *et seq*; breach of contract; and violation of unfair competition law.  (Doc. 1).  Plaintiffs brought the action "on behalf of Plaintiffs and members of the Plaintiff Class comprising all non-exempt agricultural, packing shed, and storage cooler employees employed, or formerly employed, by each of the Defendants within the State of California." *Id.* at 4.

While engaged in discovery relevant to class certification, a discovery dispute arose among the parties, and Plaintiffs moved to compel the production of documents and the depositions of Defendant's person(s) most knowledgeable.  (Docs. 25-26).  Plaintiffs sought documents related to all farm labor contractors utilized by Defendant for the relevant time.  (Doc. 27 at 1).  At the hearing, the parties agreed "that the class period runs from November 9, 2001."[4] (Doc. 30 at 5).

In compliance with the Court's deadline for seeking class certification, Plaintiffs filed their motion on September 9, 2011.  (Doc. 33).  Defendant filed its opposition on October 21, 2011, asserting Plaintiffs failed to meet the requirements of Rule 23 or establish El Rancho was an employer or joint employer of Plaintiffs or putative class members.  (Doc. 40).  Plaintiffs filed a reply to the opposition on November 14, 2011.  (Doc. 43).  Plaintiffs filed a motion to strike the class declarations filed with Defendant's opposition (Doc. 42), and the Court heard argument regarding the motion to strike concurrently with the motion for class certification on December 7, 2011.[5]

## II.  LEGAL STANDARDS FOR CLASS CERTIFICATION

Class certification is governed by the Federal Rules of Civil Procedure, which provide that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members."  Fed. R. Civ. P. 23(a).  A class action is proper if:

---

[4]Defendants do not take issue with the class period which is defined the proposed classes as running from March 5, 2000.  Thus, the Court concludes that there has been a new meeting of the mind on this topic.

[5]The Court rules on the motion to strike in a separate order issued concurrently with this Order.

3

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation, and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982) (citing *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980)); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) ("Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."). If an action meets the prerequisites of Rule 23(a), the court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b). *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

**A. Rule 23(a) Prerequisites**

    1. Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requires the Court to consider "specific facts of each case and imposes no absolute limitations." *EEOC*, 446 U.S. at 330. Although there is no specific numerical threshold, joining more than one hundred plaintiffs is impracticable. *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (finding numerosity "solely on the basis of the number of ascertained class members . . . and listing thirteen cases in which courts certified classes with fewer than 100 members").

    2. Commonality

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement has been construed permissively, and does not require all questions of law and fact to be common. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "However, it is insufficient to merely allege any common question." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011); *see also Wal-Mart*, 131 S. Ct. at 2551 (commonality "does not mean merely that [class members] have all suffered a violation of the same pro-vision of law").

4

1    Rather, commonality requires "common contention" that is "of such a nature that it is capable of

2    classwide resolution—which means that determination of its truth or falsity will resolve an issue that

3    is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

4                    3.   Typicality

5         The typicality requirement demands that the "claims or defenses of the representative parties

6    are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The standards under this

7    rule are permissive, and a claim or defense is not required to be identical, but rather "reasonably co-

8    extensive" with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of

9    typicality is whether other members have the same or similar injury, whether the action is based on

10   conduct which is not unique to the named plaintiffs, and whether other class members have been

11   injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.

12   1992) (internal quotation marks and citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d

13   1449, 1463 (9th Cir. 1995) (typicality is satisfied when named plaintiffs have the same claims as

14   other members of the class and are not subject to unique defenses).

15                   4.   Fair and Adequate Representation

16        Absentee class members must be adequately represented for judgment to be binding upon

17   them.  *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, this prerequisite is satisfied if the

18   "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

19   23(a)(4).  "[R]esolution of this issue requires that two questions be addressed: (a) do the named

20   plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the

21   named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re*

22   *Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

23        **B.   Rule 23(b) Certification**

24        If an action meets the prerequisites of Rule 23(a), the party seeking class certification must

25   show the action is appropriate under Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614

26   (1997).  Under Rule 23(b)(1), a class is maintainable if there is a risk of inconsistent or varying

27   adjudications from "prosecuting separate actions by or against individual class members."  Fed. R.

28   Civ. P. 23(b)(1).  In addition, a class may be certified if "adjudications with respect to individual

                                          5

1   class members . . . would be dispositive of the interests of other members not parties to the

2   individual adjudications or would substantially impair or impede their ability to protect their

3   interests." Fed. R. Civ. P. 23(b)(1)(B).

4        A class is maintainable under Rule 23(b)(2) if "the party opposing the class has acted or

5   refused to act on grounds that apply generally to the class, so that final injunctive relief or

6   corresponding declaratory relief is appropriate responding the class as a whole."  Fed. R. Civ. P.

7   23(b)(2).  The Supreme Court explained, "Rule 23(b)(2) applies only when a single injunction or

8   declaratory judgment would provide relief to each member of the class. ... [I]t does not authorize

9   class certification when each member would be entitled to an individualized award of monetary

10  damages." *Wal-Mart*, 131 S. Ct. at 2557.

11       Class certification under Rule 23(b)(3) is an "adventuresome innovation," and allows for

12  class certification in cases "in which class-action treatment is not clearly called for as it is in Rule

13  23(b)(1) and (b)(2) situations."  *Amchem Prods.*, 521 U.S. at 615.  Thus, a class is maintainable

14  under Rule 23(b)(3) where "questions of law or fact common to the members of the class

15  predominate over any questions affecting only individual members," and where "a class action is

16  superior to other available methods for fair and efficient adjudication of the controversy."  Fed. R.

17  Civ. P. 23(b)(3) (emphasis added).  Where the issues of a case "require the separate adjudication of

18  each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate."

19  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted).  Thus,

20  the Court must examine "whether the proposed classes are sufficiently cohesive to warrant

21  adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623; *Hanlon*, 150 F.3d at 1022.

22       **C.  Burden of Proof and Evidentiary Submissions**

23       Parties seeking class certification bear the burden of demonstrating that each element of Rule

24  23 is satisfied, and "must affirmatively demonstrate . . . compliance with the Rule."  *Wal-Mart*, 131

25  S. Ct. at 2551; *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  The

26  Court must conduct a "rigorous analysis," which may require the Court "to probe behind the

27  pleadings before coming to rest on the certification question."  *Wal-Mart*, 131 S. Ct. at 2551 (quoting

28  *Falcon*, 457 U.S. at 160-61).  The Court has an affirmative duty to consider the merits of an action

1    "to the extent that they overlap with class certification issues."  *Ellis*, 657 F.3d at 981 ("a district

2    court *must* consider the merits if they overlap with the Rule 23(a) requirements") (citing *Wal-Mart*,

3    131 S. Ct. at 2551-52; *Hanon*, 976 F.2d at 509).  As a result, the Court may consider material

4    evidence submitted by the parties to determine whether the Rule 23 requirements are satisfied.

5    *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).

6    **III.  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

7            Plaintiffs assert they, and proposed class members, "are seasonal agricultural workers in the

8    grape industry who have performed pre-harvest and harvest work for El Rancho from March 5, 2000

9    to the present."  (Doc. 37 at 9).  According to Plaintiffs, El Rancho "employ[s] approximately 350

10   field workers during the annual grape harvest."  *Id.*  Plaintiffs allege El Rancho required workers "to

11   arrive at the worksite approximately 15 to 30 minutes before the start of the shift to prepare for the

12   day's work."  *Id.*  In addition, Plaintiffs contend workers had "escuelita" or "school" before the shift

13   lead by foremen for the farm labor contractors, "during which workers were instructed in the day's

14   work, on safety issues, or some other matters."  *Id.* at 10.  Further, Plaintiffs allege they were

15   "regularly required to clean grape-harvesting trays on their own time—typically at home—during

16   harvest."  *Id.*

17          Plaintiffs allege workers "have been required to buy their own tools, including picking

18   clippers/scissors, pruning shears, clipper sheaths, gloves, goggles, and various other items that are

19   necessary to perform work."  (Doc. 37 at 11).  Plaintiffs assert the farm labor contractor "at times

20   provided limited amounts of some of these tools," but assert the tools provided "regularly break or

21   wear out" and were not replaced by a farm labor contractor or El Rancho.  *Id.*  Further, Plaintiffs

22   contend, "El Rancho does not provide sufficient quantities of the other requested materials

23   reasonably necessary for employees to complete their work assignments."  *Id.* at 11-12.

24          Finally, Plaintiffs assert the meal and rest break policies of El Rancho failed to comply with

25   the requirements of California law.  (Doc. 37 at 12-13).  Plaintiffs argue workers who are paid on a

26   pure piece rate basis are "not authorized and permitted to take *paid* rest breaks, as there is no

27   compensation for non piece-rate time, including state mandated rest breaks."  *Id.* at 12 (emphasis in

28   original).  According to Plaintiffs, "El Rancho has maintained a meal break policy throughout the

7

1   class period that has failed to provide a meal period for shifts of six hours or longer within the

2   required five-hour time period." *Id.*  In addition, Plaintiffs assert, "El Rancho failed to authorize and

3   permit rest periods in the middle of each four hour work period as required" under California law.

4   *Id.*

5       Based upon these facts, Plaintiffs seek class certification of four classes of individuals who

6   worked at El Rancho, defined as follows:

7       The Unpaid Rest Break Class:  All fieldworkers employed or jointly employed by El
        Rancho who were paid a pure piece rate at any time between 03/5/2000 to the present.
8
        The Untimely Rest & Meal Break Class:  All fieldworkers employed or jointly employed
9       by El Rancho from 03/5/2000 to the present whose rest or meal break was scheduled at
        noon or later.
10
        The Off-the-Clock-Class:  All harvest fieldworkers employed by or jointly employed by
11      El Rancho from 03/5/2000 to the present who washed trays and/or performed work
        activities before the shift off the clock.
12
        The Tool Class:  All fieldworkers employed by or jointly employed by El Rancho from
13      3/5/2001 to the present who purchased work tools.

14  (Doc. 37 at 1-6).  In support of class certification, Plaintiffs submit declarations of proposed class

15  representatives Margarita Rosales and Lorena Corza, as well as declarations from 17 putative class

16  members.  (Decl. of Hector Martinez, Exhs. 4-5).  While providing scant analysis, Plaintiffs contend

17  the evidence satisfies the Rule 23(a) requirements of numerosity, commonality, typicality, and

18  adequacy of representation for each class.  *Id.* at 15-22.  In addition, Plaintiffs assert the requirements

19  of Rule 23(b)(2) and Rule 23(b)(3) are met.  *Id.* at 24.

20  **IV.  DEFENDANT'S OPPOSITION TO CLASS CERTIFICATION**

21      Defendant opposes certification for each of the proposed classes.  According to Defendant,

22  Plaintiffs "failed to meet their heavy burden of showing commonality, typicality, predominance of

23  common issues over individual issues, and superiority of a class action over individual actions."

24  (Doc. 40 at 2).

25      **A.  Commonality**

26      Defendant asserts Plaintiffs are unable to show "El Rancho has or had a common policy that

27  violates labor laws and that each putative class member suffered the same injury as a result of that

28  policy" because El Rancho does not employ the workers, and "leaves management of filed laborers

8

to the farm labor contracts that employ them." (Doc. 40 at 3).  Because El Rancho does not have policies regarding the alleged labor violations, Defendant argues Plaintiffs cannot show commonality for the four proposed classes.

In addition, Defendant observes, "[P]laintiffs provide anecdotal reports from only 19 field laborers claiming to have worked at El Rancho Farms.  Assuming that there are 1,000 potential class members, plaintiffs have provided declarations from .02 percent (.0002) of the putative class." (Doc. 40 at 2).  According to Defendant, without proof of a common policy implemented by El Rancho to cause the same injury to these individuals, the Court "cannot reasonably find that there is a common answer as to why these 19 field laborers (1) missed meal or rest periods or took late meal or rest periods, (2) purchased their own tools, (3) worked off-the-clock-for no pay, or (4) were unpaid for rest periods." *Id.* at 3.

## B.  Typicality

Defendant argues, "Plaintiffs cannot show that their damages are typical of the putative class members' damages." (Doc. 40 at 4).  In addition, Defendant asserts dozens of employees who provided work at El Rancho gave declarations refuting Plaintiffs' claims as follows:

> The named Plaintiffs as employees of Garza, and six other Garza employees, all claim that they were required to work off-the-clock and purchase their own tools.  However, 88 Garza employees state that they were never required to work off-the-clock or purchase their own tools . . .
>
> Plaintiffs, as employees of Garza, further claim that they were denied paid rest breaks because they were not paid unless they were productive.  But not one of plaintiffs' 19 declarants states that they ever received unpaid rest breaks.  87 Garza employees, however, all state that when paid on a piece rate basis, they all received at least minimum wage for all the hours they worked.
>
> Plaintiffs, as employees of Garza, also allege they received late meal periods.  85 Garza employees, however, state that they always received meal periods when they worked for a period of five hours or more . . .
>
> Plaintiffs allege that they missed or received late rest breaks because of a schedule Garza permits in which field laborers take a consolidated rest break at noon.  First, plaintiffs were not even providing labor at El Rancho Farms when the "schedule" in question was in place.  And second, 73 Garza employees state that they knew at all times that they were entitled to a 10-minute rest break for each hour work, but collectively chose to take a 20-minute consolidate rest period at noon.

*Id.*  Therefore, with the declarations provided by Garza Contracting employees, Defendant concludes Plaintiffs are unable to show their claims are typical as required under Rule 23 for certification of the

1  proposed classes.  *Id.*

2  **C.  Individual questions and a representative action**

3  Defendant contends Plaintiffs cannot satisfy Rule 23(b) because individual questions

4  predominate over common questions in each of the four proposed classes.  (Doc. 40 at 5).

5  According to Defendant, individual inquiries will be required to determine whether workers took

6  breaks and what their wages were; what tools were purchased and why; when laborers worked off-

7  the-clock, for what periods of time, and whether the employer should have known the workers were

8  performing compensable labor; and whether the laborers were aware of their rights to meal and rest

9  periods, and chose to change their schedule.  *Id.*  Defendant concludes, "There are too many

10  individual questions to be resolved by each and every putative class member to practically manage

11  this action."  *Id.*

12  **V.  PLAINTIFFS' REPLY**

13  Plaintiffs argue the Rule 23(a) prerequisites are satisfied and that Defendant has admitted

14  "the major class-wide policies at issue."  (Doc. 43 at 1-2).  As an initial matter, Plaintiffs note

15  Defendant does not contest numerosity because "there are hundreds, perhaps even thousands, of

16  potential class members for each proposed class."  *Id.* at 2.  In addition, Plaintiffs assert the

17  commonality and typicality requirements addressed by Defendant are satisfied by each class.  *Id.* at

18  4-22.  Finally, Plaintiffs assert Rule 23(b)(3) is satisfied, because common questions predominate

19  over individual questions and class treatment is superior to other available methods.  *Id.* at 23-24.

20  **A.  Commonality**

21  Plaintiffs argue there are questions of law and fact common to each class, which "satisfy the

22  commonality standard set forth in *Wal-Mart*."  *Id.* at 2 (citing *Wal-Mart*, 131 S. Ct. at 2551).

23  According to Plaintiffs, "there are numerous common legal and factual issues capable of resolution

24  of a classwide basis."  *Id.* at 3.  Specifically, Plaintiffs identify the following common questions for

25  each class:

26  The Unpaid Rest Break Class:  (1) whether Defendant maintained a piece rate pay policy
27  through with *paid* rest breaks were not authorized and permitted . . . (2) whether this
     piece-rate policy failed to provide properly paid rest breaks and thus requires payment
28  of additional wages; (3) whether Defendant ever paid additional wages . . . and (4)

10

whether Defendant is liable to class member[s] for additional wages or other remedies for failing to provide *paid* rest breaks.

The Untimely Rest & Meal Break Class:  (1) whether or not Defendant maintained a practice and policy form the beginning of the class period to approximately 2008, which failed to provide workers with a meal within 5 hours of work; (2) whether Defendant maintains a practice and policy beginning in approximately 2008 to present which fails to provide workers with rest breaks for every 4 hours or major fraction thereof; (3) whether Defendant maintains a policy and practice during the class period which fails to provide workers with a second rest break for shifts greater than 6 hours; (4) whether the schedule of providing a late meal is unlawful; (5) whether the schedule in which there is only one rest break is unlawful; (6) whether combining two 10-minute meal breaks into a single 20 minute rest break counts as two rest breaks under the law; (7) whether the rest break must be provided within every work period of 4 hours or major fraction thereof, such that a rest break after the fourth hour is unlawful; (8) whether it was impracticable for El Rancho to provide rest breaks in the middle of each work period; (9) whether El Rancho had a policy of compensating employees for untimely or unprovided rest and meal breaks described in (1)-(8) . . . and (10) whether class members were entitled to additional wages or remedies for such violations.

The Off-the-Clock Class:  (1) whether class members were suffered to permitted to perform off-the-clock work; (2) whether the time employees are required to be on the premises without compensation is compensable; (3) whether the time spent performing required or knowingly permitted pre and post-shift activities is compensable; (4) whether El Rancho's practice of not recording pre and post-shift work violates AWPA; and (5) whether El Rancho bears the burden of proving that Class members did not perform pre and post-shift work because El Rancho failed to record such time.

The Tool Class:  (1) whether Defendant failed to provide adequate tools to field workers during the class period; and (2) whether Defendant's failure to provide adequate tools constitutes a violation of Labor Code Section 2802.

(Doc. 43 at 4, 10, 17, 20).

Plaintiffs assert these questions are subject to common answers and proof because Defendant admits El Rancho did not have a policy of providing paid rest breaks for piece-rate workers, and did not count rest periods as "hours worked." *Id.* at 5-6.  Plaintiffs allege that El Rancho "set and controlled the timing of rest and meal breaks, not the [farm labor contractors], and the daily records from El Rancho "show[] late meal and rest periods, and a failure to provide a second rest break for shifts greater than 6 hours." *Id.* at 10-11. Also, Plaintiffs argue they "provided extensive testimony in their depositions describing the exact detail of the pre and post-shift work they were expected to perform," while "Defendant's glaringly absent time and payroll records . . . fail to account for the pre

11

1    and post-shift work performed." *Id.* at 17-18.  Finally, Plaintiffs argue the evidence—including

2    "class member declarations submitted by Plaintiffs, Plaintiff's deposition testimony and Defendant's

3    failure to produce tool and equipment receipts prior to 2006"— demonstrates a common answer that

4    Defendant failed to provide adequate tools.  *Id.* at 20.

5        **B.  Typicality**

6        Plaintiffs argue the typicality requirement is met because "Plaintiffs and many putative class

7    members were all subject to the same practices of Defendant."  (Doc. 43 at 21).  Specifically,

8    Plaintiffs allege the following violations demonstrate typicality of claims: "(1) failure to provide paid

9    rest breaks for pure piece rate work; (2) failure to provide timely meal and rest breaks; (3) failure to

10   record and compensate employees for off-the-clock work, including pre-shift and washing *bandejas*;

11   (4) failure to reimburse employees for purchase of tools reasonably necessary to perform their jobs."

12   *Id.* at 21-22.  Plaintiffs admit that neither of them worked for Defendant after the meal and rest break

13   policy was changed, but assert "the claims and defenses between the late meal and rest periods are

14   essentially the same." *Id.* at 23.

15       **C.  Requirements of Rule 23(b)(3)**

16       Plaintiffs contend the requirements of Rule 23(b)(3) are met because common questions

17   predominate, and "[i]individualized damages calculation will not defeat class certification."  (Doc.

18   43 at 23-24).  Further, Plaintiffs argue a representative action is the "preferred method [to] address"

19   Plaintiffs' claims because "Plaintiffs have prevent (sic) common question[s] capable of resolution on

20   a classwide basis." *Id.* at 25.  Plaintiffs argue it is "unlikely" that class members would have an

21   interest in controlling separate actions.  *Id.*  According to Plaintiffs, because class members are

22   seasonal agricultural workers who have limited economic resources and lack proficiency of the

23   English language, individual actions "would deprive most class members of the practical opportunity

24   to pursue their claims if a class action is not certified." *Id.*  Further, Plaintiffs contend there is a

25   "severe difficulty of finding experienced counsel in rural areas to handle individual cases." *Id.*

26       Plaintiffs argue that prosecuting numerous separate actions would be more burdensome than

27   litigating this as a class action, and separate actions "would entail risks of duplicative discovery

28   procedures, disputes among counsel, repeated adjudication of similar controversies, and excessive

1   time and costs." (Doc. 43 at 26).  Therefore, Plaintiffs conclude the benefits of maintaining this as a

2   class action "appear to outweigh any administrative burdens."  *Id.* at 25.

3   **VI.   EVIDENTIARY OBJECTIONS**

4          Plaintiffs object to the use of declarations of contractors and managers, including Irma Garza,

5   Rogelio Casimiro, Ofilia Tinoco, and Thomas Clarksean.  (Doc. 45 at 12).  Plaintiffs assert, "On

6   June 13, 2011, the Court ordered El Rancho to produce identification and contact information of

7   supervisory personnel."  *Id.* (citations omitted).  The Court's order required Defendant to produce

8   this information no later than June 23, 2011.  (Doc. at 7) Thus, upon their review of these documents

9   Defendants would have known whether the contact information was produced.

10         Nevertheless, at this time, in essence, Plaintiffs raise a discovery dispute in the guise of

11  evidentiary objections.  Plaintiffs provide no explanation for delaying from late June until they filed

12  their reply brief, to seek further compliance with the Court's order or to seek the Court's assistance

13  in obtaining the information.  This delay appears to be tactically motivated.  Moreover, it appears

14  Defendant *did* provide the identification of its supervisory personnel, including John

15  Kovacevich–whom they also produced for deposition– in compliance with the Court's order.

16  Accordingly, objections on the basis of Defendant's failure to disclose the identification of

17  supervisory personnel, or otherwise obey the Court's order are **OVERRULED**.

18         Further, Plaintiffs object to every paragraph of the individual declarations submitted by

19  plaintiffs, on the grounds of lacking of foundation, requiring a legal conclusion, relevance

20  outweighed by prejudicial effect, and confusion or waste of time.  (Doc. 45 at 9-12).  In addition,

21  Plaintiffs assert several words or phrases are vague and ambiguous, such as "required," "off the

22  clock" and "time you were paid." (*See, e.g., id.* at 9).   However, Plaintiffs provide no legal analysis

23  regarding the objections or explanation for why these phrases should not be interpreted as in their

24  ordinary, lay meanings.  Consequently, the objections regarding the "identical declarations" are

25  **OVERRULED**.  Likewise, Defendant's objections on the basis of failure to demonstrate personal

26  knowledge and "conclusory" statements are **OVERRULED**.

27         The parties have filed numerous other evidentiary objections to declarations and exhibits

28  filed in this action.  Significantly, "On a motion for class certification, the court may consider

1   evidence that may not be admissible at trial." *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610 (C.D.

2   Cal. 2008) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (describing a court's

3   determination of class certification as based on "tentative findings, made in the absence of

4   established safeguards" and describing a class certification as "of necessity . . . not accompanied by

5   the traditional rules and procedures applicable to civil trials."); *see also Williams v. Veolia Transp.*

6   *Servs.*, 2009 U.S. Dist. LEXIS 123600  at *7 (C.D. Cal. Mar. 20, 2009) ("Unlike evidence presented

7   in a summary judgment motion, evidence presented at the class certification stage need not be

8   admissible at trial.")  Regardless, the Court has read the evidentiary objections filed by Plaintiffs and

9   Defendant, and has considered only the evidence deemed admissible in its analysis.

10   **VII.  "JOINT EMPLOYER" STATUS FOR EL RANCHO**

11         Each proposed class includes workers "employed by or jointly employed by El Rancho."  In

12   defense of the class definitions, Plaintiffs assert "El Rancho Farms was/is a joint employer of Class

13   Members."  (Doc. 37 at 27).  On the other hand, Defendant argues El Rancho is not a joint employer

14   of the field workers, and that the workers were employees only of the field labor contractors.  (Doc.

15   40 at 34).  Because the class definitions include the employment requirement, if El Rancho did not

16   directly or jointly employ workers, the classes may not be certified.  Thus, the Court must examine

17   the working relationship of El Rancho, the farm labor contractors it employs, and the farm laborers

18   to determine whether the relationship satisfies the definition of "employment" or "joint employment"

19   under applicable California law or the Agricultural Workers Protection Act ("AWPA").

20         **A.   Definitions of employment and joint employment**

21         California's Industrial Welfare Commission identifies an employer as one who "employs or

22   exercises control over the wages, hours or working conditions of any person."  *Martinez v. Combs*,

23   49 Cal.4th 35, 64 (2010).  According to Wage Order 14, "employ" means " to engage, suffer or

24   permit to work."  *Id.*  The California court determined, "A proprietor who knows that persons are

25   working in his or her business without having been formally hired, or while being paid less than the

26   minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power

27   to do so."  *Id.* at 69.

28         The AWPA and Fair Labor Standards Act ("FLSA"), utilize a definition similar to California

law, and an entity "employs" a person if it "suffers or permits" the individual to work.  29 U.S.C. § 203(g).[6]  This definition of "employment" rejects the common-law definition of employment, and applies "to many persons and working relationships which, prior to [the FLSA], were not deemed to fall within an employer-employee category."  *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947); *see also Martinez*, 49 Cal.4th at 58 ("Not requiring a common law master and servant relationship, the widely used "employ, suffer or permit" standard reached irregular working arrangements the proprietor of a business might otherwise disavow with impunity.").

In addition, the FLSA provides an individual may be "employed jointly by two or more employers" where "employment by one employer is not completely dissociated from employment by the other employer(s)."  29 C.F.R. 791.2(a); *see also Falk v. Brennan*, 414 U.S. 190, 195 (1952) (two or more employers may jointly employ an individual for purposes of the FLSA).  This "joint employer" definition is adopted also by the AWPA.  *Moreau v. Air France,* 356 F.3d 942, 947 n.2 (9th Cir. 2003) ("the AWPA regulations provide that joint employment under the FLSA is joint employment under the AWPA'") (citing 29 C.F.R. § 500.20(h)(4)).  Examining the legislative intent, the Eleventh Circuit explained,

> The AWPA's adoption of the FLSA definition of employment 'was deliberate and done with the clear intent of adopting the 'joint employer' doctrine as a central foundation of this new statute; it is the individual hinge between certain important duties imposed for the protection of migrant and seasonal workers and those liable for any breach of these duties."  H.R. Rep. No. 97-885, 97th Cong., 2d Sess. (1982) 6, reprinted in 1982 U.S.C.C.A.N. 4547, 4552 . . . Previous legislative efforts to protect farmworkers had focused on regulating the crewleaders who recruited, managed and paid the farmworkers. *Id.* at 4547-48.  Those efforts, however, had failed to "reverse the historical pattern of abuse of migrant and seasonal farmworkers, *id.* at 4549, primarily because crew leaders were transient and often insolvent, *id.* at 4548.  Thus, in designing the AWPA, Congress took "a completely new approach," *id.* at 4549, making agricultural entities directly responsible for farmworkers who, as a matter of economic reality, depended upon them, even if the workers were hired or employed by a middleman or independent contractor, *id.* at 4553-54.

*Antenor v. D & S Farms*, 88 F.3d 925, 930 (11th Cir. 1996).  Consequently, under both the AWPA

---

[6]  The AWPA was enacted in 1983, in part "to assure necessary protections for migrant and seasonal agricultural workers."  29 U.S.C. §1801.  Liability under the AWPA depends on whether a farmer or grower "employed" workers, as defined by the Fair Labor Standards Act. 29 U.S.C. § 1802(5) ("The term 'employ' has the meaning given such term under section 3(g) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(g)) for the purposes of implementing the requirements of that Act . . .").

1  and the FLSA, a joint employment relationship may exist between a farm labor contractor and a

2  grower where (1) they have an agreement to share the worker's services, such as to interchange

3  employees; (2) where the farm labor contractor acts "directly or indirectly in the interest of the other

4  employer;" or (3) the grower and farm labor contractor "may be deemed to share control of the

5  employee, directly, or indirectly, by reason of the fact that one employer controls, is controlled by, or

6  is under common control with the other employer."  29 C.F.R. § 791.2(b).

7  **B.  Factors to determine joint employment**

8  To determine the nature of an employment relationship, a court must look to the "economic

9  reality" of the situation.  *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 318, 326 (1992)

10  *see also* 20 C.F.R. § 500.20(h)(4) ("the ultimate question is the economic reality of the

11  relationship— whether there is economic dependence upon the agricultural employer/association or

12  farm labor contractor, as appropriate").  The Ninth Circuit observed a court must "consider all

13  factors 'relevant to the particular situation' in evaluating the 'economic reality' of an alleged joint

14  employment relationship."  *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997) (quoting

15  *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)) (an FLSA

16  case in which the Court considered "whether the alleged employer (1) had the power to hire and fire

17  the employees, (2) supervised and controlled employee work schedules or conditions of employment,

18  (3) determined the rate and method of payment, and (4) maintained employment records").  In

19  *Torres-Lopez*, the Court considered a list of regulatory factors, including:

20      (A)    The nature and degree of control of the workers;

21      (B)    The degree of supervision, direct or indirect, of the work;

22      (C)    The power to determine the pay rates or the methods of payment of the workers;

23      (D)    The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and

24

25      (E)    Preparation of payroll and the payment of wages.

26  *Id.* at 639-40.  The Ninth Circuit explained this list was "non-exhaustive," and that "courts have

27  considered many factors not listed in the AWPA regulations."  *Id.* at 640.  Accordingly, the Court

28

considered several "non-regulatory" factors to determine whether a joint employment relationship existed, including:

    (1)    whether the work was a specialty job on the production line;

    (2)    whether responsibility under the contracts between a labor contractor and employer pass from one labor contractor to another without material changes;[7]

    (3)    whether the premises and equipment of the employer are used for the work;

    (4)    whether the employees had a business organization that could or did shift as a unit from one worksite to another;

    (5)    whether the work was piecework and not work that required initiative, judgment, or foresight;

    (6)    whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

    (7)    whether there was permanence in the working relationship; and

    (8)    whether the service rendered is an integral part of the alleged employer's business.

*Id.* (internal citations and quotations omitted).  Consequently, between *Bonnette* and *Torres-Lopez*, the Ninth Circuit has set forth a number of factors to determine whether a joint employment relationship exists between a grower and a farm labor contractor.

**C.  Summary of the Parties' Arguments**

Plaintiffs argue, "[I]t is clear El Rancho <u>controls</u> the manner in which the field labor is performed."  (Doc. 37 at 27) (emphasis in original).  According to Plaintiffs, Defendant's persons most knowledgeable about El Rancho operations "open[ly] acknowledge the high degree of control they maintain over the field operations," including: making decisions about planting and harvesting, what time to pick grapes, and what time shifts begin; training Garza foremen; ensuring the daily record accurately reflects the number of workers in the field; supervising and giving escuelita; maintaining a presence in the fields by "walking in the isles (sic) [and] talking to workers if they are not performing well in order to maintain quality control;" and supervising crews when they are doing piece-rate work.  *Id.* at 27-28.

---

[7] There is no evidence contracts between El Rancho and its labor contractor pass to another labor contractor. Therefore, this factor does not impact the Court's analysis.

1       In addition, Plaintiffs assert, "El Rancho supervisors have the authority to fire field laborers"

2   and an El Rancho employee, John Kovacevich, could ask that an individual be fired for poor work.

3   (Doc. 37 at 29).  Plaintiffs argue the permanency and duration of the class members demonstrate a

4   joint employment relationship because "the labor policies and practices appear to be the same"

5   among farm labor contractors and El Rancho, and the "foremen have worked at El Rancho for a long

6   time." *Id.* at 30.  Plaintiffs note that when Garza "took over" as the farm labor contractor, the

7   foremen hired had worked for El Rancho.  *Id.*  Plaintiffs assert grape workers do not need a formal

8   education to perform their work, yet "essentially every task at El Rancho's grape fields (planting,

9   care, and harvesting) are undertaken by Garza Contracting."  *Id.* at 31.

10      Defendant counters that Plaintiffs fail to establish El Rancho "is a joint employer of each

11  plaintiff and putative class member.  (Doc. 40 at 34).  Defendant argues Plaintiffs failed to provide

12  evidence of (1) permanence of the working relationship; (2) whether laborers or contractors "had the

13  ability to shift from one worksite to another;" (3) that contracts "pass from one farm labor contractor

14  to another without material changes;" (4) that El Rancho performs payroll for the laborers; (5) that El

15  Rancho "exerts control over or supervises the putative class members;" and (6) that El Rancho

16  determines the wages for laborers.  *Id.* at 35.  To the contrary, Defendant asserts the evidence shows

17  the working relationship between El Rancho and the named plaintiffs was brief, and that workers

18  "had the ability to shift from El Rancho Farms to multiple other worksites."  *Id.*  In addition,

19  Defendant argues El Rancho does not perform payroll for any farm labor contractor, and "does not

20  maintain employment records for employees of farm labor contractors."  *Id.* at 36.  Finally,

21  Defendant asserts El Rancho never "unilaterally set the rates" for laborers, but rather "negotiated

22  with Garza the piece rates it would pay to Garza for units produced."  *Id.*

23      **D.  Discussion of *Torrez-Lopez* Factors**

24          1.  Nature and degree of control of the workers

25      Lynn Kirkorian, a general partner of El Rancho, explained that El Rancho did not have

26  uniform policies, but left responsibility and management of field laborers "including daily schedules,

27  meal and rest break times" to its farm labor contractors.  (Kirkorian Decl. ¶¶ 5-6).  In addition, Ms.

28  Kirkorian reported El Rancho did not dictate a daily schedule, and "each farm labor contractor has

18

had its own daily schedule and policies and practices . . ." (*Id.* ¶ 20).  This is corroborated by the testimony of Irma Garza–an owner of Garza Contracting–who attests Garza "is . . . responsible for providing laborers with the necessary tools and equipment . . . [and] scheduling the meal and rest periods for all field laborers . . ." (Garza Decl. ¶ 9).

Further, plaintiff Margarita Rosales testified Irma Garza and her sons, who also work for Garza Contracting, told crew foremen when to have the farm laborers stop working.  (Rosales Depo. at 76:7-9).  According to Ms. Rosales, foreman for the farm labor contractors told the laborers when to arrive at work and when the workday is over.  (*Id.* at 38:24-25, 39:12-14).  Ms. Rosales stated the foremen advised workers when it was time for meal and rest breaks.  (*Id.* at 35:9, 37:14-16).  Thus, this factor weighs against a finding of joint employment.

2.   Degree of supervision, direct or indirect, of the work

Plaintiffs assert that the declarations from putative class members "demonstrate that El Rancho supervisors have not only been present in the field, but they have also monitored the work performed by field laborers and even directing the Garza Contracting foreman."  (Doc. 37 at 27-28).  Specifically, Vicente Cruz, who worked for Garza, stated his "supervisor is John Kovacevich and [his] foreman is Mariano."  (V. Cruz Decl. ¶ 3).  Angelica Alvarez reported, "[S]upervisors for El Rancho . . . arrive[d] daily to supervise and inspect our work.  I myself saw the supervisors from El Rancho, they also walked in the field and they also talked with the female foreman."  (Alvarez Decl. ¶ 3).  Likewise, eight Golden Grain employees assert they saw "the rancher's supervisors supervise our crew."  (*See, e.g.*, Bravo Decl. ¶ 3; Mosqueda Decl. ¶ 3; Ramos Decl. ¶ 3; Prado Decl. ¶ 3). However, the Golden Grain employees fail to explain *how* the 'supervisors supervised' the crew.

Ms. Kirkorian reported El Rancho employs John Kovacevich as a field manager, but "farm labor contractors hired by El Ranch Farms have been responsible for . . . supervising employees." (Kirkorian Decl. ¶¶ 6, 22).  According to Mr. Kovacevich, he "trains" crew foreman "about what the duties and responsibilities are."  (Kovacevich Depo. at 10:23-25).  Also, Mr. Kovacevich may verify that the log prepared by Garza Contracting foreman accurately reflects the number of workers in the field because he is "constantly" in the field to "maintain quality control."  (*Id.* at 29:11-30, 37:16-20).  Mr. Kovacevich explained he stands close to the packing tables while checking the sugar, color,

19

and size of the grapes; "the cleaning of the product for defects;" and the separation of the grade of grapes. (*Id.* at 37:20- 38:4). Mr. Kovacevich stated he went down rows "[o]n occasion" to make sure workers were "harvesting the correct fruit," and make sure the workers were "picking enough or not . . . over picking" the vines. (*Id.* at 38:5-10). When performing this quality check, Mr. Kovacevich reported he did not "watch the picking," but rather would "look at the trays of what they have picked and . . . look at the vines to see what they have left." (*Id.* at 38:11-14). On occasion, he saw a worker who picked improperly. (*Id*. at 38:15-20) In that event, Mr. Kovacevich told the foreman or a helper who would provide instruction to the worker, and he did not speak to the field worker directly. (*Id.*; Kovacevich Decl. ¶ 8). When he discovered a worker who was doing a very poor job, he told the field foreman who, in most instances, would transfer the worker to a different farm. (Kovacevich Depo. at 53:8-19).

Rogelio Casimiro–the owner of farm labor contractor, Golden Grain Farms–testified that Golden Grain foremen supervised the workers in the field and while "checking the rows," reminded workers of safety concerns. (Casimiro Depo. at 223:19-24). Similarly, Ms. Garza reported that her contracting company "is responsible for . . . supervising [laborers'] work, and training them." (Garza Decl. ¶ 9). Garza Contracting employs field supervisors such as Ofilia Tinoco, who explained her duties "include enforcing Garza Contracting's policies and practices on the field." (O. Tinoco Decl. ¶ 2). Ms. Rosales testified Garza Contracting supervisors and foreman, including Ms. Garza and her sons, were in the field "to make sure the beds were clean" and scolding workers "who were not meeting the sufficient amount of boxes they required." (Rosales Depo. at 20:2- 21:2). Further, farm laborers from El Rancho reported foremen of the farm labor contractors provided training by instructing the "escuelita" or school that the workers attended each morning. (*See* M. Luiz Calderon Decl. ¶ 6). At "school," foremen used the time to "give . . . work instructions" such as "how much to pick and package that day and how to do it." (*Id.*; Corza Decl. ¶ 6; Vicente Cruz Decl. ¶ 6). Thus, it appears El Rancho has no direct supervision over the day-to-day efforts of the laborers employed.

On the other hand, the more difficult question is whether El Rancho exercised indirect supervision and, if so, to what extent. In *Torres-Lopez*, the Court cited *Hodgson v. Griffin Brand, Inc.,* 471 F.2d 235, 236-237 (5th Cir. 1973), for the proposition that the farm owner's instruction to

1  the farm labor contractor who, in turn, instructed the worker did not shield against a finding of joint

2  employment.  However, a closer review of *Hodgson* adds little to the Court's analysis here.

3      In *Hodgson*, there was significant evidence that the farm owner was at least the joint

4  employer of the field workers and, indeed, more akin to the direct employer.  *Hodgson* at 236-238.

5  The farm owner determined which workers would receive an hourly wage and which would receive a

6  piece rate, kept social security records on behalf of each worker, paid each crew leader directly,

7  withheld social security contributions for each worker and made social security contributions on

8  behalf of each worker.  *Id*.  The farm owner controlled the daily start and finish times, assigned the

9  workers a specific number of rows that the farm determined would be picked each day and

10  unilaterally determined the rate of pay that each harvest worker would receive.  *Id*.  In addition to

11  this, the farm owner oversaw the work and directed the work through the crew leaders.  *Id*.

12      On the other hand, in *Moreau*, the Court distinguished *Lopez-Torrez* and found that Air

13  France did not exercise direct control over the contractors' workers.  The Court observed,

> There is no indication that Air France had the authority to directly "control" any of the workers, but would instead communicate any complaints about performance to the service company's supervisors. Air France  was, however, very specific about how it wanted its work performed, and it checked to ensure that its standards were met and that the service provider's overall performance adhered to Air France's  specifications. This type of activity can, in some situations, constitute "indirect" supervision of the employees' performance. See *Torres-Lopez*, 111 F.3d at 642-43. It is, however, noteworthy that in this case, much of the indirect supervision or control exercised by Air France over the ground handling employees was purportedly to ensure compliance with various safety and security regulations, such as ensuring that food equipment was properly stowed or that the plane's load was adequately balanced. Any airline that is concerned about its passengers' safety would be remiss to simply delegate a task to another party and not double-check to verify that the task was done properly. We therefore believe that the purported control or supervision alleged by Moreau in this case is qualitatively different from the farmworker situation in *Torres-Lopez*.
>
> We also note that even if Air France's actions in specifying the work to be performed and following up to ensure adequate performance do constitute "some control over the work or working conditions of the employee," 29 C.F.R. § 825.106(a), the regulations do not say that a joint employment relation-ship is necessarily formed, as Moreau seems to argue. Rather, the regulations indicate only that in such circumstances, "the businesses may be joint employers under FMLA," *id*. (emphasis added), but that "the entire relationship is to be viewed in its totality." 29 C.F.R. § 825.106(b). When viewed in context, the supervision/control by Air France was minimal in contrast to numerous other factors which negate finding a joint employment relationship on these facts.

27  *Id*. at 950-951.

28

Here, the Court finds the facts to be more analogous to *Moreau* than *Hodgson*. Though there were occasions when Mr. Kovacevich saw a worker improperly picking fruit and reported this to a Garza foreman who addressed the problem, Kovacevich's primary reason for being in the field was to assure quality control–meaning that he ensured that the grapes being picked had the proper color and sugar content, that the grades of grapes were separated properly and that the grapes did not have defects. (Kovacevich Depo. at 37:16-39:1).

Significantly, supervision for the purpose of quality control has been found to be insufficient "control" for the purpose of establishing a joint employment relationship under California law. *See Martinez*, 49 Cal.4th at 76. In *Martinez*, the court observed, "Viewing the facts most favorably to plaintiffs, Apio sent its representatives Juan Toche and Manuel Cardenas to the field on days when Munoz harvested fresh berries from the Oceano and Zenon fields, and Combs sent defendant Juan Ruiz when Munoz harvested berries from El Campo. Apio's and Combs's representatives followed the same procedure: "In the morning, the representatives would explain to Munoz and his foremen how the merchant wanted strawberries packed, and Munoz and his foremen would demonstrate the packing style to the workers. For about an hour, the representatives, together with Munoz and his foremen, would check the packed containers as workers brought them from the field to the truck where they would be loaded for shipping. While the representatives would generally bring problems to the attention of Munoz and his foremen, they would also sometimes speak directly to the workers, pointing out mistakes in packing such as green or rotten berries. In the afternoon, the representatives would return briefly to check the quality and quantity of berries loaded in the truck." *Id.* In spite of these facts, the court found the plaintiffs' claim that Apio and Combs were their joint employers "through their field representatives' activities in the areas of quality control and contract compliance" lacked merit. *Id.* at 75, 77.

Based upon this evidence and the legal authority, the Court concludes that El Rancho wielded only collateral, indirect control over the field workers on its property. Moreover, as in *Moreau* and in *Martinez,* the purpose for taking this action so was to ensure that the quality of the farm's product was preserved. Thus, this factor weighs against a finding of joint employment.

///

### 3.   Power to determine the pay rates or the methods of payment of the workers

Mr. Kovacevich reported El Rancho and its farm labor contractors agree upon wages "for a particular job," and agree on the piece rate to be paid.  (Kovacevich Depo. at 51:16- 53:7).  According to Ms. Garza, "With regard to piece rate wages, Garza Contracting and El Rancho Farms negotiate the exact rate that El Rancho Farms will pay to Garza Contracting per unit produced.  With regard to regular wages, Garza Contracting's employees are paid the minimum wage." (Garza Decl. ¶ 11).  Thus, El Rancho negotiated the piece rates with Garza (Kovacevich Depo. at 51:16- 53:7) and the hourly rates were determined by the State of California's minimum wage laws.  (*Id*. at 51:18- 52:5).  The evidence shows that Gaza invoiced El Rancho based upon this agreement and paid the workers out of the money received therefrom.  (Garza Decl. at ¶ 10).  Consequently, it appears El Rancho had a limited power to determine the worker's pay and the Court concludes that this factor weighs against a finding of joint employment.

### 4.   Right, directly or indirectly, to hire, fire or modify employment conditions

Mr. Kovacevich confirmed that if he encountered a field worker who was doing a very poor job, he would contact the Garza foreman, who "[u]sually did not bring [the worker] back the next day," or who could terminate the worker if the worker was purposefully damaging the crop. (Kovacevich Depo. 53:8-15).  Mr. Kovacevich testified that "many times," the foreman would take the worker somewhere else to work.  (*Id.* at 53:16-19).  With regard to Golden Grain employees, "El Rancho . . . did not have the ability to hire or fire Golden Grain Farms' employees from their employment with Golden Grain." (Kirkorian Decl. ¶ 15).   Therefore, though El Rancho could tell Garza they did not want a worker who did poor work to work at its farm, Garza chose whether to fire the worker or merely to transfer the worker to a different farm.  (*Id*.)  The fact that El Rancho took steps to ensure that those picking the crop did not purposely damage it and, instead, picked the correct fruit in a proper manner, does not necessitate a finding that El Rancho was a joint employer.  Instead, these efforts are more akin to those taken in *Martinez* and *Moreau* to provide a satisfactory

1   and safe flight service to its passengers .[8]  *Moreau*, at 950-953.  Thus, this factor weighs against a

2   finding of joint employment.

3                    5.   Preparation of payroll and the payment of wages

4         Lynn Kirkorian and Martha Stroud, El Rancho's office manager from 2001 to 2010, both

5   declared that farm labor contractors hired by El Rancho Farms were responsible for "calculating

6   wages" that were owed to the employees of the farm labor contractors and for "performing payroll"

7   related to that effort.  (Kirkorian Decl. ¶ 8; Stroud Decl. ¶ 4).  Ms. Garza reported her company "is ...

8   responsible for calculating all wages due and for payroll."  (Garza Decl. ¶ 9).  After calculating

9   payroll, Garza submitted an invoice to El Rancho "for the amount that Garza Contracting has paid its

10  employees in wages, plus a commission between 29 and 31 percent."  (*Id.* ¶ 10).  Ms. Stroud

11  reported that Garza submitted copies of payroll registers to support the invoices given to El Rancho.

12  (Stroud Decl. ¶ 10).  Similarly, Mr. Casimiro testified he had to send growers an invoice of work

13  completed by Golden Grain laborers, and that he kept copies of the invoices sent.  (Casimiro Depo.

14  233:24- 234:4).  Therefore, there is significant evidence that El Rancho does not prepare the payroll

15  or pay wages to the farm laborers so the Court finds that this factor weighs against a finding of joint

16  employment.

17                    6.   Non-regulatory considerations

18        According to Mr. Kovacevich, an employee hired to do picking "can be taught in about 15

19  minutes the first day, and then it's an ongoing process."  Thus work performed by laborers at El

20  Rancho does not require "initiative, judgment, or foresight."  (Kovacevich Depo. at 60:23- 61:6).  On

21  the other hand, the work is an integral part of El Rancho's business, because all production work—

22  including girdling, pruning, picking, and harvesting— is handled by the farm labor contractors.  (*Id.*

23  at 62:1-5).  This work is analogous to "a specialty job on the production line."  *See Torres-Lopez*,

24

25        [8] In *Moreau*, the Court determined that the fact that Air France's employee monitored the quality of service provided
26  by the workers did not equate to direct or indirect control over the workers.  *Moreau* at 950.  The evidence presented was
    that the Air France's employee initially testified "that's right" to the question whether monitoring the workers meant that he
27  supervised them.  However, then he qualified his statement, "I would say supervise what they do is different. I'm not a
    crusader after people. I check what they do. It's a different story. I don't monitor their schedule. I don't monitor if they are
28  sick or on vacation. This is done by their supervisor. I just want to make sure that my operation is covered."  *Id.*  The Ninth
    Circuit determined that this was insufficient to demonstrate joint employment.

                                        24

111 F.3d at 643 (finding the task of picking cucumbers analogous to a production line job because it "constituted one small step in the sequence of steps taken by [the grower] to grow the cucumbers and prepare them for processing . . .").

Significantly, farm labor contractors utilized by El Rancho supplied field labor crews to a number of agricultural growers.  (Garza Decl. ¶ 4) Garza Contracting has supplied field labor crews agricultural growers including El Rancho, Bolthouse Farms, Grimmway Farms, Richardson Farms, Anthony Vineyards, and Lucich Farms. *Id*.  Golden Grain supplied farm labor to El Rancho, Lucich Farms, and Castle Rock.  (Casimiro Depo. at 192-193) Further, according to Ms. Garza, "Early in the defined 'class period,' Garza Contracting employed approximately 3,000 employees per year.  Since 2006, Garza Contracting has employed between approximately 8,000 and 11,000 employees per year."  Because El Rancho Farms is so small, only approximately 300 field laborers are required . . . to perform field labor."  (Garza Decl. ¶ 5).  Thus, Garza supplies only a fraction of its workers to El Rancho and substantially more labor to other farms.  Likewise, Golden Grain employed up to 50 to 55 workers to El Rancho at a time.  (Casimiro Depo. at 184: 5-11).  This distinguishes the working relationship between El Rancho and its farm labor contractors from the relationship in *Torres-Lopez* between the grower and farm labor contractor.

In *Torres-Lopez*, the Court found a joint employment relationship between the grower Bear Creek Farms and Ag-Labor Services ("Ag-Labor"), which "agreed to supply and supervise farmworkers" to harvest the crop."  *Torres-Lopez*, 111 F.3d at 637.  The Court noted Ag-Labor did not recruit workers, because they "would learn by word of mouth that harvesting work was available at Bear Creek Farms . . . [and] appear at the field on harvest days."  *Id*.  Then, Ag-Labor selected workers from the group who reported to the farm.  *Id*.  Due in part to this procedure, the Court determined that Ag-Labor really did not have employees, but rather worked more as an employment broker who selected workers specifically for Bear Creek Farms. *Id*. at 644.

Further distinguishing this case from *Torres-Lopez* is the fact that the farm labor contractors had operations that could—and do—shift from one agricultural grower to another.  According to Ms. Garza, "The crews move to different farms at different times of the seasons, although certain crews do remain at certain farms year-round."  (Garza Decl. ¶ 6).  Thus, the permanence and longevity of

1  the working relationship between any farm laborer and El Rancho varies based upon whether the

2  crew was assigned only to El Rancho, or was one that moved to another grower.

3        According to Mr. Kovacevich, the only materials supplied by El Rancho were "boxes and

4  packaging materials." (Kovacevich Depo. at 62:11-24).  All other supplies were furnished by the

5  farm labor contractor, such as tables, wheelbarrows, picking trays, and umbrellas.  (*Id.* at 62: 17-

6  63:3).  In addition, Mr. Kovacevich reported the farm labor contractor provided all hand tools the

7  workers needed for various jobs, such as scissors, pruning shears, clippers, and shovels.  (*Id*. at 63:4-

8  25).  This was corroborated by Ms. Garza, who said her company is "responsible for providing

9  laborers with the necessary tools and equipment, providing laborers with restroom facilities and

10 water, and for providing laborers with umbrellas." (Garza Decl. ¶ 9). Notably, Ms. Garza attested

11 Garza maintains a "box of tools and equipment . . . at the fields during working hours." (*Id*. at ¶ 21).

12 Likewise, Mr. Casimiro reported Golden Grain provided "[w]hatever tools the workers need."

13 (Casimiro Depo. at 159:24- 160:4).  Therefore, while the premises of El Rancho are used for the

14 work, a vast majority of the equipment was provided by the farm labor contractors.

15       Given these facts, the Court finds the non-regulatory factors weigh against a finding that El

16 Rancho and its farm labor contractors were joint employers.

17     **E.  Conclusion**

18       The *Martinez* court determined that under the "suffer or permit to work" standard for an

19 employment relationship, "the basis for liability is the defendant's knowledge of and *failure to*

20 *prevent* the work from occurring." *Martinez*, 49 Cal.4th at 69 (citing *People v. Shefffield Farms-*

21 *Slawson-Decker Co.*, 167 N.Y.S. 958, 961 (1917) ("The basis of liability is the owner's failure to

22 perform the duty of seeing to it that the prohibited condition does not exist")).  Here, there is no

23 evidence that any worker was not formally hired, and Plaintiffs present no evidence that El Rancho

24 was aware that any worker did not receive minimum wage.  To the contrary, the evidence presented

25 indicates that all workers, including those working on a pure piece rate, were paid minimum wage."

26 (Clarksean Decl. ¶ 7; Garza Decl. ¶ 13). Consequently, payroll records presented to El Rancho

27 reflected minimum wage payments to workers.  As a result, liability does not attach under

28

California's definition of "employ"– because El Rancho did not have knowledge of or fail to prevent work that violated the minimum wage laws.

Furthermore, despite the presence of El Rancho's field manager, the farm labor contractors' foremen and supervisors were in control of the schedules for employees, including informing workers when it was time to take rest and meal breaks, and when to cease operations for the day. Thus, it appears that the day-to-day operations are overseen by the farm labor contractors contracted with El Rancho.  Notably, equipment necessary for daily operations is supplied by the farm labor contractors, from hand tools to tables, and even toilets.

The fact that the farm labor contractors provide labor to several agricultural growers demonstrates an ability to shift workers from one work site to another.  For example, though El Rancho may request that a worker not return to its farm, the worker can be relocated to another farm at Garza's discretion.  Thus, El Rancho does not have the power directly or indirectly, to fire a worker, though as a result of misfeasance, the employee may be moved to work at a different farm. El Rancho negotiates the wages paid but if it stopped paying competitive wages, the farm labor contractor could simply choose to not work with El Rancho.  Because El Rancho is a relatively small operation, it lacks economic superiority over the farm labor contractor.  Therefore, it does not appear that the workers employed by the farm labor contractor–or the farm labor contractor–has "economic dependence" on El Rancho farms–indeed, it is almost the reverse.  *See* 20 C.F.R. § 500.20(h)(4).

Thus, after considering all of the factors, the Court concludes that El Rancho was not a "joint employer" as defined by the FLSA and the AWPA nor was it a "joint employer" as that phrase is used by Plaintiffs in their proposed class definitions.

## VIII.   DISCUSSION AND ANALYSIS OF RULE 23 REQUIREMENTS

The Court is cognizant that an issue of liability, such as whether El Rancho was a joint employer, should not be the sole reason for denying the motion for class certification, because "it is improper to advance a decision on the merits to the class certification stage." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983).  Accordingly, the Court now turns to the issue of whether the four proposed classes satisfy the requirements of Rule 23 for class certification. ///

**A.   The Unpaid Rest Break Class**

This proposed class includes field workers "who were paid a pure piece rate" at any time during the class period.  (Doc. 37 at 1).  Plaintiffs assert this class has been wronged by a "policy that results in failure to provide *paid* rest breaks for pure piece-rate work."  *Id*.  Plaintiffs assert common issues for this class include:

> (1) whether El Rancho's policy of paying a piece rate wage without paying employees any wages during rest breaks violates California rest-break laws and [the Agricultural Workers Protection Act ("AWPA")]; and (2) whether El Rancho's policy of paying a piece rate without paying employees at least the minimum wage for rest-break time violates California minimum wage laws and AWPA; and (3) whether El Rancho's policy of paying a piece rate without paying employees their "regular rate" during rest breaks violates California labor laws and AWPA.

*Id*. at 1-2.  According to Plaintiffs, "[t]hese questions are subject to common proof," including Defendant's admission that workers who are paid a pure piece rate are not compensated for rest breaks, and payroll documents required to calculate damages.  *Id*. at 2.

Defendant argues the common questions identified by Plaintiffs are insufficient to establish commonality under the Supreme Court's ruling in *Wal-Mart*.  *Id*. at 19.  According to Defendant, El Rancho does not have a "company-wide policy" that sets forth a piece-rate worker was not to receive additional pay for rest periods, and Plaintiffs failed to provide proof that there is such a policy in place.  *Id*. at 19-20 (citing *Wal-Mart*, 131 S. Ct. at 2550-53) (requiring "significant proof" of a company-wide policy of discrimination).  In addition, Defendant argues "the named Plaintiffs have failed to show that they were . . . paid on a pure piece rate basis."  *Id*.  Therefore, Defendant concludes Plaintiffs "failed to show commonality, typicality, predominance, and standing."  *Id*. at 17.

### 1.  Liability under California law

Plaintiffs allege, "Because California law requires that workers receive paid rest breaks, a piece-rate policy that fails to provide compensation for non piece-rate time—such as paid rest breaks or other compensated worktime—runs afoul of the rest break laws."  (Doc. 37 at 1) (citing Industrial Welfare Commission Wage Order 14, 8 Cal. Code Regs. § 11140).  On the other hand, Defendant argues, "There is no legal basis for such a claim," because "Wage Order No. 14 requires only that employers must 'authorize and permit' employees to take ten minute rest periods that are counted as hours worked and for which no deduction in wages can be made."  (Doc. 40 at 16).

1    However, the Court will not make a ruling on the precise meaning of Wage Order 14 as it

2    relates to piece rate work for the purposes of this motion.[9]  Rather, the Court will focus upon whether

3    Plaintiffs satisfy the prerequisites for certification under Rule 23.

4                    2.  Plaintiffs' ability to assert a claim on behalf of this class

5        Importantly, a named plaintiff must have the requisite "personal stake in the outcome" and be

6    a member of the class which he or she seeks to represent at the time the class is certified.  *O'Shea v.*

7    *Littleton*, 414 U.S. 488, 494 (1974).  "[A] class representative must be a part of the class and possess

8    the same interest and suffer the same injury as the class members."  *Falcon*, 457 U.S. at 156.

9    Therefore, "[a] named plaintiff cannot represent a class alleging ... claims that the named plaintiff

10   does not have standing to raise."  *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir.

11   2001) (citing *O'Shea*, 414 U.S. at 493-94).  If Plaintiffs were not paid on a pure piece rate basis, they

12   cannot represent others who may have such a claim.  In reply, Plaintiffs assert Ms. Corza and Ms.

13   Rosales both declared that they "worked pure piece rate for Defendant and were not provided with

14   paid rest breaks."  (Doc. 43 at 22).

15       In her declaration, Ms. Corza reported she "started to work at El Rancho in 1994

16   approximately and . . . stopped working in 2005 approximately."  (Corza Decl. ¶ 2).  Explaining the

17   pay she received, Ms. Corza reported:

18           During the harvest they paid me by hour plus by contract for each box of grapes my
             group picked and packaged.  During other times, when I carried out tipping work and the
19           trimming they only paid me by the hour.  In the tying and pruning seasons they paid me
             by contract and there were times that they paid me by the hour.

20

21   *Id.* ¶¶ 6-7.  Thus, from the information Plaintiffs provided, it is not clear that Ms. Corza received a

22   pure piece rate *during the class period*.  The Court finds, therefore, that Ms. Corza has failed to

23   establish that she has suffered any injury relevant to this proposed class.

24

        ─────────────────────

25       [9] Importantly, the meal and rest break requirements of Wage Order 14 are under review by the California Supreme

26   Court in the case entitled *Brinker Restaurant Corp. v. Superior Court*, 165 Cal.App.4th 25 (2008), *petition for review granted*
     October 22, 2008.  The Ninth Circuit noted, "[T]he resolution of *Brinker* may dictate what California law requires employers

27   must do to comply with California state labor laws regulating employee meals and rest breaks."  *Forrand v. Fed. Express
     Corp.*, 2011 U.S. App. LEXIS 544, at *3 (9th Cir. Cal. Jan. 5, 2011).  As a result, the standards of law regarding meal and

28   rest breaks are uncertain at this time.  However, because the meaning of Wage Order 14 is not determinative here, the Court
     does not attempt to discern the determination that will be made by the California Supreme Court.

On the other hand, Ms. Rosales reported that she "started to work at El Rancho in 2003 approximately and . . . stopped working in 2005 approximately." (Rosales Decl. ¶ 2).  Thus, Ms. Rosales' employment at El Rancho occurred during the class period. (Rosales Decl. ¶ 6).  She asserted she was "paid by contract . . . and sometimes . . . by the hour" during the pruning season. (*Id*.)  Likewise, Ms. Rosales asserted in her declaration that she worked for Garza Contracting during this period without any indication that, at times during this period, she worked for other farm labor contractors. (*Id*.)  Indeed, her declaration implies that she worked only for Gazra.  (*Id*.)

Ms. Rosales has contradicted these assertions.  At her deposition she testified that, in fact, she also worked for farm labor contractor, Golden Grain during the period that her declaration represented she was working only for Garza.  (Rosales Depo. at 10:12-15).  Ms. Rosales produced pay stubs proving this fact that, indeed, she worked *both* for Garza Contracting and for Golden Grain during this time period.  (Estrada Decl., Exh. F).  These same pay stubs demonstrate that *she did not work for a pure piece rate at any time* during any period reflected on the pay stubs.  (*Id*.)

Moreover, Defendant offers evidence demonstrating that the employment periods for the named plaintiffs was different than the "approximate" dates set forth in their declarations.  This evidence shows that "'Angelica Rosales' was paid for labor performed at El Rancho Farms for the work period of July 8, 2004 through August 4, 2004," and "'Margarita Rosales' was paid for labor at El Rancho Farms for the work periods of July 16, 2005 through August 19, 2005." (Stroud Decl. ¶ 11).  Of greater significance is Defendant's evidence set forth in payroll registers produced for Garza Contracting by its payroll service, which demonstrate that Angelica Rosales and Margarita Rosales were paid an hourly wage plus a piece rate production bonus during the applicable periods while working at El Rancho.  (Clarksean Decl., Exhs. A-B).

In reply, Plaintiffs do not refute–or even address–the evidence proffered by Defendant regarding their employment history and wages earned at El Rancho, nor do they explain the contradiction between Margarita Rosales' declaration and the payroll stubs *that she produced*. Rather, Plaintiffs discuss Defendant's failure to keep employment records of Golden Grain employees, which Plaintiffs imply may have shown they worked a pure piece rate.  (Doc. 43 at 22). Regardless of any failure by Defendant to maintain records for various farm labor contractors,

30

Plaintiff's bear the burden of proof on the issue of standing.[10]  "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege *and show* that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 347 (1996) (internal quotation marks and citation omitted) (emphasis added); *Pence v. Andrus*, 586 F.2d 733, 737 (9th Cir. 1978) (named representatives "must allege and show" personal injury).  Consequently, though Plaintiffs had the burden to demonstrate that either named Plaintiff worked for a pure piece rate during which time they failed to receive paid rest breaks, Plaintiffs failed to meet this burden.

Because Plaintiffs failed to meet their burden, the Court will not further analyze whether the class is maintainable under Rule 23.  Plaintiffs' failure to show personal injury defeats Rule 23 requirements.  *See* Fed. R. Civ. P. 23(a)(3) (requiring "the claims or defenses of the representative parties are typical of the claims or defenses of the class"); *see also Hanon*, 976 F.2d at 508 ("The test of typicality is whether other members have the same or similar injury" as the named plaintiffs).  Consequently, the Court recommends that the request to certify this class be **DENIED**.

### B.   The Untimely Rest & Meal Break Class

This proposed class includes field workers "whose rest or meal break was scheduled at noon or later."  (Doc. 37 at 2).  Plaintiffs assert, "El Rancho enforces rest and meal break schedules that contravene the State's break laws, because "the California Labor Code . . . and Wage Order 14 of the Industrial Welfare Commission (IWC) require that meal periods be provided within 5 hours of work."  *Id.* at 2-3.  Specifically, the relevant portions of Wage Order 14 (IWC Order 14-2001) provide:

> 11.  Meal Periods.  Each employer shall authorize and permit all employees after a work period of not more than five (5) hours to take a meal period of not less than thirty (30) minutes, except that when a work period of not more than six (6) hours will complete the

---

[10]Plaintiffs cite *Hernandez v. Mendoza*, 199 Cal.App.3d 721, 727 (Cal.App.2d 1988) and *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 687 (1945) for the proposition that once employee must come forward with anecdotal evidence of the amount of hours worked, the burden shifts to the employer to demonstrate the precise number of hours the employee worked.  However, at issue here is not the precise number of hours worked–or even exactly which hours Plaintiffs worked.  Here, the question presented is whether Plaintiffs have met their burden of proof to demonstrate the Rule 23 factors; namely, commonality and typicality and the overarching issue of standing.

day's work, the meal period may be waived by mutual consent of employer and employee.  Unless the employee is relieved of all duty during a thirty (3) minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked.  An 'on duty' meal period shall be permitted only when the nature of the work prevents and employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal is agreed to.

12.  Rest Periods.  Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period.  The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.  However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours.  Authorized rest period time shall be counted, as hours worked for which there shall be no deduction from wages.

8 Cal. Code Regs. § 11140.  According to Plaintiffs, El Rancho has two schedules for meal and rest breaks: "(1) the meal period is provided at noon . . . or (2) a single rest break is provided at noon with a meal break at 9:00 a.m."  (Doc. 37 at 2).  Therefore, Plaintiffs conclude the policies in place regarding meal and rest breaks at El Rancho are contrary to law.  *Id.* at 2-4.

### 1.   Commonality

Plaintiffs submit anecdotal evidence from the proposed class representatives and putative class members, as well as daily time sheets for Garza Contracting.[11]  (*See* Martinez Decl., Exhs. 4-6).  Ms. Rosales testified she was provided with daily rest breaks at 9:00 a.m. and 2:00 p.m. for ten minutes, with a half-hour lunch break at 12:00 p.m.  (Rosales Depo. at 16:12-20; Rosales Decl. ¶ 8).  Ms. Corza testified she received breaks at 9:00 a.m. and 12:00 p.m. as well, but that her afternoon rest break was at 2:30 p.m.  (Corza Depo. at 10:11-16, 36:23- 37:8).  Further, both Ms. Rosales and Ms. Corza reported working "during [the] lunch hour to meet the box requirement."  (Rosales Decl. ¶ 8; Corza Decl. ¶ 8).

Garza Contracting employees with different foremen reported various meal and rest schedules.  For example, Vicente Cruz and Virginia Cruz reported they had a break at 9:00 a.m. for thirty minutes "to eat" and "lunch break" at 12:00 p.m. for twenty minutes.  (Vicente Cruz Decl. ¶¶ 2, 7; Virginia Cruz Decl. ¶¶ 2, 7).  Angel Lopez Cruz, whose foremen were Enrique and Salomon, reported his "lunch break is always from 12:00 pm for 30 minutes and at 9:00 a.m. they give us 20

---

[11]  Plaintiffs assert daily reports demonstrate rest and meal period violations, but fail to explain the documents provided.  Notably, the daily reports demonstrate only the time a meal period was given, and do not reflect if, or when, a rest break was given.  Thus, the Court must rely upon the anecdotal evidence from the prospective class members.

minutes to eat." (Lopez Cruz Decl. ¶¶ 3, 7).  Angelica Alvarez, whose foreman was Maria, reported "3-4 times a week El Rancho did not provide rest periods." (Alvarez Decl. ¶ 6).  According to Ms. Alvarez, field laborers "had to work during this time—because they forced us to work like this—but we were not paid."  *Id.*

Eight workers employed by Golden Grain at El Rancho all reported, "It was common practice . . . that employees did not take break periods of ten (10) minutes for every four (4) hours or the highest fraction of said hour." (*See, e.g.,* Mosqueda Decl. ¶ 7; Bravo Decl. ¶ 7; Prado Decl. ¶ 7). According to the Golden Grain employees, they were assigned an amount of work to complete, and "if [they] didn't keep pace, [the workers] had to continue working through [the] break periods to be able to catch up with the others."  *Id.*  Further, the Golden Grain employees reported, "It was common practice during [their] employment that employees . . . were required to work at least five (5) hours without a lunch period." (*See, e.g.,* Mosqueda Decl. ¶ 8; Bravo Decl. ¶ 8; Prado Decl. ¶ 8). Maria Luiz Calderon, who was "employed by Garza Contracting and Golden Grain on the El Rancho Farms property," reported that her lunch break "always began 2-3 minutes after 12:00 and they always yelled . . . that the lunch break had ended 2-3 minutes before 12:30 p.m." (Calderon Decl. ¶ 7).  Ms. Calderon reported she worked many times during the meal period "to meet the box requirement."  *Id.*

Defendant argues there is "no common practice or policy regarding daily schedules, meal breaks, or rest breaks" at El Rancho because the daily schedules are left to farm labor contractors.[12] (Doc. 40 at 28).  In addition, Defendant provides declarations from putative class members, 82 of which indicate they have never "worked more than 5 hours without receiving a 30-minute meal break" nor "worked more than 4 hours without receiving a 10-minute rest break." (*See, e.g.,* E.

---

[12]On the other hand, there appears to be no dispute that sometime in late 2007 or early 2008, the meal and rest break periods at El Rancho changed.  At this time, workers began taking their meal period at 9:00 a.m. and a 20-minute rest break in the afternoon.  At the hearing, Plaintiffs argue that there would need to be a determination as to whether each worker was offered a break every day and whether every day they chose to forego the morning break without pressure from El Rancho. Defendants countered that this is exactly the type of individualized determination that militates against a class-wide determination.  The Court agrees.  In any event, neither named Plaintiff worked on El Rancho property at the time that this policy was in effect.  Thus, neither has standing to pursue this sub-class.  Furthermore, Plaintiffs' unsupported request to amend the complaint–at this incredibly late date and in the face of obvious prejudice to Defendants–to add other named Plaintiffs who *would* have standing, is DENIED.

1   Zamora Decl. ¶¶ 6, 8; Maria Garcia Decl. ¶¶ 6, 8; C. Gonzalez ¶ 6, 8; Decl. B. Tinoco Decl. ¶¶ 6,

2   8).[13]  These individuals worked under Garza foremen, including Mariano, Salomon, and Maria, who

3   were also identified as foremen for whom  Plaintiffs' declarants worked.  (*See, e.g.,* B. Sanchez Decl.

4   ¶ 1; Zamora Decl. ¶ 1; Moreno Decl. ¶ 1; R. Perez Decl. ¶ 1).

5       Further, 57 of the declarants indicated: "At all times during my employment, I understood

6   that I was entitled to one 10-minute break for every 4 hours that I worked, and that I was entitled to

7   take the 10-minute rest break as close to the middle of the 4-hour work period as practical."  (*See*

8   *id.*).  Nine reported that they were unaware of their entitlements for the timing of breaks but none of

9   these declarants reported that they did not receive a rest break when they worked four hours.[14]

10   Defendant's declarants uniformly indicated they had not "been required to work during [the] 30-

11   minute meal break," though two reported they were "required to work during [the] 10-minute rest

12   break."  (M. Monjarez Decl. ¶ 7; F. Hernandez Decl. ¶ 7).

13       Importantly, the evidence provided by Plaintiffs and Defendant appears to be directly in

14   conflict.  Previously, this Court noted, "[C]onflicting testimony poses a significant concern for

15   managing [a] class action."  *Garcia v. Sun Pacific Farming Coop.*, 2008 U.S. Dist. LEXIS 111969

16   (E.D. Cal. May 14, 2008), *aff'd* 359 Fed.Appx. 724 (9th Cir. Nov. 13, 2009).  In *Garcia*, the

17   plaintiffs presented seven employee declarations in which employees claimed that the defendant

18   instituted employment policies that required work off-the-clock, failed to permit meal and rest

19   periods, and did not reimburse workers for tool expenses.  In opposition, the defendants presented 33

20   declarations from employees—some of whom were from the same crews as the plaintiff's

21   declarants—who reported they did not work off-the-clock, and that defendants provided meal and

22   rest periods, as well as necessary tools.  *Id.*, 2008 U.S. Dist. LEXIS 111969 at *28-32.  The Court

23   held,

---

26   [13] Due to the volume of evidence, the Court will not list all the declarants, but rather cites a sample.  However, the Court has read and considered each of the admissible declarations provided in support of and in opposition to the motion.

27   [14] *See* F. Lopez Decl. ¶¶ 6, 16; Y. Diaz Decl. ¶¶ 6, 16; V. Monjarez Decl. ¶¶ 6, 16; Martina Garcia Decl. ¶¶ 6, 16;

28   C. Parra Decl. ¶¶ 6, 16; C. Lopez Decl. ¶¶ 6, 16; Castaneda Decl. ¶¶ 6, 16; S. Rameriz Decl. ¶¶ 6, 16; and R. Ayala Decl. ¶¶ 6, 16.

> This conflicting testimony poses a significant concern for managing the class action. Based on the evidence before the Court, there is not consistent application of the wage and hour laws between and among the various Crews. Some persons within a Crew are given  meal and rest breaks, while others in the same Crew are not given meal and rest breaks. Unlike the evidence in *Dukes*, there is no strong evidence of company wide policies and corporate structure. **The evidence before this Court demonstrates significant differences between the crews and individuals and no commonality. Plaintiff is therefore unable to demonstrate commonality.**

*Id*. at *31-32 (emphasis added).

Likewise, in *Arrendondo v. Delano Farms Co.*, 2011 U.S. Dist. LEXIS 44134 (E.D. Cal. Apr. 19, 2011), the Court observed that "conflicting evidentiary support may preclude certification." *Id.*, 2011 U.S. Dist. LEXIS 44134, at *25.  However, in *Arrendondo*, the Court found the evidence was not in conflict, because the defendants' declarants did not identify how long they had been employed by the defendants, or the period of time to which the testimony applied.  *Id.* at *8.  Specifically, the Court observed:

> Each declarant is a current employee, but gives no evidence of the duration of their employment or the time period for which the testimony applies.  The implication is that because the declarants are current employees, and the declarant's declarations are worded in the present tense, the testimony applies for the current employment practices. [Citation].  The declarants do not provide sufficient evidence of labor practices during any period other than the current time period.

*Id.* at *28-29.  Further, the Court noted that plaintiffs presented evidence explaining that the defendants' labor practices changed in 2010, and thus the current labor practices differed from former labor practices.  *Id.* at *29-30.  As a result, the Court found the plaintiffs "offered a reasonable explanation of why, what appears to be conflicting declarant testimony, is not conflicting at all."  *Id.* at *30.

Though Defendant's declarants are all current employees of Garza Contracting, unlike the declarations in *Arrendondo*, each provides information regarding how long the declarant has been employed by Garza Contracting while working at El Rancho–many of which who have worked for Garza for decades–and the identity of the crew foremen.  Moreover, the declarations are not worded in the present tense but speak to the entire time that each worker has been employed by Garza and working at El Rancho.

1    Further, the substance of the evidence here is similar to that presented in *Garcia*.  Field

2    laborers who worked under the same foremen at El Rancho report receiving untimely rest and meal

3    breaks, while others working under the same foremen report receiving timely rest and meal periods.

4    For example, Mariano was the foreman for Vicente Cruz, Balbina Sanchez, Felix Rameriz, and Rosa

5    Perez.  Nevertheless, Ms. Sanchez, Mr. Rameriz, and Ms. Perez reported they never "worked more

6    than 4 hours without receiving a 10-minute rest break" or "worked more than 5 hours without

7    receiving a 30-minute meal break."  Although Ms. Sanchez and Mr. Rameriz are current employees,

8    they have worked at El Rancho since 1998 and would have been subject to either schedule Plaintiffs

9    assert were in place during the class period, yet Ms. Sanchez and Mr. Rameriz allege no untimely

10   rest or meal breaks.  (*See* B. Sanchez Decl. ¶¶ 1, 6, 8; F. Rameriz Decl. ¶¶ 1, 6, 8).  In addition, some

11   laborers report they were required to work through meal or rest periods—in most instances to meet a

12   quantity requirement set forth by the labor contractor foreman—while others report they were not

13   required to work during the meal and rest periods.

14       Given the dissimilarities and conflicting testimony of putative class members, the Court is

15   unable to find a "common contention" that is "capable of classwide resolution."  *See Wal-Mart*, 131

16   S. Ct. at 2551.  Consequently, Plaintiffs have failed to demonstrate commonality.

17               2.  Typicality

18       "The commonality and typicality requirements of Rule 23(a) tend to merge."  *Falcon*, 457

19   U.S. at 157 n.14.  The typicality test inquires whether class representatives "have the same or similar

20   injury" and "have been injured by the same course of conduct" as putative class members.  *Hanon*,

21   976 F.2d at 508.

22       In *Washington v. Joe's Crab Shack*, 271 F.R.D. 629 (N.D. Cal. 2010), the plaintiff alleged

23   wage and hour violations, including untimely meal and rest breaks, and provided declarations of six

24   putative class members.  *Id.* at 633-34.  These declarations were contradicted by declarations

25   provided by the defendant.  *Id.*  For example, 19 of the defendant's declarants reported the defendant

26   "made meal and rest breaks available, but that they sometimes (or always) chose not to take them."

27   *Id.* at 634.  In addition, most of the declarants reported "they have never been asked to work off-the-

28   clock."  *Id.*  Although the court found the plaintiff' established a common question—whether the

1  defendant's practices constitute violations of California law—the plaintiff failed to demonstrate

2  typicality due to the conflicting evidence.  The court observed:

3      [P]laintiff's claims appear to be reasonably co-extensive with those of some of the absent
       class members, or at least with those class members who signed declarations in support
4      of plaintiff's motion.  On the other hand, plaintiff's claims are not co-extensive with
       those of the class members who submitted declarations in support of [the defendant's]
5      opposition to the present motion.

6  *Id.* at 637.  Likewise, in *Garcia*, the Court noted the conflicting evidence defeated a finding that the

7  plaintiff had satisfied the typicality requirement.  *Garcia*, 2008 U.S. Dist. LEXIS 111969, at *36-37.

8  The Court observed the proposed class representatives' claims were "typical of some of the proposed

9  class members but atypical of other of the proposed class members."  *Id.* at *36.

10     Ms. Corza and Ms. Rosales report they were denied timely meal and rest breaks, and had to

11  work through the breaks to meet the quantity requirement.  Plaintiffs assert the typicality requirement

12  is met because "Plaintiffs and many putative class members were all subject to the same practices of

13  Defendant."  (Doc. 43 at 21).  However, as discussed above, many declarants assert they were never

14  denied a rest or meal period, or required to work during one of the breaks, throughout the course of

15  their employment on El Rancho property.  Plaintiffs do not appear "to have the same or similar

16  injury" as many of the putative class members.  Rather, their claims are the same or similar to those

17  asserted by declarants in support of the motion, but different from statements provided by Defendant

18  asserting violations did not occur.  Therefore, Plaintiffs are unable to demonstrate typicality of

19  claims with members of the proposed class.

20         3.   Adequacy of Representation

21     Because Plaintiffs have not satisfied the prerequisites of commonality and typicality under

22  Rule 23(a), Plaintiffs would not be proper representatives of the class.  *See Stearns v. Ticketmaster*

23  *Corp.*, 2011 U.S. App. LEXIS 17454, at *33 (9th Cir. Aug. 22, 2011) (affirming a finding that the

24  named plaintiffs "are not proper class representatives" because their claims were "not typical of the

25  class members").

26  **C.  The Off-the-Clock- Class**

27     This proposed class includes field workers "who washed trays and/or performed work

28  activities before the shift off the clock."  (Doc. 37 at 5).  Plaintiffs assert workers performed

37

uncompensated and unrecorded pre-shift and post-shift work.  *Id.* at 9-10.  Because the off-the-clock work would not be documented, Plaintiffs submit anecdotal evidence to demonstrate the requirements of Rule 23 are satisfied.

Ms. Corza and Ms. Rosales reported that they had to arrive to work approximately 15- 20 minutes before the start "time to prepare the equipment and work area." (Corza Decl. ¶¶ 7, 10; Rosales Decl. ¶¶ 7, 10).  According to Ms. Corza, she had a number of activities to perform before the start time: "[W]hen I arrived I had to carry the trays and scales and take them from the car to the field.  I also had to prepare the table, bags, and boxes that we utilized to package and place labels on the boxes."  (*Id.* ¶ 7); *see also* Rosales Decl. ¶ 7(same).  Plaintiffs reported "daily or almost daily," they were "forced ... to attend a meeting that they called 'school,'" which "[f]requently ... began 5-10 minutes before the start time."  *Id.* At the end of the shift, Ms. Corza said the laborers "continued working 10-15 minutes" after the foreman alerted them the shift was over "to finish the day's assignment and to put away the table, the equipment, and the boxes of grapes."  (*Id.* ¶ 9).  Likewise, Ms. Rosales reported the laborers "continued working 10-30 minutes." (Rosales Decl. ¶9).  Plaintiffs both reported they were not paid for work prior to the start time, and were "only paid up to the hour when [they] finished the shift."  (Corza Decl. ¶¶ 7, 9; Rosales Decl. ¶¶ 7, 9-10).

In addition, Plaintiffs contend the workers were "regularly required to clean grape-harvesting trays on their own time—typically at home—during harvest."  (Doc. 37 at 10).  Ms. Corza reported that during the harvest, she was required to take trays home every night, and two to three days a week she took home 12 trays to wash.  (Corza Decl. ¶ 11).  Similarly, Ms. Rosales reported she was required to take trays home nightly, and she took approximately 12 trays home about six times a week.  (Rosales Decl. ¶ 11).  Plaintiffs reported, "The foreman inspected our trays each morning and if they were dirty, he did not let us work."  (*Id.*; Corza Decl. ¶11).

### 1.  Commonality

Plaintiffs provide declarations of putative class members corroborating their testimony, which Plaintiffs assert demonstrates "a practice whereby employees perform uncompensated and unrecorded pre and post-shift work during the harvest and pre-harvest." (Doc. 37 at 21).  Declarants provide information about when they were required to come to work, when "school" began, what set

up and clean up was required off the clock, and how many trays they took home to clean.  Each of Plaintiffs' putative class members assert they were required to work before the official start of the shift and after the official end, and a majority took trays home for cleaning.  (*See, e.g.,* Virginia Cruz Decl. ¶ 5; M. Luiz Calderon Decl. ¶ 5, 8-10; A. Alvarez Decl. ¶ 7, 9-10; A. Prado Decl. ¶ 5).  For example, Mr. Cruz testifies, "I have to arrive to work approximately 10 to 15 minutes before the start time to prepare the equipment and the work area," and "there were occasions [o]n which we were asked to arrive 30 minutes before."  (Vicente Cruz Decl. ¶¶ 6).  Mr. Cruz reported the "school" always began ten minutes before the shift, and they were required to attend six days a week.  (*Id.* ¶ 9).  Further, Mr. Cruz stated he had to wash four trays at home, about three times per week.  (*Id.* ¶ 10).  Similarly, Ms. Alvarez reported "the foreman forced [her] to arrive to work approximately a half an hour before the official start time," during which time she was required "to arrange [her] equipment, including carrying the trays from the car to the field and/or attending the school."  (A. Alvarez Decl. ¶ 7).

On the other hand, Defendants provide evidence that the workers at El Rancho were not and are not required to perform off-the-clock work such as set-up before shifts, cleaning after shifts, or taking home trays to clean.  Ms. Tinoco reported, "Garza Contracting prohibits any work off the clock."  (O. Tinoco Decl. ¶ 9).  Ms. Tinoco reported, "Field laborers were and are prohibited from setting up" and "were prohibited from doing any of the clean up after the scheduled work day."  (*Id.* ¶¶ 11, 13).  According to Ms. Tinoco, this work was completed by the field supervisor (herself) and the Garza Contracting foremen, who "set up tables, umbrellas, and everything else necessary for field laborers to perform their duties," and "clean[ed] up all of the equipment and work stations."  (*Id.* ¶¶ 11, 13).  In addition, Ms. Tinoco and Mr. Kovacevich testified the workers were not required to clean trays at home.  (*Id.* ¶ 13; Kovacevich Depo. at 34:10-20).  Specifically, Mr. Kovacevich reported the workers had the option of either leaving their trays with the foreman or taking the trays home.  (Kovacevich Depo. at 34:10-20; 35:6-10).  If the trays were taken home, it was not for the purpose of cleaning them and there was no requirement that the trays be kept clean.  (*Id.*)  Mr. Kovacevich testified that he informed Garza in 2007 that if El Rancho wanted the trays cleaned, El Rancho would provide supplies to clean them during working hours.  (*Id.*)  Likewise, Ms. Garza

reported, "Field laborers are given the option to either leave their trays on the field, take them home, or give them to their foremen for cleaning."  (Garza Decl. ¶ 19).

In addition, Mr. Casimiro and Ms. Tinoco reported the farm labor contractors began the "school" training sessions the once work day commenced.  (Casimiro Depo. at 224:6-9; O. Tinoco Decl. ¶ 10).  Specifically, Ms. Tinoco reported, "Garza Contracting gave training sessions every day at the start of the scheduled work day.  The training sessions were never given off-the-clock, and Garza Contracting employees were always paid for any training."  (O. Tinoco Decl. ¶ 10).

Further, the declarations of putative class members provided by Defendant refute the facts set forth by Plaintiffs' declarants.  For example, according to putative class member Lilia Garcia, "Trainings always began at the scheduled start time," and "set up . . . was done 'on the clock.'" (*Id.* ¶¶ 2-3).  Notably, *each* of Defendant's 71 declarants indicated they have never been "required to work 'off the clock' without pay," by doing  "work" that included "attending trainings or crew meetings, arriving early for set up, and cleaning trains.  (*See, e.g.,* B. Sanchez Decl. ¶ 2; E. Zamora Decl. ¶ 2; R. Perez Decl. ¶ 2; F. Rameriz; Decl. ¶ 2; L. Garcia Decl. ¶5).  Ms. Garcia explained, "I was never required or asked to take my grape trays home to clean them.  I was always given the option of taking my grape trays home, but I was also given the option to leave my grape trays with Garza Contracting, Inc. for cleaning."  (L. Garcia ¶ 4).

Thus, to construe this evidence, the Court must conclude that some workers were required to work off-the-clock to do tasks such as performing set up or clean up, cleaning trays, or attending training and crew meetings.  However, nearly three times the number of people who make these claims, were not required to work off-the-clock.  Consequently, Plaintiffs have failed to demonstrate the commonality of claims under this proposed class.

### 2.   Typicality and Adequacy of Representation

Although the plaintiffs and putative class members were employed at El Rancho and, as a result, were likely subject to the same policies and procedures, the testimony of farm laborers and others provides a vastly different account of what was required of them.  This demonstrates, not a common policy or practice, but practices that varied from worker to worker.  Because of this, Plaintiffs' claims are typical of some putative class members, while atypical of others who assert

they have never been required to work off-the-clock without pay while working at El Rancho.  Thus, the Court does not find that Plaintiffs have satisfied the typicality requirement of Rule 23(a). Further, because Plaintiffs' claims are not typical of the proposed class, they would not be proper representatives.

Consequently, the Court recommends that the request to certify this class be **DENIED**.

**D.   The Tool Class**

This proposed class includes workers "who purchased work tools." (Doc. 37 at 6).  Under California law, "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." *Id.* at 21 (quoting Cal. Labor Code § 2802(a)).  Accordingly, the class definition is intended to include workers who "are required to purchase, without reimbursement, tools and equipment necessary to perform their jobs." *Id.* at 6.

Plaintiffs report they were "not provided with all the necessary tools to carry out [the] job." (Corza Decl. ¶ 12; Rosales Decl. 12).  Ms. Corza and Ms. Rosales each reported, "I had to purchase scissors for picking, a case for the picking sheers and pruning shears," without reimbursed for the cost of the tools.  *Id*.

1.   Commonality

Plaintiffs assert, "Testimonial evidence from workers demonstrates the practice of failing to provide needed tools and equipment or to reimburse employees who had to purchase these tools." (Doc. 37 at 6-7).  According to Plaintiffs, "Class Member declarations state that they incurred expenses related to their work by having to buy tools." *Id.* at 21.

The eight putative class members who asserted they were not provided with all the necessary tools identified several tools they purchased for work at El Rancho.  For example, Vicente Cruz reported he "had to purchase scissors for picking, pruning shears and gloves." (Vicente Cruz Decl. ¶ 11). Virginia Cruz reported she "had to purchase scissors for tipping, gloves and glasses." (Virginia Cruz Decl. ¶ 7).  Maria Luiz Calderon reported she "had to purchase pruning shears, covers for the scissors, [and] glasses for the trimming and pruning." (Luiz Calderon Decl. ¶ 11).  Angelica Alvarez reported she "had to buy covers for the scissors during [her] employment at El Rancho." (A. Alvarez

1    Decl. ¶ 11).

2         Defendant argues Plaintiffs fail "to provide significant proof of commonality among the

3    putative class members.  (Doc. 40 at 24).  Further, Defendant argues the farm labor contractors

4    supply the necessary tools to workers.  *Id.*  According to Ms. Garza, her company "has always

5    supplied its employees with all tools necessary to perform their duties," and the "field laborers are

6    supplied with pruning shears, picking scissors, glasses and gloves." (Garza Decl. ¶ 20).  As evidence

7    of this practice, Ms. Garza produced transaction receipts for purchases made by Garza Contracting

8    for these tools between 2006 and 2011.  (Garza Decl., Exh. A).  Further, Ms. Garza reported

9    "Provision of tools to field laborers is one thing that the Labor Commissioner's field inspectors

10   inspeft for a field inspections. . . [and] Garza has never been cited for failure to provide tools to its

11   employees." (Garza Decl. ¶ 21).  Ms. Garza attested that whenever work occurs, there is a "box of

12   tools and equipment that Garza Contracting keeps at the field during working hours."  (*Id*.)

13   Similarly, Mr. Casimiro reported that Golden Grain provided "[w]hatever tools the workers need,"

14   though he observed some workers preferred their personal tools rather than those provided by

15   Golden Grain.  (*See* Casimiro Depo. at 159:24- 160:4).

16        Declarations of field workers support the assertion that the tools were provided for them.

17   Lilia Garcia, for example, reported she "was never required to purchase any tools necessary to

18   perform [her] job duties.  All equipment was provided to [her] by Garza Contracting, Inc., including

19   clippers, gloves, and safety classes, amongst other things."  (L. Garcia Decl. ¶ 6).  Further, Ms.

20   Garcia reported she "received a new pair of clippers every year from Garza Contracting . . . [and]

21   understood that if any of [her] equipment or tools broke or became defective, Garza Contracting, Inc.

22   would replace the equipment or tools immediately."  (*Id.* ¶ 7).  In addition, each of Defendant's

23   declarants indicated they have never "been required . . . to purchase hand tools that are necessary to

24   perform [the] employment duties. . ." (*See, e.g.,* B. Sanchez Decl. ¶ 10; Zamora Decl. ¶ 10; Moreno

25   Decl. ¶ 10; R. Perez Decl. ¶ 10).  Thus, 71 individuals working for Garza Contracting on El Rancho

26   property assert they have never been required to purchase tools without reimbursement.  Further,

27   none of Plaintiff's declarants who worked through Golden Grain, assert they were required to

28   purchase tools for work at El Rancho.

1    Though the number of declarants providing contradictory evidence is significant, the more

2    troublesome fact is that these field laborers contend they have never been required to purchase hand

3    tools that were necessary to perform the required work.  Plaintiffs contend that "there is a common

4    question as to whether El Rancho failed to provide adequate tools and expected their employees to

5    incur these costs."  (Doc. 37 at 21).  However, this contention misses the mark.

> [The] common contention, moreover, must be of such a nature that it is capable of
> classwide resolution—which means that determination of its truth or falsity will resolve
> an issue that is central to the validity of each one of the claims in one stroke.  What
> matters to class certification is not the raising of common questions–even in droves—but,
> rather the capacity of a classwide proceeding to generate common *answers* apt to drive
> the resolution of the litigation.  Dissimilarities within the proposed class are what have
> the potential to impede the generation of common answers.

10   *Wal-mart*, 131 S. Ct. at 2551.  Given the conflicting evidence, the Court is unable to conclude that

11   class litigation can provide a common answer to whether tools were provided to the field laborers, or

12   whether the laborers were required to purchase necessary tools.  Consequently, Plaintiffs have failed

13   to demonstrate commonality.

14                        2.   Typicality and Adequacy of Representation

15   Once again, farm laborers provide contradictory statements regarding the policy of tool

16   distribution, or lack thereof, at El Rancho.  Because of this, Plaintiffs' claims are typical of some

17   putative class members, while atypical of others who assert they have never been required to

18   purchase necessary tools.  The dissimilarities in the claims of field laborers defeats finding that

19   Plaintiffs have satisfied the remaining requirements of Rule 23(a).

20   Once again, therefore, the Court recommends that the request to certify this class be

21   **DENIED**.

22   **IX.   FINDINGS AND RECOMMENDATION**

23   As set forth above, Plaintiffs have failed to show Defendant is a joint employer with its farm

24   labor contractors.  Moreover, even if joint employment was proven, Plaintiffs have not demonstrated

25   the Rule 23 prerequisites are satisfied for the four proposed classes.  First, Plaintiffs are unable to

26   raise a claim on behalf of the "Unpaid Rest Break Class," because they were not paid a pure piece

27   rate during their employment at El Rancho.  Second, contradictory evidence and dissimilarities

28   defeat a finding that there is a commonality of claims in the remaining classes, because the Court

1   cannot find there would be a common answers that are capable of classwide resolution.  Further, the

2   contradictory evidence refutes a finding that Plaintiff's claims are typical of the classes, or that

3   Plaintiffs would be adequate representatives.  Because the Rule 23(b) requirements are evaluated

4   only after the prerequisites of Rule 23(a) are met, an analysis of Rule 23(b) is unnecessary.

5          Accordingly, **IT IS HEREBY RECOMMENDED**: Plaintiffs' motion for class certification

6   and appointment of class counsel be **DENIED**.

7          These Findings and Recommendations are submitted to the United States District Judge

8   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the

9   Local Rules of Practice for the United States District Court, Eastern District of California.  Within

10  fourteen days after being served with these Findings and Recommendations, any party may file

11  written objections with the court.  Such a document should be captioned "Objections to Magistrate

12  Judge's Findings and Recommendations."  The parties are advised that failure to file objections

13  within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*,

14  951 F.2d 1153 (9th Cir. 1991).

15

16  IT IS SO ORDERED.

17  Dated:   **December 12, 2011**                                    **/s/ Jennifer L. Thurston**
                                                                     UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28