1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  MARGARITA ROSALES, et al., | ) Case Nos.: 1:09-cv-00707-AWI-JLT |
| 12          Plaintiffs, | ) FINDINGS AND RECOMMENDATIONS |
| 13          v. | ) GRANTING FINAL APPROVAL OF CLASS |
| | ) SETTLEMENT (Doc. 184) |
| 14  EL RANCHO FARMS, et al., | ) |
| 15          Defendants. | ) FINDINGS AND RECOMMENDATIONS |
| | ) GRANTING IN PART PLAINTIFFS' MOTION |
| 16 | ) FOR ATTORNEY FEES (Doc. 185) |
| 17  ANGEL LOPEZ CRUZ, et al., | ) |
| 18          Plaintiffs, | ) |
| 19          v. | ) |
| 20  EL RANCHO FARMS, et al., | ) |
| 21          Defendants. | ) |

22          Plaintiffs Margarita Rosales and Angelica Rosales[1] seek final preliminary approval of a class

23  settlement reached with El Rancho Farms and Garza Contracting Inc. (Doc. 184)  In addition, Plaintiffs

24  seek an award of attorneys' fees and costs, claims administration costs, and class representative

25  enhancement payments from the settlement fund.  (Doc. 185)

26          Because Plaintiffs carry their burden to demonstrate certification of the Settlement Class is

27

28  _____

[1] The true and correct name of "Angelica Rosales" is "Maria Lorena Corza Alvarado," though she is known as "Lorena Corza."  Ms. Corza reports she used the name of her daughter, "Angelica Rosales," while working at El Rancho. (Doc. 35-7 at 3). Therefore, the Court will refer to plaintiff "Angelica Rosales" as "Lorena Corza."

1

1   appropriate under Rule 23 of the Federal Rules of Civil Procedure and that the settlement terms are fair,

2   reasonable, and adequate, the Court recommends that Plaintiffs' request for final approval of the

3   Settlement be **GRANTED**.  In addition, the Court recommends that Plaintiff's request for attorney fees

4   be **GRANTED** in the modified amount of $690,089.65; costs be awarded in the amount of $36,620.54;

5   and Plaintiffs' request for enhancement payments be **GRANTED** in the modified amount of $7,500 for

6   Margarita Rosales and Lorena Corza, and $4,000 for Angel Lopez Cruz and Angelica Alvarez.

7   **BACKGROUND**

8            On March 5, 2004, Arnaldo Lara, Mario Laveaga, Mirna Diaz, Paula Leon, and Raul Diaz,

9   individually and acting for the interests of the general public, ("Lara Plaintiffs") initiated an action in

10  the Kern County Superior Court against Rogelio Casimiro, doing business as Golden Grain Farm

11  Labor.[2]  On September 12, 2005, the Lara Plaintiffs filed a second amended complaint and identified

12  other employers of agricultural farm workers as defendants, including El Rancho Farms; Stevco, Inc.;

13  Lucich Family Farms; and Castlerock Farming and Transport, Inc.

14           On November 9, 2005, Plaintiffs' counsel initiated an action against table grape growers based

15  in Kern County, including D.M. Camp & Sons; Marko Zaninovich, Inc.; Sunview Vineyards of

16  California, Inc.; and Giumarra Vineyards Corporation.[3]  (*Doe v. D.M. Camp & Sons*, Case No. 1:05-

17  cv-1417-AWI-SMS, Doc. 2)  At the time the complaint was filed, the plaintiffs were unnamed former

18  and current employees of the defendants.  (*See id.*)  On December 6, 2005, the plaintiffs filed a First

19  Amended Complaint, identifying additional defendants, including El Rancho Farms.  (*Doe*, Doc. 9)

20  The Court acknowledged the *Doe* matter was related to several other cases initiated against grape

21  growers.  *See Doe v. D.M. Camp & Sons*, 624 F.Supp.2d 1153 (E.D. Cal. 2008).

22           Defendants in *Doe*, including El Rancho Farms, filed motions to dismiss, which were granted

---

[2] The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  The record of a court proceeding is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records. *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), *aff'd* 645 F.2d 699 (9th Cir. 1981); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236m 1239 (4th Cir. 1989); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980).  Therefore, judicial notice is taken of the original Complaint and the Second Amended Complaint filed in *Lara v. Casimiro*, case number S-1500-CV-252445-SPC.  In addition, judicial notice is taken of the state court's docket of the *Lara* action, available at http://www.kern.courts.ca.gov.

[3] For the reasons set forth above in Footnote 2, judicial notice is taken of the Court's docket in *Doe v. D.M. Camp & Sons*, Case No. 1:05-cv-01417-AWI-SMS.

2

by the Court on March 31, 2008. (*Doe*, Docs. 81, 168) In addition, the Court granted motions to sever the action, and the Court ordered the plaintiffs to file amended pleadings against each defendant. (*Id.*) On May 29, 2008, "Angelica Rosales" and Margarita Rosales were identified as plaintiffs in the Third Amended Complaint against El Rancho Farms. (*Doe*, Doc. 173) On March 31, 2009, the Court ordered Plaintiffs to re-file in a new action within twenty days to finalize severance. (*Doe*, Doc. 241)

On April 20, 2009, Plaintiffs filed their complaint against El Rancho Farms, alleging: violations of the Agricultural Workers Protection Act, 29 U.S.C. § 1801; failure to pay wages; failure to pay reporting time wages; failure to provide meal and rest periods; failure to pay wages of terminated or resigned employees; knowing and intentional failure to comply with itemized employee wage statement provisions; penalties under Labor Code § 2699, *et seq.*; breach of contract; and violation of unfair competition law. (Doc. 1) Plaintiffs brought the action "on behalf of Plaintiffs and members of the Plaintiff Class comprising all non-exempt agricultural, packing shed, and storage cooler employees employed, or formerly employed, by each of the Defendants within the State of California." (*Id.* at 4)

In compliance with the Court's deadline for seeking class certification, Rosales and Corza filed a motion on September 9, 2011. (Doc. 33) Rosales and Corza sought certification of classes for unpaid rest breaks, untimely rest and meal breaks, off-the-clock work, and tool reimbursement. Each class included "fieldworkers employed or jointly employed by El Rancho." (*Id.*) However, Rosales and Corza failed to show El Rancho was a joint employer of the fieldworkers, as required by the class definitions. Further, they failed to demonstrate they worked a pure piece rate basis, and the Court found Rosales and Corza lacked standing to represent the unpaid rest break class. Finally, conflicting evidence defeated certification of the remaining classes. The recommendations were adopted in full on January 31, 2012, and the motion for class certification was denied. (Doc. 56)

Rosales and Corza filed a motion for reconsideration based upon additional evidence, seeking to demonstrate El Rancho and Garza Contracting were joint employers. (Doc. 60) Plaintiffs "abandoned the allegations of rest break violations to focus on the meal schedule" and abandoned claims of workers employed at El Rancho by farm labor contractors other than Garza. (Doc. 95 at 5) On July 6, 2012, the Court found the evidence presented by Plaintiffs was not new, and "[r]econsideration of the issues based upon new evidence is not warranted." (Doc. 95 at 4) Further, the Court affirmed its prior order

3

denying certification of classes based unpaid rest breaks, untimely rest and meal breaks, off-the-clock work, and tool reimbursement. (*Id.* at 9) However, the Court granted Plaintiffs leave "to file a second motion for class certification with respect to meal periods of Garza employees who worked at El Rancho facilities." (*Id.*) Accordingly, Rosales and Corza filed a second motion for class certification on July 26, 2012. (Doc. 96)

The Court found the requirements of Rule 23 of the Federal Rules of Civil Procedure were satisfied, and recommended a class be certified for only for the meal break claim. (Doc. 106) These recommendations were adopted in full, and the class defined as: "All employees of Garza Contracting, Inc. who worked at El Rancho Farms facilities from 11/9/2001 through 12/31/2008 and who were provided a 12:00 noon meal break on shifts starting before 7:00 a.m." (Doc. 112) Rosales and Corza were appointed as class representatives, and the law firm of Mallison & Martinez was appointed as Class Counsel. (*Id.* at 6)

Following the Court's determination that Rosales and Corza lacked standing to represent a class for rest break violations, Angel Lopez Cruz and Angelica Alvarez initiated an action against El Rancho Farms and Garza for failure to provide rest periods on November 28, 2012. (Case No. 1:12-cv-1934-AWI-JLT ("Cruz") Doc. 1) In addition, Cruz and Alvarez asserted El Rancho and Garza were liable for violations of the Agricultural Workers Protection Act, failure to pay wages, failure to pay wages of terminated or resigned employees, knowing and intentional failure to comply with itemized employee wage statement provisions; penalties under Labor Code § 2699, and violation of unfair competition law—similar to the claims presented by Rosales and Corza. (*See id.*) El Rancho and Garza filed motions to dismiss, arguing the action was duplicative in nature and "an attempt by plaintiffs to certify a subclass that was previously denied certification." (*See Cruz*, Doc. 13 at 2) Although the motions were taken under submission, the Court did not have the opportunity to issue a ruling.

On June 20, 2014, the parties filed a Notice of Settlement, reporting they "participated in a private mediation session on June 11, 2014 with a private mediator, David Rudy," and were "in the final stages of negotiating a Proposed Settlement Agreement." (Doc. 159 at 1-2) Given the similarities between the claims presented in *Rosales v. El Rancho Farms* (Case No. 1:09-cv-00707-AWI-JLT) and *Cruz v. El Rancho Farms* (Case No. 1:12-cv-1934-AWI-JLT), the parties mediated the actions together.

1  (Doc. 161 at 4)

2    The Court granted preliminary approval of the proposed settlement on November 26, 2014.

3  (Doc. 173)  The Settlement Class was defined as: "all persons who have been employed or jointly

4  employed by Garza Contracting at El Rancho Farms facilities between November 9, 2001 and June 11,

5  2014."  (Doc. 165 at 16; Settlement § I.D)  In addition, Margarita Rosales, Lorena Corza, Angel Lopez

6  Cruz, and Angelica Alvarez were appointed the Class Representatives, and authorized to seek

7  enhancement payments up to $10,000 for their representation of the class.  (Doc. 173 at 22)  Stan

8  Mallison and Hector Martinez were appointed as Class Counsel, and authorized to seek fees that did

9  not "exceed 33 1/3% of the gross settlement amount" and "costs up to $50,000." (*Id*.)  Gilardi and Co.,

10  LLC was appointed the Settlement Administrator.  (*Id*.)  On December 8, 2014, the Court approved the

11  Class Notice Packet that conveyed this information to class members.  (Doc. 177)

12    On January 9, 2015, the parties requested a sixty-day extension of time to prepare the class data

13  and provide it to the Settlement Administrator.  (Doc. 178)  The Court approved an extension of time,

14  and directed Plaintiff to prepare and file an amended notice to the class.  (Doc. 179)  However, in April

15  2015, the parties informed the Court that the estimated number of class members increased from 3,000

16  to approximately 6,900.  (Doc. 182 at 3)  Therefore, the parties requested a further extension of the

17  deadlines related to the class notice, which was granted.  (Doc. 183)

18    On April 20, 2015, the Settlement Administrator mailed the Class Notice Packet to class

19  members.  (Doc. 184-3 at 2, McGill Decl. ¶ 3)  The Postal Service returned 1,224 of the packets to the

20  Settlement Administrator.  (*Id.*, ¶ 5)  Gilardi sought new addresses and re-served 552 of the Notice

21  Packets, of which 70 were again retuned as undeliverable.  (*Id*.)  As of July 10, 2015, the Settlement

22  Administrator "received 992 timely claim forms and 48 late claim forms."  (Doc. 198-1 at 2, McGill

23  Supp. Decl. ¶ 3)  No objections were filed with the Court or mailed to the Settlement Administrator.

24  (Doc. 184-3 at 4, McGill Decl. ¶ 14)

25    Plaintiffs filed the motion for final approval of the class settlement terms on June 19, 2015.

26  (Doc. 184)  In addition, Plaintiffs filed their motion for attorneys' fees costs, and class representative

27  enhancement payments on June 26, 2015.  (Doc. 185)  Defendants filed an opposition to the Settlement

28  on July 2, 2015, asserting uncashed checks should be distributed to cy pres beneficiaries of Defendants'

choosing, rather than Plaintiff's choice.  (Doc. 195)  Plaintiffs filed a brief in reply on July 13, 2015.[4]
(Doc. 199)

### THE PROPOSED SETTLEMENT

Pursuant to the proposed settlement ("the Settlement"), the parties agree to a gross settlement totaling $2,300,000.  (Doc. 184-1 at 7; Doc. 166-1 at 3, Settlement § I.S)  El Rancho and Garza agree to fund the Settlement for a class including "all persons who have been employed or jointly employed by Garza Contracting at El Rancho Farms facilities between November 9, 2001 and June 11, 2014."  (Doc. 166-1 at 1; Settlement § I.D)  Defendants agreed to fund the Settlement no later than January 31, 2015.  (Doc. 166-1 at 13, Settlement § III.I.6)

## I.      Payment Terms

The gross settlement fund will cover payments to class members with additional compensation to the Class Representatives.  (Doc. 166-1 at 5-6, Settlement § III.B) Further, the Settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement Administrator, and the California Labor & Workforce Development Agency.  (*Id.*)  Specifically, the Settlement provides for the following payments from the gross settlement amount:

- The Class Representatives will receive up to $10,000 each;

- Class counsel will receive no more than $766,667 for attorneys' fees, which equals 33.33% of the gross settlement amount, and $50,000 for expenses;

- The California Labor and Workforce Development Agency shall receive $30,000 from the award pursuant to PAGA; and

- The Settlement Administrator will receive compensation for its fees and expenses.

(Doc. 166-1 at 5-6, Settlement § III.B)  After these payments have been made, the remaining money ("Net Settlement Amount") will be distributed as settlement shares to Class Members.  (*Id.*)

To receive a settlement share from the Net Settlement Amount, a class member must submit a

---

[4] Plaintiffs' reply brief was untimely.  Pursuant to Local Rule 203(d), a party may file a reply "[n]ot less than seven (7) days preceding the date of hearing."  Seemingly, counsel is unaware of the lateness of Plaintiffs' response given they offer absolutely no explanation for the late filing, do not seek leave for the filing of the late reply and do not, even, argue that the late filing should be considered.

timely and valid claim form.[5]   According to Plaintiff's preferred methodology, settlement shares will be calculated based upon:

> (a) that Claimant's total pay periods (or if necessary, the number of Months of Employment) during the Class Period (b) divided by the aggregate number of pay periods (or if necessary, the number of Months of Employment) of all Participating Class Members (all class member claims) during the Class Period (with the division rounded to four decimal places) (c) multiplied by the value of the Net Settlement Amount.

(Doc. 166-1 at 7, Settlement § III.F.1)  Under Defendant's proposal, a claimant's total pay period is divided by the total number of pay periods placed at issue in the complaint and then multiplied by the Net Settlement Amount.  (Doc. 166-1 at 7, Settlement § III.G.1)  Consequently, under Plaintiff's methodology the exact amount each Class Member would receive depends upon the aggregate number of pay periods worked by all of those who submitted timely and valid claim forms.  Under Defendants' proposal, the amount each claimant would receive depends entirely on the number of pay periods the member worked.  For the reasons set forth below, the Court recommends Plaintiff's methodology be adopted.

## II.     Releases

The Settlement provides that Rosales, Corza, Cruz, and Alvarez (collectively, "Plaintiffs") and Class Members, other than those who elect not to participate in the Settlement, at the time final judgment is entered, shall release Defendants El Rancho and Garza from the claims arising in the class period.  Specifically, the release for class members provides:

> As of the date of the Judgment, all Participating Class Members hereby fully and finally release Defendants, and their partners, owners, subsidiaries, employees, officers, directors, agents, attorneys, stockholders, fiduciaries, other service providers, and assigns, from any and all claims, known and unknown, for or related to all claims based on or arising from the allegations that they were or are improperly compensated under federal, California, or local law (the "Class's Released Claims"). The Class's Released Claims are limited to the time period November 9, 2001 to June 11, 2014 for claims for alleged unpaid wages, overtime compensation, missed meal-period and rest-break wages or penalties, and interest; related penalties, recordkeeping penalties, pay-stub penalties, minimum-wage penalties, missed meal-period and rest-break penalties, and waiting-time penalties; and costs and attorneys' fees and expenses. The Class Member's Released Claims include all claims arising from or related to the matters alleged in the Actions, or that could have been alleged in the Actions.

---

[5] Although Plaintiffs reported Defendants did not agree upon the proposed claim procedure, El Rancho reported it did "not prefer the direct delivery of checks over a claims procedure, or vice versa."  (Doc. 171-1 at 4)

7

(Doc. 166-1 at 15, Settlement § III.J.2)  The release for Plaintiffs encompasses more claims than the release of Class Members, because Plaintiffs release any claims that could have arisen during the course of their employment with Defendants.  (*Id.*, Settlement § III.J.1)  Specifically, Plaintiffs' release provides:

> As of the date of the Judgment, Plaintiffs and their Counsel hereby fully and finally release Defendants, and their partners, owners, subsidiaries, employees, officers, directors, agents, attorneys, stockholders, fiduciaries, other service providers, and assigns, from any and all claims, known and unknown, including but not limited to claims arising from or related to their employment or claimed employment with Defendants, their compensation while employed as Defendants' employee, under federal, state and/or local law, statute, ordinance, regulation, common law, or other source of law (the "Plaintiffs' Released Claims").  The Plaintiffs' Released Claims include, but are not limited to, all claims arising from or related to the matters alleged, or that could have been alleged in the Actions.  The Plaintiffs' Released Claims include all such claims covering the time period November 9, 2001 to June 11, 2014 for unpaid wages, including overtime compensation, missed meal-period and rest-break wages, and interest; penalties, including but not limited to, recordkeeping penalties, pay-stub penalties, minimum-wage penalties, missed meal-period and rest-break penalties, and waiting-time penalties; and attorneys' fees and expenses. The Plaintiffs' Released Claims include all claims arising from or related to the matters alleged in the Actions, or that could have been alleged in the Actions.

(*Id.*, emphasis added)  Thus, claims released by Plaintiffs, but not Class Members, include any claims arising under the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Employee Retirement Income Security Act.

## III.     Service of the Notice Packets and Responses Received

The Court ordered the Settlement Administrator to mail the Class Notice Packet to the class members no later than April 20, 2015.  (*See* Doc. 183 at 3)  The Class Notice Packet—including the Class Notice, Claim Form and Exclusion Request Form—explained the nature of the action, the class definition approved by the Court, the claims and issues to be resolved, the deadlines applicable to Class Members, and the binding effect of a class judgment.  Each class member received an estimate of his or her settlement based upon the months of employment.  (*See generally* Doc. 180)  In addition, the Class Notice Packet explained individuals may object to the settlement or elect to be excluded from the class, and the time and method to file objections or return the Exclusion Request Form to the Settlement Administrator.  (*See id.* at 8-9)

According to Maggie McGill, an employee of Gilardi & Co. LLC, the Class Notice Packets were "printed in both English and Spanish and mailed to the 6,692" Class Members on April 20, 2015.

(Doc. 184-3 at 2, McGill Decl. ¶ 3)  Ms. McGill reports that the United States Postal Service returned 1,224 Notice Packets as "undeliverable" to the Settlement Administrator.  (*Id.*, ¶ 5)  Gilardi performed address searches and found updated mailing addresses for 552 class members, who were re-served with the Notice Packet.  (*Id.*)  However, "70 were returned once again as undeliverable."  (*Id.*)

Following service of the Class Notice Packet, the Settlement Administrator "received 992 timely claim forms and 50 late claim forms."[6]  (Doc. 200 at 2, McGill Supp. Decl. ¶ 3)  Although the Settlement Administrator received 70 requests for exclusion, "37 Class Members concurrently submitted a Claim Form."  (Doc. 184-3 at 4, McGill Decl. ¶ 13)  Ms. McGill reports Gilardi contacted the class members who returned both a claim form and a request for exclusion "to determine their intent," and counsel agreed that these would be considered valid claims. (Doc. 200 at 3, ¶ 8)  No objections were received by the Settlement Administrator.  (Doc. 184-3 at 4, McGill Decl. ¶ 14)

**IV.    Method of Settlement Share Distribution and the Cy Pres Beneficiary**

Generally, parties should have a plan for distributing unclaimed funds because many class action settlements result in unclaimed funds. *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990).  The options for such distribution include cy pres distribution, escheat to the government, and reversion to the defendants.  *Id.*, 904 F.2d at 1307.  Here, Plaintiffs and Defendants have agreed that a cy pres recipient should be designated for funds under the Settlement, but again seek the Court's intervention related to their disputes concerning the identity of the beneficiary, and what funds should be directed to the cy pres beneficiary.  Previously, the Court determined it would be appropriate for both uncashed and unclaimed funds to go to the cy pres beneficiary.  (Doc. 173 at 10)  The Court opined a pro rata distribution, as proposed by Plaintiffs, was impractical because the described method would require the Settlement Administrator "to calculate each claimant's share of the unclaimed funds and uncashed checks, and send a second payment to each of the class members."  (*Id.*)

In seeking final approval of the Settlement, Plaintiffs renew their request that the funds be distributed on a pro rata basis to the class members who have made valid claims.  (Doc. 184-1 at 12)

---

[6] The parties have agreed to deem the untimely Claim Forms that were postmarked after the deadline as valid. (Doc. 198)

1    Plaintiffs explain the entire net settlement would be distributed to Class Members, which would require

2    "only one distribution with all funds added in one check."  (*Id.* at 13)  Plaintiffs contend this method

3    "ensures that a high percentage of net settlement funds actually go to the Class."  (*Id.*)  Finally,

4    Plaintiffs contend that the funds from uncashed checks should go to the California Rural Legal

5    Assistance.  (*Id.* at 15-18)

6          On the other hand, Defendants oppose distribution on a pro rata basis, asserting that method of

7    distribution is not preferable to the cy pres beneficiary receiving all unclaimed funds.  (Doc. 195 at 4-6)

8    According to Defendants, distribution of the funds to the Class Members on a pro rata basis "would

9    result in a windfall to the relatively low number of members making claims in this action." (*Id.* at 6)

10   Defendants explain, "The participating class members comprise just less than 15% of the total class.  If

11   the settlement covers nearly all of the wage claims, then participating class members have been made

12   nearly whole by receiving their calculated distribution."  (*Id.*)  Further, Defendants assert that "a pro

13   rata distribution is not the 'next best thing' for the approximately 5,700 silent class members," either

14   directly or indirectly."  (*Id.*)  Finally, Defendants argue they should be permitted to select the cy pres

15   beneficiary, subject to the Court's approval, because "it is the recollection of counsel for both El

16   Rancho Farms and for Garza Contracting that plaintiffs agreed to permit defendants to select the cy

17   pres beneficiary, just as plaintiffs did in *Rodriguez* and *Morales*," where the plaintiffs were represented

18   by the same class counsel.  (*Id.* at 7)  Therefore, Defendants urge the Court to find both unclaimed and

19   uncashed funds should go to the Boys and Girls Club of Kern County.  (*Id.* at 8)

20         **A.    Distribution Method**

21         The Ninth Circuit has determined a cy pres award must qualify as "the next best distribution" to

22   giving the funds directly to class members.  *Dennis v. Kellogg Co.,* 697 F.3d 858, 865 (9th Cir. 2012)

23   (citing *Six Mexican Workers*, 904 F.2d at 1308).  The designation of a cy pres beneficiary is appropriate

24   to ensure class members do not receive a windfall while silent class members do not receive any

25   compensation.  *Hartless v. Clorox Co.*, 273 F.R.D 630, 642 (S.D. Cal. 2011) ("distribution to claimants

26   on a pro rata basis is inappropriate if it would result in a windfall to those claimants"); *see also State of*

27   *California v. Levi-Strauss*, 41 Cal.3d 460, 474-78 (1986) (noting direct distribution may be a problem

28   because non-claiming class members receive no compensation at all, while other class members can

                                                      10

receive a windfall, and the failure to allocate funds to a cy pres beneficiary would "cripple" the compensatory function of the private class action).

Here, Defendants assert: "If the settlement covers nearly all of the wage claims, then participating class members have been made nearly whole by receiving their calculated distribution. Redistribution of 85 % of the silent members' shares would result in a windfall to the relatively low number of members making claims in this action." (Doc. 195 at 6)  On the other hand, it is not clear that the proposed settlement, in fact, covers all of the wage and hour violations raised by the *Rosales* and *Cruz* plaintiffs, such that the claimants have been made nearly whole.  Mr. Mallison reported that at the time the parties engaged in mediation, Class Counsel estimated the value of the claims to be "between 3,000,000 and 5,000,000 [dollars]," excluding attorneys' fees.[7]  (Doc. 184-2 at 14, Mallison Decl. ¶ 36)  The net settlement to be distributed to Class Members has been estimated to be $1,356,633. (Doc. 199-5 at 2, McGill Decl. ¶ 2)  Thus, there is no real evidence of a windfall.

Notably, it was only after this Court granted preliminary approval of the Settlement that the parties determined there were approximately 3,000 more class members than previously identified. (Doc. 182 at 3) As a result, the case-value estimates made by the parties for mediation purposes were likely to be a significant underestimate—and potentially only half the value of the claims presented in both *Rosales* and *Cruz*.  Because there is insufficient evidence to support a determination that Class Members who submitted claim forms will receive a windfall, the proposed pro rata distribution is appropriate for unclaimed funds.  Thus, the Court recommends the pro rata distribution occur as recommended by Plaintiffs.

## B.      Propriety of the Proposed Cy Pres Beneficiaries

Defendants assert, "The identity of the cy pres recipient was an important term to El Rancho Farms."  (Doc. 195 at 4)  Previously, Defendants' counsel reported it was "the reason that El Rancho agreed to such a large settlement amount.  (Doc. 171-1 at 2, Estrada Decl. ¶ 6)  Plaintiffs dispute this and argue that the execution of the settlement agreement which excludes this provision belies this claim.  Indeed, the willingness of both sides to proceed in the settlement process without assurance that

---

[7] According to Ms. Estrada, counsel for El Rancho, she estimated the value of Plaintiffs' claims to be approximately$1.2 million.  (Doc. 195 at 7)  However, she acknowledged at the hearing that this estimate did not include the value of the claims against Garza Contracting.

11

their proposed beneficiary would be selected, undercuts that this determination was material to settlement.  In any event, the parties agree that the Court should select the beneficiary.

The Ninth Circuit has determined any proposed cy pres recipient should be "tethered to the nature of the lawsuit and the interest of the silent class members."  *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011).  In other words, the Ninth Circuit "require[s] that there be a driving nexus between the plaintiff class and the cy pres beneficiaries."  *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (citing *Nachshin*, 663 F.3d at 1038).  The Court explained that without such tethering, the distribution of funds "may create the appearance of impropriety" by catering "to the whims and self interests of the parties, their counsel, or the court."  *Nachshin*, 663 F.3d at 1038.  Therefore, a cy pres award should not benefit a group that is "too remote from the plaintiff class."  *Six Mexican Workers*, 904 F.2d at 1308.

The Ninth Circuit directs courts to consider whether awards to the proposed cy pres beneficiary would "(1) address the objectives of the underlying statutes, (2) target the plaintiff class, or (3) provide reasonable certainty that any member will be benefitted."  *Nachshin*, 663 F.3d at 1040.  Further, the Court must consider whether the cy pres distribution is appropriate given the "size and geographic diversity" of the class members.  *Id.* at 1040-41 (citing, e.g., *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 683 (8th Cir. 2002); *Houck on Behalf of U.S. v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989)).

Notably, the Ninth Circuit has determined also that issues related to the identity of a cy pres beneficiary are not generally ripe until there are funds that remain undistributed.  *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (finding cy pres distribution "becomes ripe only if entire settlement fund is not distributed to class members" and declining to determine propriety of cy pres at that time).  The Court explained that where a cy pres distribution is contingent on the outcome of the claims process for a cash distribution, issues regarding the identification of recipients "will not be ripe until it is determined that available cash remains in th[e] fund after the claims process has concluded."  *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012).   If the pro rata distribution recommended above is adopted by the Court, it is unlikely there will be any remaining funds once the

distribution occurs.  Therefore, the matter continues not to be ripe for decision.[8]

## APPROVAL OF A CLASS SETTLEMENT

When parties settle the action prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

## I.        Certification of a Settlement Class[9]

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all."  Fed. R. Civ. P. 23(a).  Parties seeking class certification bear the burden of demonstrating the

---

[8] Though not deciding the issue, the Court is concerned that designating the CRLA as the cy pres beneficiary could create the appearance of impropriety because time sheets submitted by Plaintiff's counsel indicate that the CRLA attorneys actually worked on this case.  (Doc. 188-1 at 33, 36, 37)  Such a designation could raise the specter of a quid pro quo arrangement and Class Counsel has cited no legal authority to the contrary.

In addition, Class Counsel has an ongoing relationship with the CRLA.  Mr. Mallison, Hector Martinez and Marco Palau, all were employed by the CRLA in the past.  (Doc. 188 at 2, 7-8, Mallison Decl. ¶¶ 4, 11-12)  Further, the CRLA and the Mallison & Martinez firm continue to act as co-counsel on other litigation (*See id.* at 4, Mallison Decl. ¶ 6(h)) and, as described above, continue to work in tandem as demonstrated by this litigation.  This ongoing entanglement is further demonstrated by the fact that Class Counsel has solicited the involvement of the CRLA in the cy pres beneficiary selection process.  (Doc. 199-1 at 3-4, ¶ 10)  Indeed, Class Counsel represents that the CRLA claims that if the group is not designated as the beneficiary, the CRLA will appeal.  Class Counsel fails to explain how such an appeal—which risks delay of the payment to the class (Doc. 166-1 at 13-14, Settlement § III.I.7)—furthers the interest of the class members.  Likewise, given this threat, seemingly the CRLA's interests conflict with the Class Members' interest in a timely completion of the settlement.

Notably, the Court errs in designating a cy pres beneficiary which raise the concerns outlined here.  *See, e.g., Weeks v. Kellogg, Co.*, 2011 WL 6531116 at *19-20, n.102 (C.D. Cal. Nov. 23, 2011) (observing that "[c]ourts are wary of distributing cy pres funds to organizations that have a close relationship with class counsel given the appearance of a conflict of interest," and finding a proposed beneficiary was improper due to "its preexisting relationship with certain of plaintiffs' counsel"); *In re Linerboard Antitrust Litigation*, 2008 WL 4542669, *5 (E.D. Pa. Oct. 3, 2008) ("The Court agrees that PILCOP is a well respected public legal services organization in the Philadelphia area and, in general, is a deserving recipient of cy pres funds. However, because an attorney formerly associated with this case currently serves in a lead role at PILCOP, the Court does not deem it appropriate to direct any of the cy pres distribution to PILCOP"); *see also* American Law Institute, Principles of the Law of Aggregate Litigation § 3.07 ("A cy pres remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the selection of the recipient was made on the merits").

[9] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification of the Settlement Class is required.

elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

Here, Plaintiffs assert the Court should certify a settlement class that includes "all persons who have been employed or jointly employed by farm labor contractor Garza Contracting Inc. at El Rancho Farms facilities between November 9, 2001 and June 11, 2014."  (Doc. 166-1 at 1, Settlement § I.D) According to Plaintiffs, "Every requirement of Rule 23 is satisfied with respect to this proposed settlement class."  (Doc. 184-1 at 28)

### A.    Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982).  Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

### 1.    Numerosity

A class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This requires the Court to consider "specific facts of each case and imposes no absolute limitations."  *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is not a specific numerical threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) ("find[ing] the numerosity requirement . . . satisfied solely on the basis of the number of ascertained class members . . . and listing thirteen cases in which courts certified classes with fewer than 100 members").  Here, the parties have identified more than 6,000 Class Members.  (Doc. 184-1 at 28)

1    Therefore, the numerosity requirement is satisfied.

2              2.    Commonality

3         Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

4    Commonality "does not mean merely that [class members] have all suffered a violation of the same

5    pro-vision of law," but "claims must depend upon a common contention."  *Wal-Mart Stores*, 131 S.

6    Ct. at 2551.  In this case, Plaintiffs assert common issues include "minimum wage, overtime, and rest

7    and meal period violations."  (*See* Doc. 184-1 at 29)  Defendants do not dispute that the requirements

8    of Rule 23 are satisfied.  Accordingly, the Court finds the commonality requirement is satisfied for

9    purposes of settlement.

10             3.    Typicality

11        This requirement demands that the "claims or defenses of the representative parties are typical

12   of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The standards under this rule are

13   permissive, and a claim or defense is not required to be identical, but rather "reasonably coextensive"

14   with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether

15   other members have the same or similar injury, whether the action is based on conduct which is not

16   unique to the named plaintiffs, and whether other class members have been injured by the same course

17   of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation

18   marks and citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995)

19   (the typicality requirement is satisfied when the named plaintiffs have the same claims as other

20   members of the class and are not subject to unique defenses).

21        Here, Plaintiffs report that "[e]ach of the Class Representatives has claims similar and typical of

22   the rest of the Class since they suffered similar injuries and have the same interest in redressing them."

23   (Doc. 184-1 at 29)  Because Plaintiffs and the putative class members were subject to the same policies

24   and practices at El Rancho Farms, the typicality requirement is satisfied.

25             4.    Fair and Adequate Representation

26        Absentee class members must be adequately represented for judgment to be binding upon them.

27   *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, representative parties must "fairly and

28   adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[R]esolution of this issue

15

requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any

conflicts of interest with other class members and (b) will the named plaintiffs and their counsel

prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

*a.     Class counsel*

As the Court noted previously, Stan Mallison and Hector Martinez have experience litigating

wage and hour class action cases and serving as class counsel.  (*See* Doc. 173 at 13, citing Doc. 166 at

5-7)  Further, Mr. Mallison reports there are no known "personal affiliation[s] or family relationship[s]

with the Plaintiffs and proposed Class Representatives."  (Doc. 184-2 at 9, Mallison Decl. ¶ 17)  Thus,

Class Counsel satisfy the adequacy requirement.

*b.     Class representatives*

All named plaintiffs seek appointment as class representatives of the Settlement Class.  (Doc.

184 at 2)  Further, the parties have not identified any conflicts between Plaintiffs and Class Members.

Because it appears the interests of the named plaintiffs are aligned with those of the class—to maximize

their recovery— Plaintiffs will fairly and adequately represent the interests of the Settlement Class.

**B.     Certification of a Class under Rule 23(b)(3)**

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified

if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.

Plaintiffs assert class certification is appropriate under Rule 23(b)(3), which requires a finding that (1)

"the questions of law or fact common to class members predominate over any questions affecting only

individual members," and (2) "a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy."  These requirements are generally called the "predominance"

and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 131 S. Ct.

at 2559 ("(b)(3) requires the judge to make findings about predominance and superiority before

allowing the class").

1.     Predominance

The predominance inquiry focuses on "the relationship between the common and individual

issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

16

1    representation." *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  The Ninth Circuit

2    explained, "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of

3    common issues will help achieve judicial economy.'"  *Vinole v. Countrywide Home Loans, Inc.*, 571

4    F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th

5    Cir. 2001)).  In this case, Plaintiffs argue the predominance requirement is satisfied because "the issues

6    of Defendant's [sic] alleged failure to pay Class Members minimum wage, overtime, and rest and meal

7    period violations create common issues that predominate over individual questions."  (Doc. 184-1 at

8    29)  Accordingly, for settlement purposes only, the Court finds the predominance factor is satisfied.

9                         2.    Superiority

10           The superiority inquiry requires a determination of "whether objectives of the particular class

11   action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).

12   This tests whether "class litigation of common issues will reduce litigation costs and promote greater

13   efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule

14   23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior

15   method of adjudication, including (1) the class members' interest in individual litigation, (2) other

16   pending litigation, (3) the desirability of concentrating the litigation in one forum, and (4) difficulties

17   with the management of the class action.

18                       a.    *Class members' interest in individual litigation*

19           This factor is relevant when class members have suffered sizeable damages or have an

20   emotional stake in the litigation.  *See In re N. Dist. of Cal., Dalkon Shield, Etc.*, 693 F.2d 847, 856 (9th

21   Cir. 1982)).  Here, the Settlement Administrator received 70 requests for exclusion.[10]  (Doc. 184-3 at 4,

22   McGill Decl. ¶ 13)  Importantly, there is no evidence that the class members who seek exclusion from

23   the class are interested in pursuing their own actions.  Therefore, this factor does not weigh against

24   class certification.

25                       b.    *Other pending litigation*

26           The parties have not identified any other pending litigation for wage and hour violations

27

28           ─────────────
             [10] As noted above, 37 Class Members who returned a request to be excluded from the Settlement Class also
      submitted a Claim Form.  (Doc. 184-3 at 4, McGill Decl. ¶ 13)

                                                     17

against El Rancho Farms and Garza Contracting.  As a result, this factor weighs in favor of certifying the Settlement Class.

c.      <em>Desirability of concentrating litigation in one forum</em>

Because common issues predominate on Plaintiffs' class claims, "presentation of the evidence in one consolidated action will reduce unnecessarily duplicative litigation and promote judicial economy." *Galvan v. KDI Distrib.*, 2011 U.S. Dist. LEXIS 127602, at *37 (C.D. Cal. Oct. 25, 2011). Moreover, because the parties have resolved the claims presented in both cases through the settlement, this factor does not weigh against class certification.

d.      <em>Difficulties in managing a class action</em>

The Supreme Court explained that, in general, this factor "encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  However, because the parties have reached a settlement agreement and the class has received notice of the claims in issue, it does not appear there are any problems with managing the action.  Therefore, this factor weighs in favor of class certification.

Because the factors set forth in Rule 23(b) weigh in favor of certification, the Settlement Class is maintainable under Rule 23(b)(3).  Accordingly, it is recommended that Plaintiffs' request to certify the Settlement Class be **GRANTED.**

## II.      Evaluation of the Settlement Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). Approval is required to ensure settlement is consistent with Plaintiffs' fiduciary obligations to the class. *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  The Ninth Circuit has identified several factors to determine whether a settlement meets these standards, including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant;[11] and the reaction of the class members to the proposed settlement.

---

[11] Because there is not a government participant in this action—only a government beneficiary of the settlement—this factor does not weigh in the Court's analysis.

18

*Staton*, 327 F.3d at 959 (citation omitted).  Further, a court should consider whether settlement is "the product of collusion among the negotiating parties." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458 (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)).  Reviewing the settlement terms, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute."  *Class Plaintiffs*, 955 F.2d at 1291(internal quotation marks and citation omitted).

### A.      Strength of Plaintiffs' Cases

When evaluating the strength of a case, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements."  *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F.Supp 1379, 1388 (D. Az. 1989)).  However, the Court does not "reach any ultimate conclusions on the merits of the dispute."  *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 625 (9th Cir. 1982).

In this action, there are several disputed claims the fact-finder would be required to determine. Plaintiffs would face a significant risk of success if both actions were to proceed, and assert:

> Although Plaintiffs believe strongly in the underlying merits of their case, wage and hour cases on behalf of low wage agricultural workers can difficult to prove on a class basis especially given the changing and uncertain legal environment. Further, there are clear uncertainties surrounding Plaintiffs' ability to prove their claims given the unpredictability of a lengthy and complex jury trial.

(Doc. 184-1 at 23)  Further, although the Court did not rule on the motions to dismiss filed in *Cruz*, Defendants argued the claims presented by Cruz and Alvarez were duplicative in nature.  (*See Cruz*, Doc. 13 at 2)  Given the uncertainties of the merits of *both* actions, this factor weighs in favor of approving of the Settlement.

### B.      Risk, Expense, Complexity, and Likely Duration of Further Litigation

Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the Settlement were to be rejected, the parties would have to engage in further litigation, including discovery and seeking class certification in *Cruz*.  The time and expense of continued litigation could outweigh any additional recovery.  In addition, as Plaintiffs previously acknowledged, "legal

1   developments could seriously diminish the value of [their] claims." (Doc. 165 at 15)  On the other

2   hand, the proposed settlement provides for immediate recovery for the class, which includes

3   individuals who may have been excluded in the class previously certified by the Court.  Thus, this

4   factor weighs in favor of approval of the Settlement.

5       **C.      Maintenance of Class Status throughout the Trial**

6       There is a substantial risk a class may not have been certified in *Cruz*, particularly if the Court

7   were to determine, as Defendants argued, that the action was merely "an attempt by plaintiffs to certify

8   a subclass that was previously denied certification." (*See Cruz*, Doc. 13 at 2)  Due to the risk to the

9   claims of class members, this factor supports preliminary approval of the Settlement.

10      **D.      Amount Offered in Settlement**

11      The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of

12  absolutes and an abandoning of highest hopes.'" *Officers for Justice*, 688 F.2d at 624 (citation

13  omitted).  Thus, when analyzing the amount offered in settlement, the Court should examine "the

14  complete package taken as a whole," and the amount is "not to be judged against a hypothetical or

15  speculative measure of what *might* have been achieved by the negotiators." *Id.*, 688 F.2d at 625, 628.

16      Here, the proposed gross settlement amount is $2,300,000, of which an estimated $1,356,633

17  would be available to Class Members.[12]  (Doc. 166-1 at 3, Settlement § I.S; Doc. 199-5 at 2, McGill

18  Decl. ¶ 2)  Mr. Mallison reports that "Plaintiffs estimate[d] the value of class wage claims to be

19  between 3,000,000 and 5,000,000 [dollars] excluding substantial attorneys' fees, should Plaintiffs

20  prevail completely on a class-wide basis at trial." (Doc. 184-2 at 14, Mallison Decl. ¶ 36)

21      Notably, however, "[t]he fact that a proposed settlement may only amount to a fraction of the

22  potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate

23  and should be disapproved." *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir.

24  1998).  Rather, as noted by the Ninth Circuit, "parties, counsel, mediators, and district judges naturally

25  arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense

26  verdict, the potential recovery, and the chances of obtaining it, discounted to present value." *Rodriguez*

27

28      [12] This assumes the maximum award of attorney fees and class representative enhancements under the Settlement.
    (Doc. 199-5 at 2, McGill Decl. re Distribution ¶ 2)

*v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  Based upon the parties' agreement that this amount provides adequate compensation for the class claims against El Rancho Farms and Garza Contracting, Inc., the Court finds the amount offered supports approval of the class settlement.

### E.    Extent of Discovery Completed and Stage of the Proceedings

The Court is "more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case."  *Adoma*, 913 F. Supp. 2d at 977 (quoting *DIRECTV, Inc.,* 221 F.R.D. at 528).

Here, El Rancho began litigating the claims presented by "Doe" plaintiffs in 2005, and "Angelica Rosales" and Margarita Rosales were identified as plaintiffs in 2008.  Garza and its employees were involved in discovery from the *Rosales* action prior to the filing of *Cruz.*  In the course of litigation, the parties have produced and reviewed "thousands of documents including payroll and timekeeping information."  (Doc. 184-1 at 25)  Given the amount of discovery conducted by the parties and the number of years that have passed since Plaintiffs' counsel filed the First Amended Complaint in *Doe* identifying El Rancho Farms as a defendant, it appears that the parties made informed decisions regarding the merits of their claims and defenses.  Thus, the settlement agreement "is presumed fair," and this factor supports final approval of the settlement.  *See Adoma*, 913 F. Supp.2d at 977.

### F.    Experience and Views of Counsel

According to Mr. Mallison, "the class settlement with Defendants for $2,300,000, is reasonable and adequate and is in the best interest of the putative class members, including Defendants' current and former workers, in light of all known facts and circumstances…"  (Doc. 184-2 at 17, Mallison Decl. ¶ 46) Similarly, Defendants agree that the Settlement "reflects a fair, reasonable, and adequate settlement of the Actions."  (Doc. 166-1 at 18, Settlement § III.L.10)  Given counsels' experience and familiarity with the facts, their recommendation that the settlement be approved is entitled to significant weight.  *Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation"); *see also Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("In considering the

1    adequacy of the terms of a settlement, the trial court is entitled to, and should, rely upon the judgment

2    of experienced counsel for the parties.")  Consequently, this factor supports approval of the Settlement.

3           **G.      Reaction of Class Members to the Proposed Settlement**

4           The reaction of the class has been primarily positive.  The Class Representatives report they

5    "are strongly in support of the settlement."  (Doc. 184-1 at 27; *see also* Doc. 190 at 3, Cruz Decl. ¶ 7;

6    Doc. 191 at 3, Corza Decl. ¶ 8; Doc. 198 at 3, Alvarez Decl. ¶ 7; Doc. 193 at 3, Rosales Decl. ¶ 8)

7    Further, the Settlement Administrator received only 70 requests for exclusion (Doc. 184-3 at 4, McGill

8    Decl. ¶ 13), and no objections were received by either the Settlement Administrator or the Court.

9           Significantly, "the absence of a large number of objections to a proposed class action settlement

10   raises a strong presumption that the terms of a proposed class action settlement are favorable to the

11   class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529.  Because the number of requests for

12   exclusion and objections received are vastly outweighed by the remaining class members who have

13   indicated their consent to the terms of settlement, this factor weighs in favor the settlement.

14          **H.      Collusion between Negotiating Parties**

15          The inquiry of collusion addresses the possibility that the settlement agreement is the result of

16   either "overt misconduct by the negotiators" or improper incentives of class members at the expense of

17   others.  *Staton*, 327 F.3d at 960.   Plaintiffs assert, "[T]he Settlement was reached after extensive

18   discovery, certification of late meal period class, years of motion practice, and extensive arms-length

19   negotiations during numerous mediation sessions with Robert Coviello and Dave Rudy."  (Doc. 184-1

20   at 27)  Because the parties utilized private mediators, Plaintiffs conclude "the procedure by which the

21   Settlement was arrived" supports approval of the Settlement.  (*Id.*)  Notably, the Ninth Circuit has

22   determined the "presence of a neutral mediator [is] a factor weighing in favor of a finding of non-

23   collusiveness." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

24   Because there is no indication the agreement was the product of collusive conduct, this factor weighs

25   in favor of approval of the Settlement.

26   ///

27   **III.     Conclusion**

28

                                              22

The factors set forth by the Ninth Circuit weigh in favor of final approval of the Settlement, which appears to be is fair, reasonable, and adequate as required by Rule 23.  Therefore, the Court recommends that Plaintiffs' motion for final approval of the Settlement Agreement be **GRANTED**.

<u>**REQUEST FOR ATTORNEYS' FEES AND COSTS**</u>

Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be awarded pursuant to Rule 23(h).  Under the settlement, Class counsel may request attorneys' fees that total "no[] more than 33.33% ($766,667) of the Gross Settlement Amount. (Doc. 166-1 at 5, Settlement § III.A.2)  Class Counsel are also authorized under the Settlement to seek litigation expenses that are "not more than $50,000." (*Id.*)  Here, Class Counsel requests the maximum of fees and costs permitted under the Settlement. (Doc. 185 at 1)  In support of these requests, a representative from each law firm representing Plaintiffs filed a declaration setting forth the hours worked and hourly rates sought, as well as the firm's expenses.  (Docs. 186-188)

**I.      Legal Standards**

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement" to determine whether it is "'fundamentally fair, adequate, and reasonable' Fed. R. Civ. P. 23(e)." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003)).  To do so, the Court must "carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Id*.

A court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case. *See Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (noting a court may not adopt representations regarding the reasonableness of time expended without independently reviewing the record); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request where "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

The party seeking fees bears the burden of establishing that the fees and costs were reasonably

23

necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000).  Therefore, a fee applicant must provide time records documenting the tasks completed and the amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and class counsel "turns adversarial."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted).  As a result the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

The Ninth Circuit determined both a lodestar and percentage of the common fund calculation "have [a] place in determining what would be reasonable compensation for creating a common fund." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court applies the lodestar or percentage method, the Ninth Circuit requires "fee awards in common fund cases be reasonable under the circumstances."  *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *see also Staton*, 327 F.3d at 964 (fees must be "fundamentally fair, adequate, and reasonable").

## A.      Lodestar Method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate."  *Florida* , 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433).  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008).  Next, the court may adjust the lodestar upward or downward using a "multiplier" considering the following factors adopted by the

Ninth Circuit in a determination of the reasonable fees:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). However, the Court has since determined that the fixed or contingent nature of a fee and the "desirability" of a case are no longer relevant factors. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citing *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 n.4 (9th Cir. 1992)).

### B.      Percentage from the common fund

As the name suggests, under the "common fund" method, attorneys who create a common fund for a class may be awarded their fees and costs from the fund. *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"). An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and as such application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing Co.*, 444 U.S. at 478.

In the Ninth Circuit, the typical range of acceptable attorneys' fees is 20% to 30% of the total settlement value, with 25% considered the benchmark. *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir. 2002); *Hanlon*, 150 F.3d at 1029 (observing "[t]his circuit has established 25 % of the common fund as a benchmark award for attorney fees"); *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that district courts should award in common fund cases"). The percentage may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

To assess whether the percentage requested is reasonable, courts may consider a number of factors, including "the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis."  *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (internal quotation marks omitted).

## II.     Evaluation of the Fees Requested

"The district court has discretion to use the lodestar method or the percentage of the fund method in common fund cases." *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (quoting *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*., 109 F.3d 602, 607 (9th Cir. 1997)).  Notably, the Court must consider similar factors under either method.  *See Kerr*, 526 F.2d at 70; *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d at 954-55.  Further, the Court may "appl[y] the lodestar method as a crosscheck" to determine whether the percentage requested is reasonable.  *Vizcaino*, 290 F.3d at 1050, n.5.

### A.     Results obtained for the class

Courts have recognized consistently that the result achieved is a major factor to be considered in making a fee award.  *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).  Class Counsel assert they "recovered $2,300,000.00 on behalf of the class, that the class members would likely not have recovered independent of this action."  (Doc. 189 at 11)  Of this, the claims administrator estimates that $1,356,633 from the common fund will be distributed to Class Members.  (Doc. 199-5 at 2, McGill Decl. ¶ 2)  As noted above, Mr. Mallison reports that "Plaintiffs estimate[d] the value of class wage claims to be between 3,000,000 and 5,000,000 [dollars] excluding substantial attorneys' fees, should Plaintiffs prevail completely on a class-wide basis at trial."  (Doc. 184-2 at 14, Mallison Decl. ¶ 36)  While the settlement amount when compared to the lower value is an exceptional result, if the case value was closer to the upper end, the result is merely average.  On the other hand, at the hearing, Class Counsel admitted that the case value was determined at the time of the mediation at which time Counsel believed that there were only 3,000 potential claimants.  (Doc. 182 at

26

3) During the claims process, this number doubled to about 6,000. This suggests that the case value was significantly underestimated.[13] Thus, the Court has been provided insufficient information for it to determine that an exceptional recovery for the class has occurred and, therefore, cannot recommend an upward departure from the benchmark. *See Vizcaino*, 290 F.3d at 1048 (observing "[e]xceptional results are a relevant circumstance" to an adjustment from the benchmark).

### B.  Risk undertaken by counsel

The risk of costly litigation and trial is an important factor in determining the fee award. *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994). The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). As a result, the Ninth Circuit approved an award slightly above the benchmark in *Vizcaino* where the case was "extremely risky for class counsel" and the "plaintiffs lost in the district court – once on the merits, once on the class definition – and twice counsel succeeded in reviving their case on appeal." *Id.*, 290 F.3d at 1048.

Class Counsel assert the request of 33 1/3 % is justified, in part, because the case was taken "without any guarantee that they would ever obtain any compensation at all, as the representation [was] being handled solely on a contingency fee basis." (Doc. 189 at 12) In addition, Class Counsel contend they faced risks related to the merits of the case, because the action was filed when "wage and hour law in California was uncertain." (*Id.*, citing *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012)). Further, Class Counsel assert:

> [U]ntil recently (*See Bluford v. Safeway Stores, Inc.*, 216 Cal. App. 4th 864 (2013)) the legal theory that employers are required to pay piece rate workers a separate payment for the rest breaks was largely untested. Plaintiffs [sic] counsel was on the vanguard of this legal theory (*See Ontiveros v. Zamora*, 2009 WL 425962 at *4 (E.D. Cal. 2009)). This legal theory is a critical part of the *Cruz* allegations. Thus, the risk associated with litigating class actions during the uncertainty of wage and hour law prior to *Brinker*, plus the presence of still novel legal claims in *Cruz*, weigh in favor of a departure from the Ninth Circuit 25% bench in awarding attorneys' fees.

(Doc. 189 at 12)

---

[13]At the hearing Class Counsel argued there would be no windfall to the claimants if a pro rata distribution method was adopted despite that this nearly tripled the average recovery. In doing so, implicitly, Counsel admitted this amount did not exceed that which would make each claimant whole. Notably, had a larger number of claims been submitted—only about 15% of those eligible to make claims did so (Doc. 184-1 at 7)—the average recovery could have been dismal.

Significantly the Ninth Circuit has suggested the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7. (9th Cir. 2011) (observing "whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees); *but see In re Online DVD-Rental Antitrust Litigation*, 779 F.3d at 954-55 (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund). Further, although Mr. Mallison asserts his firm "would not have agreed to represent plaintiffs in this case other than on a contingency fee basis unless it would have been confident that it would be awarded a contingency fee approximately 1/3rd of the potential recovery if we were successful in our efforts" (Doc. 188 at 20-21, Mallison Decl. ¶55), Mr. Martinez previously admitted that "[t]he firm chose the proposed class representatives" in this action. (Doc. 35 at 7, Martinez Decl. ¶19) Moreover, he fails to explain why he presumed at the onset of this case that a one-third award would be likely made by the Court or to detail upon what authorities he relied when deciding to pursue this case—notably, doing so without clients.

On the other hand, as Class Counsel observes, the California Supreme Court clarified the labor laws related to rest and meal periods in *Brinker*. In a related action, where the plaintiffs also raised meal and rest break violations, the Court observed the facts were straightforward, but "Plaintiffs' counsel faced significant risk on the legal merits." *Morales v. Stevco*, 2013 WL 1222058 at *3 (E.D. Cal. Mar. 25, 2013). Accordingly, this factor weighs slightly in favor of a departure from the benchmark fee award. *See id.* (awarding 30% of the common fund as attorney fees).

## C.    Skills of counsel and quality of work

The complexity of issues and skills required may weigh in favor of a departure from the benchmark fee award. *See, e.g., Lopez v. Youngblood*, 2011 WL 10483569 at *5-6 (E.D. Cal. Sept. 2, 2011) (in determining whether to award the requested fees totaling 28% of the class fund, the Court observed the case involved "complex issues of constitutional law in an area where considerable deference is given to jail officials," and the action "encompassed two categories of class members"); *see also In re Heritage Bond Litig.*, 2005 WL 1594403 at *14 (C.D. Cal. June 10, 2005) ("Some courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award").

Here, Class Counsel assert their skills and the quality of work support an award greater than the benchmark in this action.  (Doc. 189 at 12)  According to Class Counsel, they "showed great skill, thoroughness, and conscientiousness in investigating and developing the claims, liability theories, and estimated possible recoveries in the Litigation."  (*Id.*)  Specifically, they report:

> Class Counsel and their staff interview dozens of workers and collected twenty-three (23) declarations from El Rancho and Garza fieldworkers in support of the Motion for Class Certification. [Citation.] Plaintiffs' counsel also took three depositions and defended two depositions in this case. [Citation.] Plaintiffs' counsel reviewed thousands of pages of time keeping records.

(Doc. 189 at 13)

On the other hand, a review of the record indicates that the effectiveness of Class Counsel's work was not stellar.  Initially, Plaintiffs sought certification of four classes: (1) the unpaid rest break class, (2) the untimely rest and meal break class, (3) the off-the-clock work class, and (4) the tools reimbursement class.  (Doc. 37 at 2, 6-11)  Despite the fact that Class Counsel selected the plaintiffs in this action, the Court determined Lorena Corza and Margarita Rosales lacked standing to represent claims for unpaid rest breaks.  (Doc. 52 at 29-31; Doc. 56 at 12-13)  The Court denied Plaintiffs' request to add a named plaintiff who could represent such claims given the fact that the litigation had been pending for more than five years and there was no *right* to substitute a proper class representative.[14]  (Doc. 56 at 31, citing *Moreno v. Autozone, Inc.* 410 Fed. Appx. 24, 25 (9th Cir. 2010); *Lierboe v. State Farm Mut. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003))  Further, the Court declined to certify the other proposed classes due to evidentiary failures, including the failure to show common policies among the farm labor contractors (such as Garza) who employed laborers at El Rancho.  (Doc. 52 at 31-39; Doc. 56 at 13-16)

Class Counsel filed a motion for reconsideration "based [upon] clear error and manifest injustice" and proposed narrowing the definitions of the classes to individuals employed only by Garza rather than all farm labor contractors.  (Doc. 189 at 13)  Class Counsel requested reconsideration, in part, "based on new evidence."  (Doc. 95 at 3)  However, the Court found the evidence to which

---

[14] Class Counsel has not explained how the fact that two named plaintiffs lacked standing escaped their notice until after the Court raised the issue when considering the initial motion for class certification.  Indeed, the *Cruz* matter was filed only after the Court ruled that Plaintiffs would not be permitted to add another class representative who had standing to represent the unpaid rest break claims.

Plaintiffs referred was *not* new, and should have been presented in support of the motion to file class

certification.  (*Id.* at 4)  Further, the Court upheld its prior ruling denying the motion for class

certification, but granted Plaintiffs leave to file a second motion for class certification with a narrowed

class definition.  (Doc. 95 at 9)  Clearly, a more thorough review of the evidence should have occurred

before Plaintiffs filed their motion for class certification such that a proper class definition could have

been proposed and the lack of standing by Ms. Corza and Ms. Rosales could have been determined.

Moreover, when this action was initiated in 2005, many of the lead attorneys had been

practicing for less than 10 years, demonstrating that exceptional skill and experience was not needed to

pursue this litigation.  Because the Court does not find this matter required exceptional skills and Class

Counsel displayed skills and work quality consistent with those of attorneys with comparable

experience, this factor supports an award equal to the Ninth Circuit benchmark.

### D.      Length of professional relationship

Class Counsel do not address the length of the professional relationships with their clients as a

factor supporting the fees requested.  (*See* Doc. 189 at 10-16)  "Angelica Rosales" was identified in the

*Lara* action as a plaintiff in the Second Amended Complaint filed on September 12, 2005.  Margarita

Rosales was not identified as a plaintiff until on May 29, 2008, with the filling of a Third Amended

Complaint against El Rancho Farms.  (*Doe*, Doc. 173)  Despite the fact that Class Counsel have

expended nearly ten years representing these plaintiffs, the Ninth Circuit has determined the 25 percent

standard award" where "the litigation lasted more than 13 years."  *See Six Mexican Workers v. Ariz.*

*Citrus Growers*, 904 F.2d 1301, 1311 (finding "the 25 percent standard award" was appropriate

although "the litigation lasted more than 13 years").  Therefore, this factor does not weigh in favor of

departure from the benchmark.

### E.      Awards in similar cases

Notably, as discussed above, 25% of a common fund is "benchmark award for attorney fees" in

the Ninth Circuit.  *Hanlon*, 150 F.3d at 1029; *see also Vizcaino,* 290 F.3d at 1047 (9th Cir. 2002).

Previously, this Court observed that "[t]he typical range of acceptable attorneys' fees in the Ninth

Circuit is 20 percent to 33.3 percent of the total settlement value." *Barbosa v. Cargill Meat Solutions*

*Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013).  Thus, the amount requested by Class Counsel is at the

highest end of the award spectrum. *See id.*

Class Counsel assert that "courts within this District have awarded Class Counsel fee awards of 33.3% to Class Counsel Mallison & Martinez in similar wage and hour class actions, including: *Benitez v. Wilbur*, E.D. Cal. Case No. 08-1122 LJO GSA ($33^{1/3}$% award). *Alvarado et al. v. Rex Nederend*, E.D. Cal. Case No. 1:08-cv-01099 OWW DLB ($33^{1/3}$% award); *Vasquez v. Coast Valley Roofing*, *Inc.*, E.D. Cal. Case No. 1:07-cv-00227 ($33^{1/3}$% award); *Chavez et al. v. Petrissans et al.*, E.D. Cal., 1:08-cv-00122 ($33^{1/3}$% award)." (Doc. 189 at 14-15)  However, Class Counsel failed to provide *any* analysis regarding how they believe these cases are similar to the matter pending; indeed, they are not.

For example, in *Benitez*, the Court did not conduct an analysis regarding the reasonableness of the attorney fees or address the number of hours expended by counsel to represent the class of approximately 100 workers. (*See Benitez*, Case No. 1:08-1122-LJO-GSA, Docs. 39, 49 and 52) The Court approved a settlement of $400,000 and awarded class counsel $133,333 in fees. (*See Benitez*, Doc. 52)  Notably, class counsel had reported that 70 class members presented claim forms, and the estimated average payment to class members was nearly $3,000 per claimant. (*Benitez*, Doc. 49 at 9)  Similarly, in *Alvarado*, there were "approximately 150 class members," and the estimated average settlement share was $2,000. (*Alvarado*, Case No. 1:08-1099-OWW-MJS, Doc. 73 at 6, 10)  In *Chavez*, counsel reported the average settlement share was $3,750 (*Chavez*, Case. No. 1:08-00122-LJO-GSA, Doc. 83 at 10) and in *Vasquez* the average share was "approximately $2600 per claimant." (*Vasquez*, Case. No. 1:07-cv-00227-OWW-GSA, Doc. 72 at 16)  These settlement shares are significantly greater than the results achieved in the matter now before the Court.

Class Counsel acknowledge they have not received $33^{1/3}$% in similar cases and the Court "awarded Class Counsel attorneys' fees of 30% of the net settlements in class action cases on behalf of fieldworkers employed in the table-grape industry."[15]  (Doc. 189 at 14, citing *Rodriguez v. D.M. Camp & Sons*, Case No. 1:09-cv-00700 and *Morales v. Stevco*, Case No. 1:09-cv-00704)  However, Class Counsel argue *Rodriguez* and *Morales* "are distinguishable in a number of ways" that support a higher fee award. (*Id.* at 15)  For example, Class Counsel assert, "neither *Rodriguez* nor *Morales* persuaded

---

[15] Presumably, Class Counsel refers to the *gross* settlement amounts as the fees were deducted from the common fund prior to distribution of the remaining funds to the class members.

1  the Court to certify a class," and neither case entailed "extensive law and motion practice."[16]  (*Id.*)

2        On the other hand, the results obtained in the *Rodriguez* and *Morales* settlements were much

3  more beneficial to the class members than the estimated awards for class members in this action.  In

4  *Morales,* the average award for class members was "over $4,300" for each class member.  *Morales*,

5  2013 WL 1222058 at *2 (E.D. Cal. Mar. 25, 2013).  The Court found this was "a significant recovery"

6  that weighed in favor of a higher award.  *Id.*  Similarly, in *Rodriguez*, the average award was

7  approximately $2,200 award per worker, and "the highest award [was] estimated to be approximately

8  $17,300."  *Rodriguez*, 2013 WL 2146927 at *13 (E.D. Cal. May 15, 2013). The Court determined such

9  results were significant and weighed in favor of an award higher than the benchmark.  *See Morales*,

10  2013 WL 1222058 at *2; *Rodriguez*, 2013 WL 2146927 at *13.  In contrast, here, the estimated average

11  settlement share with a pro rata distribution is $1,336.58.  (Doc. 199-5 at 2, McGill Decl. ¶ 3)  Given

12  the disparity in the results achieved, the Court does not find this compares favorably to *Morales* and

13  *Rodriguez* to support the reward requested.

14      **F.**    **Lodestar Crosscheck and Market Rate**

15        Class Counsel provided a list of each legal professional who worked on *Rosales* and *Cruz*, and

16  report they worked at total of 2,617.89 hours.  (Doc. 188 at 21-24)  According to Class Counsel, this

17  results in a lodestar calculation of $1,414,414.31. (*See id.* at 24)  Generally, when the lodestar is used as

18  a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and

19  review of counsel's hours."  *See Schiller*, 2012 WL 2117001 at *20 (citing *In re Rite Aid Corp. Sec.

20  Litig.*, 396 F.3d 294, 306 (3d Cir. 2005); *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166 (S.D.

21  Cal. 2007)).  However, because a cursory review of the records revealed significant flaws related to the

22  lodestar calculation—including hours not related to this litigation, overbilling and clerical tasks— the

23  Court has performed a detailed review of the records.

24      **1.**    **Hourly rate**

25        As an initial matter, the Supreme Court has determined that attorneys' fees should be calculated

26  according to the "prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886,

27

28      [16] Although Class Counsel may imply otherwise, the plaintiffs did not file motions for class certification in *Rodriguez* and *Morales*.

895 (1984).  In general, the "relevant community" for purposes of determining the prevailing market

rate, is the "forum in which the district court sits."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973,

979 (9th Cir. 2008).  Thus, when a case is filed in the Fresno Division of the Eastern District of

California, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish

the lodestar hourly rate."  *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

However, "rates, other than those of the forum, may be employed if local counsel was unavailable,

either because they are unwilling or unable to perform because they lack the degree of experience,

expertise, or specialization required to handle properly the case."  *Gates v. Deukmejian*, 987 F.2d 1392,

1405 (9th Cir. 1992).

Here, Class Counsel argues that the out-of-district hourly rates from the San Francisco Bay area

and Central District, which they used to calculate the lodestar, should be applied in this action.  (Doc.

189 at 16) According to Class Counsel, "the fact that Class Counsel has been involved in 16 of the 18

Agricultural Workers Protection Act (29 U.S.C. § 1801 *et seq.*) cases filed within the last ten years

highly suggests that counsel located within the district is incapable or unwilling to take these contingent

farm worker class actions because they do not have the requisite experience."  (*Id.*)  Significantly,

however, several of attorneys who represented plaintiffs in related action are employed in Bakersfield,

California, which lies within the Fresno Division of the Eastern District.  *See Rojas v. Sunview*, Case

No. 1:09-cv-00705-AWI-JLT.[17]  Further, Class Counsel report the California Rural Legal Assistance

has "filed lawsuits on behalf of 250 Central Valley farmworkers in matters involving AWPA and/or

California wage and hour matters and filed administrative complaints or otherwise privately negotiated

matters for 1,250 Central Valley farmworkers."  (Doc. 184-1 at 17)  Because other lawyers are clearly

available and willing to represent farmworkers and prosecute wage and hour class actions, Class

Counsel have not met their burden to show hourly rates other than those of the Fresno Division should

have been used for purposes of calculating the lodestar.  *See Camacho*, 523 F.3d at 979; *Gates*, 987

F.2d at 1405.   Accordingly, the hourly rates must be adjusted to be consistent with attorneys in the

Fresno Division of the Eastern District.

---

[17] For the reasons set forth in Footnote 2, the Court takes judicial notice of the Court's docket in *Rojas v. Sunview*, Case No. 1:09-cv-00705-AWI-JLT.

33

a.       Attorneys

The hourly rates sought by counsel range from $295 to $825.  (*See* Doc. 188 at 21-23)  For example, Stan Mallison and Hector Martinez seek hourly rates of $650.  (*Id.*)  Previously, this Court has declined to calculate the lodestar with the requested hourly rate of $650 for Mr. Mallison and Mr. Martinez.  *Ontiveros v. Zamora*, 303 F.R.D. at 356, 373-74 (E.D. Cal. 2014).  The Court noted that the hourly rates were "high for even the most experienced attorneys in the Eastern District." *Id.* at 374 (citing *Johnson v. Allied Trailer Supply*, 2014 WL 1334006, at *5 (E.D. Cal. Apr. 3, 2014); *Joe Hand Prom., Inc. v. Albright*, 2013 WL 4094403, at *2 (E.D. Cal. Aug. 13, 2013).  Consequently, the Court calculated the lodestar with using $400 as the hourly rate for partners at Mallison & Martinez and $175 as the rate for associates.  *Id.*  Although *Ontiveros* was filed in the Sacramento Division of the Eastern District, it demonstrates the hourly rates requested here do not align with those in the Eastern District.

More recently, this Court has reviewed the billing rates for the Fresno Division and concluded that "hourly rates generally accepted in the Fresno Division for competent experienced attorneys [are] between $250 and $380, with the highest rates generally reserved for those attorneys who are regarded as competent and reputable and who possess in excess of 20 years of experience." *Silvester v. Harris*, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 2014).  For attorneys with "less than ten years of experience … the accepted range is between $175 and $300 per hour." *Id.* (citing *Willis v. City of Fresno*, 2014 WL 3563310 (E.D. Cal. July 17, 2014); *Gordillo v. Ford Motor Co*., 2014 WL 2801243 (E.D. Cal. June 19, 2014)).  With these parameters in mind, the hourly rates for counsel must be adjusted to calculate the lodestar.

Hours for each of the attorneys who have been in practice 20 years or more—including David Rosenfeld, William Sokol, Chris Raisner, Emily Rich, Suzanne Murphy, Jeff Westerman, and Elizabeth Lin—will be calculated at the rate of $380 per hour.  For attorneys who have been in practice between 15 and 20 years—including Stan Mallison, Hector Martinez, Sabrina Kim, and Nicole Duckett—the hourly rate is adjusted to $350 per hour.  Further, for attorneys who have been in practice between 10 and 15 years—including Alegria de la Cruz, Linelle Mogado, and Manjari Chawla—the rate is adjusted to $300 per hour. The hours worked by attorneys who have been admitted to practice between 5 and 10 years—including Joseph Sutton, Jessica Juarez, Kerianne Steele, and Marco Palau —the lodestar will

34

be calculated at a rate of $225 per hour.  Finally, for attorneys who have been in practice for less than five years, the rate is adjusted to $175 per hour.  Based upon the prior survey of the attorney fees in the Fresno Division and the Court's own knowledge, these hourly rates are reasonable.  *See Silvester,* 2014 WL 7239371 at *4; *see also Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates).

<u>b.     Non-attorney staff</u>

Class Counsel calculated their lodestar using hourly rates ranging from $95 to $325 for non-attorney staff.  (See Doc. 188 at 21-23)  Generally, paralegal rates within the Fresno Division of the Eastern District range between $75 to approximately $150.00.  *See Moreau v. Daily Independent*, 2013 WL 796621 at *3 (E.D. Cal. Mar. 1, 2013) (observing that "$75 for paralegals [is] reasonable for litigation performed in this district"); *Spence v. Wells Fargo Bank, N.A.*, 2012 WL 844713 at *5 (E.D. Cal., Mar. 12, 2012) (approving "paralegal or other support rates" of $125.00, $145.00 and $155.00); *Silvester* 2014 WL 7239371 at *4 ("The current reasonable hourly rate for paralegal work in the Fresno Division ranges from $75 to $150, depending on experience.")

Here, Class Counsel request hourly rates of $95 per hour for Joel Salas, Mirella Lopez, and Dyvienne Martinez.  (*See* Doc. 188 at 22)  Because these rates are within the range generally awarded in the Fresno Division, no adjustment is required.  The hourly rate of $150 is appropriate for Eleanor Natwick, Judy Castillo, Teresa Oviedo, and Aaron Nathan, who have all been working as legal assistants or paralegals for more than twelve years.  (Doc. 186 at 6-7, Rich Decl. ¶¶ 15-18)  Because Michelle Grisat was a paralegal for only one year (*see id.*, ¶ 14), her hourly rate will be adjusted to $75.  Finally, Class Counsel offer no support that higher hourly rates are appropriate for Hector Hernandez, Jan Spring, or Deborah Vanore.  Given the lack of information regarding their experience, the Court adjusts their hourly rates to $100 per hour.  *See Willis*, 2014 WL 3563310 at *14 (setting the hourly rate for a paralegal at $100 where the plaintiffs did "not offer[] any reason" to support a rate "set at the highest level in this district").  Accordingly, the hourly rate for these individuals is adjusted to $100 to be in line with the rates in the Fresno Division.

**2.     Hours expended**

A representative from each of the law firms designated as Plaintiffs' counsel has provided a declaration including the hours worked in support of the request for attorney fees.  Accordingly, the Court has reviewed the hours reported by each firm to determine whether they are reasonable.

a.      Mallison & Martinez

Stan Mallison reports that his law firm worked 2,049.80 hours in the course of this action since 2005.  (Doc. 188 at 21-22, Mallison Decl. ¶ 57)  However, this total includes work related to several other cases and claims against other grape growers.

i.      *Work related to other claims*

The total hours reported by Mallison & Martinez includes work performed on the *Lara* action in the state court action.  Significantly, the *Lara* plaintiffs did not identify El Rancho as a defendant until the filing of their Second Amended Complaint on September 12, 2005, and El Rancho did not respond to the allegations in the state court.  Despite this, Mallison & Martinez seeks an award for a fraction of the hours for work completed in *Lara* beginning in April 2005, including preparing for and attending case management conferences; investigating claims against other defendants in *Lara* such as Golden Grain, Giumarra, Lucich Farms, and Castlerock; reviewing responses to discovery; and settlement discussions with Castlerock. (*See, e.g.,* Doc. 188-1 at 2, 15, 24, 37, 86-88)  In addition, Mallison & Martinez include work related to responding to demurrers in *Lara*, performing legal research, and preparing responses to the demurrers by the defendants. (Doc. 188-1 at 25, 77, 80)  Because these tasks did not relate to the claims against El Rancho and Garza, the time related thereto should not be awarded from the class settlement fund. *See Gauchat-Hargis v. Forest River, Inc.*, 2013 U.S. Dist. LEXIS 128508 at *11 (E.D. Cal. Sept. 9, 2013) ("Time spent on tasks that are not relevant to the case at issue should be eliminated from the lodestar analysis.")  This results in a deduction of **38.44 hours**.[18]

Mallison & Martinez also report time related to work on the bankruptcy proceeding filed by Rogelio Casimiro, doing business as Golden Grain, and the related adversary proceedings initiated by

---

[18] This total includes 3.59 hours for Hector Martinez, 33.35 hours for Stan Mallison, and 1.5 hours for Alegria De La Cruz.

36

1    the *Lara* plaintiffs in the bankruptcy court.[19]   For example, several individuals report contacting

2    Casimiro/Golden Grain employees and conducting interviews:

| 4/19/2006 | Martinez, H. | Telephone Calls to Lara, Paula, Mario re Casimiro Facts | 0.42 |
|---|---|---|---|
| 5/30/2006 | Mallison | Preparation and attendance at Bnkruptcy [sic] deposition; meeting with investigator and co-counsel; defendanse [sic] counsel; trustee and deponents | 2.00 |
| 6/6/2006 | Hernandez | Case discussion about declaration of workers that work for Rogelio Casimiro; Revise and comment on declaration | 0.17 |
| 7/15/2006 | Martinez, D. | Telephone Call to former Golden Grain workers to schedule appointments | 0.67 |
| 7/15/2006 | Martinez, H. | Contact Former workers from Employee list provided by Casimiro | 0.67 |
| 7/16/2006 | Martinez, D. | Telephone Call to former Golden Grain workers re case update and scheduling for appointment | 1.38 |
| 7/17/2006 | Martinez, D. | Telephone Call to former Golden Grain workers to make initial contact and schedule appointments | 1.37 |
| 7/17/2006 | Martinez, H. | Telephone Call to Golden Grain former employer; explained status of case; scheduled appoints [sic]; discussions… | 1.00 |
| 7/18/2006 | Martinez, D. | Telephone Call to former GG workers to conduct initial contact and schedule interviews | 0.95 |
| 7/18/2006 | Martinez, H. | Contacting class members re GG violations; explaination [sic] of case status' scheduled appointments. | 0.67 |
| 7/19/2006 | Martinez, D. | Telephone Call to former GG workers to provide[] update and schedule appts in Bakersfield | 0.65 |
| 7/19/2006 | Martinez, H. | Contact former GG workers and explaining status of case; scheduled appointments | 0.50 |
| 7/20/2006 | Martinez, D. | Telephone Call to former GG workers to update and schedule appts in Bakersfield | 0.65 |
| 7/20/2006 | Martinez, D. | Prepare for trip to Bakersfield; Travel | 0.85 |
| 7/20/2006 | Mallison | Factual investigation and Preparation for [travel] to Bakersfield; database work | 0.71 |
| 7/20/2006 | Martinez, H. | Supervise DM and advise regarding calls to GG former workers | 0.33 |
| 7/20/2006 | Martinez, H. | Prepare for trip to Bakersfield; Travel time | 0.83 |
| 7/21/2006 | Mallison | Prep; travel to' attendance at witness interviews | 1.83 |
| 7/21/2006 | Martinez, H. | Meeting with witnesses and clients to obtain declarations | 1.83 |
| 7/22/2006 | Mallison | Preparation for; attendance at interviews of witnesses in [Bakersfield] | 2.00 |
| 7/22/2006 | Martinez, H. | Meeting with former Casimiro workers; Telephone Call to witnesses; review documents from Sara. Travel | 1.83 |
| 8/2/2006 | Martinez, H. | Telephone Call to Golden Grain [w]itnesses regarding meeting in Arvin to obtain declarations | 0.50 |
| 8/3/2006 | Martinez, H. | T/Cs to Golden Grain former workers to advise of meeting in Arvin on Sunday | 0.33 |
| 12/13/2006 | Mallison | Review of settlement documents for GG case; declaration of Hector Martinez for appointment as lead counsel | 0.29 |

---

27    [19] On October 12, 2005, Casimiro filed Chapter 13 bankruptcy in the United States Bankruptcy Court, Eastern District of California, Case No. 05-19558-B-13.  In January 2006, the *Lara* Plaintiffs initiated Adversary Proceeding No. 05-01401 in the Bankruptcy Court, and sought withdrawal of reference from the Bankruptcy Court. (Case No. 1:06-cv-0028-AWI, Doc. 1-4 at 2.)  Plaintiffs again sought withdrawal of reference in August 2007, *In re Rogelio A. Casimiro, et al.*, Case No. 1:07-cv-01218-AWI.

(Doc. 188-1 at 12-13, 65, 68)  Significantly, there is no evidence that the claims against Golden Grain were intertwined with the claims against El Rancho Farms or Garza Contracting.  Because Class Counsel fail to explain how the discovery related to the bankruptcy proceedings was relevant here, or how the evidence gathered against Golden Grain was used to support Plaintiffs' claims in *Rosales* and *Cruz*, the tasks related to the adversarial proceedings and class certification in the Bankruptcy Court should not be compensated here.  This results in a total deduction of **22.43 hours**.

### ii.     Work related to *Valenzuela*, *Case No. 1:05-cv-01600-AWI-SMS*

On December 16, 2005, Santos Valenzuela, Trinidad Ruiz, Marta Rincon De Diaz, Ramon Cervantes Perales, and Hugo Perez Rios filed a class action complaint against Giumarra Vineyards.[20] On December 21, 2005, Plaintiffs' counsel filed a motion to consolidate the action with *Doe.* (*See Valenzuela*, Doc. 5)  Stan Mallison and Hector Martinez report they had conferences related to *Valenzuela* and prepared documents related to consolidation of the claims with *Doe*.  (Doc. 188-1 at 22-23, 75-77)  Because the claims brought by the *Valenzuela* plaintiffs related only to their employment by Giumarra Vineyards (*see Valenzuela*, Doc. 1), the work completed in that action was not related to the class claims here and should not be compensated. Thus, the lodestar is reduced by **9.63 hours**.[21]

### b.     Weinberg, Roger & Rosenfeld

Emily Rich, a shareholder with the law firm of Weinberg, Roger & Rosenfeld, reports that "the firm expended 1557.23 hours in attorney and paralegal time" prior to the severance of *Doe*, and seek 1/6 of this time, or 259.54 hours.  (Doc. 186 at 8, Rich Decl. ¶ 21)  In addition, Ms. Rich reports they spent 62.15 hours on *Rosales* after the *Doe* action was severed into six separate actions.  (*Id.*, ¶ 22)

### i.     Work related to claims against other grape growers

Importantly, it is clear that many tasks reported prior to the severance of *Doe* into six separate cases relate to the claims of individuals who were not employed at El Rancho Farms.  For example, Chris Raisner recorded having several telephone conferences with attorneys who represented Giumarra

---

[20] Because the accuracy of the court's docket cannot reasonably be questioned, the Court takes judicial notice of the docket and documents filed in *Valenzuela v. Giumarra Vineyards Corporation*, Case No. 1:05-cv-1600-AWI-SMS. *See Mullis*, 828 F.2d at 1388 n.9.
[21] This includes 6.72 hours for Stan Mallison and 2.91 for Hector Martinez.

1   Vineyards, Stevco, and DM Camp & Sons.  (*See, e.g.,* Doc. 186-2 at 8-9)  Mr. Raisner also noted he

2   drafted three letters to the Workforce Development Agency "re DM Camp & Sons, Marko Zaninovich,

3   Inc.; and Sunview Vineyards of California." (*Id.* at 11)  Mr. Raisner and Ms. Rich worked on the

4   proposed consolidation and appointment as lead counsel in *Valenzuela*—which, as discussed above,

5   only raised claims against Giumarra Vineyards—with *Doe*. (*Id.* at 6-7)  Further, the timesheets include

6   investigations regarding other grape growers: Linelle Mogado interviewed Sunview and DM Camp

7   workers while Kerianne Steele "[i]nterviewed putative class members and collected declarations from

8   them re Casimiro's violations of labor code." (*See id.* at 12, 15, 22)

9          In total, the attorneys at Weinberg, Roger & Rosenfeld worked 236 hours on actions that clearly

10   did not relate to claims of individuals who were not employed at El Rancho Farms.  As such, even 1/6

11   the time for these tasks should not be included in the lodestar calculation.  *See Gauchat-Hargis*, 2013

12   U.S. Dist. LEXIS 128508 at *11 ("Time spent on tasks that are not relevant to the case at issue should

13   be eliminated from the lodestar analysis.")  Thus, the lodestar will be reduced by **39.2 hours**.[22]

14                          *ii.      Clerical tasks*

15          Notably, Class Counsel's lodestar calculation included time for clerical tasks performed by

16   Eleanor Natwick such as filing; "[d]ocument organization;" and downloading, printing, and saving

17   documents from PACER. (*See, e.g.,* Doc. 186-2 at 20-21, 23-25)  Similarly, Linelle Mogado reported

18   she assisted with "filing, preparation and scanning exhibits," and showed an assistant "how to compile

19   information and enter data."  (*Id.* at 23, 25)  Given the clerical nature of these tasks, the time expended

20   should be deducted from the lodestar calculation.  *See Missouri*, 491 U.S. at 288 n. 10; *Nadarajah,* 569

21   F.3d at 921.  Because Class Counsel seeks 1/6 of the time and Ms. Natwick and Ms. Mogado recorded

22   31.75 hours in clerical tasks, this results in a deduction of **5.29 hours**.[23]

23                          c.      Milberg, LLP

24          Milberg, LLP also represented the plaintiffs in the *Doe* action and seeks an award of 1/6 of the

25   time related to that phase of the litigation.  David Azar submitted a declaration on behalf of Milberg

26   LLP, reporting: "The total number of hours expended on this litigation by [the] firm is 222.95 hours.

27   _____

28   [22] This total includes deductions of 22.58 hours for Chris Raiser, 12.33 hours for Emily Rich, 2.96 hours for Linelle Mogado, and 1.33 hours for Kerianne Steele.
    [23] This total includes deductions of 1.58 hours for Linelle Mogado and 3.71 hours for Eleanor Natwick.

1    The total lodestar for [the] firm is $113,015.68 consisting of $89,310.43 for attorneys' time and

2    $23,705.25 for professional time." (Doc. 187 at 2, ¶ 6)

3                        i.       *Work related to claims against other grape growers*

4            Milberg LLP also erroneously included several tasks related to other defendants from *Lara* and

5    *Doe*, such as Castlerock. For example, Nicole Duckett reports time for preparing a joint status report

6    related to the claims against Stevco. (Doc. 187-1 at 8) In addition, Ms. Duckett noted she spent time

7    related to: "CastleRock: Email Hector Gonzalez; Call to Hector Gonzales; research mediators." (*Id.* at

8    9) Similarly, Sabrina Kim reports time for a conference with Ms. Duckett regarding "Castlerock

9    mediation and status and next steps in litigation; tele/conf. with J. Westerman re: same." (*Id.*) Ms. Kim

10   also indicates she spent time reviewing a stipulation regarding "lead structure in Giumarra and

11   SunView." (*Id.* at 7) In total, the attorneys report 23.75 on tasks that clearly relate to claims against

12   other defendants in *Doe* and *Lara*, which should not be included in the lodestar calculation. *See*

13   *Gauchat-Hargis*, 2013 U.S. Dist. LEXIS 128508 at *11. Because Milberg LLP seeks 1/6 of the time

14   related to these actions, the lodestar will be reduced by **3.96 hours**.[24]

15                       ii.       *Clerical tasks*

16           The lodestar calculation by Mr. Azar includes 50.62 hours of work by document clerks, Jessica

17   Ortiz and Ray Velazquez. (Doc. 187-1 at 1) Ms. Ortiz and Mr. Valazquez were responsible for

18   docketing documents, copying, printing and "monitoring" the case. (*See id.* at 9-14) Given the

19   clerical nature of these tasks, the time attributed to a "document clerk" should not be included in the

20   lodestar calculation. *See Missouri*, 491 U.S. at 288 n. 10; *Nadarajah*, 569 F.3d at 921. This results in

21   the deduction of **50.62 hours**.

22           In addition, many of the tasks performed by Cecille Chaffins were clerical in nature. For

23   example, Ms. Chaffins reported prepared courtesy copies of documents, retrieved documents from

24   PACER, calendared deadlines, and "organize[d] working files." (*See* Doc. 187-1 at 3-9) In total, Ms.

25   Chaffins spent 31.2 hours on tasks that are clerical in nature. Because Milberg seeks 1/6 of the time,

26   this results in a deduction of **5.2 hours**.

27

28           [24] This includes deductions of 1.21 hours for Sabrina Kim, 0.08 hours for Jeff Westerman, and 2.67 hours for
     Nicole Duckett.

### iii. Quarter-hour billing

Notably, the minimum time recorded at Milberg LLP was 0.25 hours, which is a practice that has been criticized because it inflates the time billed. *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 949 (9th Cir. 2007) (affirming a reduction after finding the billing practice inflated the time recorded); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1100-01 (D. Haw. 2010) (applying a 20% reduction for billing in quarter-hour increments); *Prudential Ins. Co. v. Am. v. Remington*, 2014 U.S. Dist. LEXIS 9209 at *9 (E.D. Cal. Jan. 24, 2014) (also applying a 20% reduction where counsel billed in 15 minute-increments).

In *Welch*, the district court "imposed a 20 percent across-the-board reduction on [the] requested hours" because the law firm "billed in quarter-hour increments." *Id.*, 480 F.3d at 948. The district concluded the "practice of billing by the quarter-hour resulted in a request for excessive hours . . . because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time." *Id.* The Ninth Circuit also reviewed the time sheets, and noted: "Our own review of the time sheet confirms that it is replete with quarter-hour or half-hour charges for the drafting of letters, telephone calls and intraoffice conferences." *Id.* Therefore, the reduction for quarter-hour billing was affirmed. *Id.*

Here, counsel and their staff billed 15 minutes on several occasions for reading brief minute orders from the Court, reviewing emails, and checking deadlines (*See, e.g.,* Doc. 187-1 at 2, 9, 5 11) In *Remington*, this Court noted that "15-minute billing for reading the three-sentence Minute Order, which should have been read in 30 seconds or less time, obviously inflated the time spent performing that task, and causes concern that other unverifiable tasks likely took a fraction of the time billed to complete." *Prudential Ins. Co. v. Am. v. Remington*, 2014 U.S. Dist. LEXIS 9209 at *9. Similarly, Mr. Westerman's billing 15 minutes for reading a minute order suggests that the reported time *was* inflated significantly by the quarter-hour billing minimum on other tasks such as reviewing emails, leaving a telephone message, and conferences with co-counsel. *See id*; *Welch*, 480 F.3d at 948-49. Therefore, the remaining time reported by counsel is reduced by 20% for purposes of the lodestar calculation.

### 3. Lodestar Calculation

With the rates and time adjustments set forth above, the lodestar in this action is $**690,089.65**:

| LAW FIRM | LEGAL PROFESSIONAL | ADJUSTED HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Mallison & Martinez ($556,891.85) | Stan Mallison | 553.61 | $350 | 193,763.50 |
| | Hector Martinez | 357.45 | $350 | 125,107.50 |
| | Marco Palau | 337.62 | $225 | 75,964.50 |
| | Joseph Sutton | 670.40 | $225 | 150,840.00 |
| | Alegria de la Cruz | 13.00 | $300 | 3,900.00 |
| | Eric Trabucco | 14.20 | $175 | 2,485.00 |
| | Hector Hernandez | 0.85 | $100 | 85.00 |
| | Jan Spring | 10.25 | $100 | 1,025.00 |
| | Jessica Juarez | 12.60 | $225 | 2,835.00 |
| | Joel Salas | 0.50 | $95 | 47.50 |
| | Mirella Lopez | 6.50 | $95 | 617.50 |
| | Deborah Vanore | 2.33 | $95 | 221.35 |
| | Dyvienne Martinez | 0.00 | n/a | 0.00 |
| | | | | |
| Weinburg, Roger & Rosenfeld ($91,092.60) | David Rosenfeld | 3.28 | $380 | 1,246.40 |
| | Bill Sokol | 1.29 | $380 | 490.20 |
| | Chris Raisner | 71.6 | $380 | 27,208.00 |
| | Emily Rich | 83.9 | $380 | 31,882.00 |
| | Linelle Mogado | 71.54 | $300 | 21,462.00 |
| | Majari Chawla | 5.17 | $300 | 1,551.00 |
| | Kerianne Steele | 16.88 | $225 | 3,798.00 |
| | Suzanne Murphy | 1.75 | $380 | 665.00 |
| | Michelle Grisat | 6.38 | $75 | 478.50 |
| | Eleanor Natwick | 10.58 | $150 | 1,587.00 |
| | Teresa Oviedo | 3.08 | $150 | 462.00 |
| | Judy Castillo | 1.50 | $150 | 225.00 |
| | Aaron Nathan | 0.25 | $150 | 37.50 |
| | | | | |
| Milberg, LLP ($42,105.20) | Sabrina Kim | 22.71 | $350 | 7,948.50 |
| | Jeff Westerman | 2.97 | $380 | 1,128.60 |
| | Nicole Duckett | 75.73 | $350 | 26,505.50 |
| | Elizabeth Lin | 12.77 | $380 | 4,852.60 |
| | Cecille Chaffins | 16.7 | $100 | 1,670.00 |
| | "Document Clerks" | 0.00 | n/a | 0.00 |
| | | | | |
| TOTAL | | | | $690,089.65 |

Significantly, there is a strong presumption that the lodestar is a reasonable fee. *Gonzalez*, 729 F.3d at 1202; *Camacho*, 523 F.3d at 978. The benchmark award of 25% of the common fund amounts to $575,000—which is less than the lodestar as calculated above. However, the lodestar above is significantly less than the fees requested by Class Counsel. As a result, the lodestar cross-check

42

1   supports a request slightly above the benchmark, but not the amount sought by class counsel.

2   **III.    Fees to be Awarded**

3          Weighing the factors set forth by the Ninth Circuit in *In re Online DVD-Rental Antitrust*

4   *Litigation*, a slight upward departure from the benchmark appears appropriate in this action.  Despite

5   the fact that Class Counsel displayed less than exemplary work and exerted dozens of hours re-

6   litigating issues related to class certification, Class Counsel succeeded on the second motion to certify a

7   class and defeated motion for decertification.  Further, the lodestar-cross check supports an upward

8   departure from the benchmark. *See Vizcaino* 290 F.3d at 1048; *Gonzalez*, 729 F.3d at 1202.

9   Accordingly, it is recommended that Class Counsel's request for attorney fees be **GRANTED** in the

10   modified $690,089.65, which is approximately 30% of the gross settlement fund.

11                          **REQUESTS FOR COSTS**

12   **I.     Litigation Expenses**

13          Reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil

14   Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying

15   clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  Here, the

16   Settlement authorized Class Counsel to seek up to $50,000 for expenses. (Doc. 166-1 at 5, § III.B)

17   Plaintiffs' counsel report their actual costs totaled $36,620.54, and seek reimbursement of these funds.

18   (Doc. 189 at 11)  Class Counsel assert:

19           Here, the costs incurred are reasonable for a document-intensive wage and hour case
             and as such Class Counsel should be reimbursed. Mallison Decl. ¶¶58, 59. Plaintiffs
20           propounded document requests demanding all of the critical payroll and timekeeping
             information at issue in this case and the names and contact information for
21           Defendant's former and current employees. Mallison Decl. ¶¶34-36. Defendants'
             timekeeping system is paper-based consisting of a database for payroll and paper time
22           records. *Id.* This required Class Counsel to meticulously review a vast quantity of
             paper time keeping and payroll records in order to properly analyze and negotiate a
23           settlement in this case. Id. In addition, Class Counsel necessarily incurred significant
             costs related to taking depositions in this litigation. *Id.* Class counsel also incurred
24           significant costs related to the production, duplication, and photocopying of the
             extensive paper record. *Id.* at ¶40.
25

26   (Doc. 189 at 19)

27          Previously, this Court noted cost "including filing fees, mediator fees …, ground transportation,

28   copy charges, computer research, and database expert fees … are routinely reimbursed in these types of

                                         43

1  cases." *Alvarado*, 2011 U.S. Dist. LEXIS 52793, at *27-28.  A review of the cost lists provided by

2  Class Counsel demonstrates the costs incurred are reasonable.  Accordingly, the Court recommends the

3  request for costs in the amount of $36,620.54 be **GRANTED**.

4  **II.    Costs of Settlement Administration**

5        The Settlement authorizes the reimbursement of "reasonable fees and expenses" for the

6  Settlement Administrator (Doc. 166-1 at 6, Settlement § III.B)  Originally, Gilardi estimated the cost

7  of administration would be approximately $30,000.  (Doc. 165 at 5)  Now, Gilardi seeks an award of

8  $57,500 for performing the duties required under the terms of the Settlement.  (Doc. 200 at 3)

9        Notably, when Gilardi made an estimate for its fees and expenses related to this action, the

10 estimate was based upon a class size of 3,000.  (Doc. 166-5 at 1)  It was only after the Court granted

11 preliminary approval of the Settlement and appoint Gilardi as the Settlement Administrator, that the

12 class expanded from "approximately 3,000 Class Members" to more than 6,000 Class Members.  (*See*

13 Doc. 184-1 at 28.)  Due to the additional time spent on the class data and significant increase in the

14 number of Class Members, as well as the work related to processing late claims that the parties

15 stipulated will be deemed timely, Gilardi seeks an award of fees greater than previously requested.

16 (*See* Doc. 184-3 at 4, ¶ 16; Doc. 198-1 at 2, ¶ 4)  Specifically, Ms. McGill reports that the costs for

17 administration have increased to $75,054.  (Doc. 200 at 6)  Despite the actual costs of the settlement

18 administration, Gilardi requests an award of $57,500.  (*Id.* at 3, McGill Decl. ¶ 10)

19       Previously, this Court has awarded $25,000 for settlement administration in a wage and hour

20 case involving approximately 170 potential class members. *See Vasquez v. Coast Valley Roofing*, 266

21 F.R.D. 482, 483-84 (E.D. Cal. 2010).  Given that this class involves more than thirty times the number

22 of class members in *Vasquez*, the Court finds the increased administrative expenses are reasonable,

23 and recommends an award of $57,500 for the settlement administration be **GRANTED**.[25]

24              **PLAINTIFFS' REQUEST FOR AN INCENTIVE AWARD**

25       The settlement provides that Plaintiffs may apply to the District Court for a class representative

26

27 _____

28       [25] Class Counsel indicated that they were neutral on the amount of the award to the Claims Administrator but
argued that Gilardi should be given the opportunity to file a declaration that would explain its higher costs.  However,
Gilardi had already done so.  Ms. McGill's declaration details that the actual cost for the services rendered was $75,000 but
Gilardi offered a discount in the amount of $17,554.07 reducing the total to $57,500.  (Doc. 200 at 3, 5-6.)

1   enhancement up to $10,000, to be paid from the gross settlement amount.  (Doc. 166-1 at 5, Settlement

2   § III.B)  Here, Plaintiffs request awards of $10,000 for the *Rosales* plaintiffs and $7,500 for the *Cruz*

3   plaintiffs.  (Doc. 189 at 20)

4          In the Ninth Circuit, a court has discretion to award class representatives reasonable incentive

5   payments.  *Staton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463.  Incentive

6   payments for class representatives are not to be given routinely.  In *Staton*, the Ninth Circuit observed,

7           Indeed, '[i]f class representatives expect routinely to receive special awards in addition
            to their share of the recovery, they may be tempted to accept suboptimal settlements at
8           the expense of the class members whose interests they are appointed to guard."
            *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also*
9           *Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D.
            173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a
10          separate peace with defendants, grave problems of collusion are raised.").

11  *Id.* at 975.  In evaluating a request for an enhanced award to a class representative, the Court should

12  consider all "relevant factors including the actions the plaintiff has taken to protect the interests of the

13  class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort

14  the plaintiff expended in pursuing the litigation . . . and reasonable fears of workplace retaliation."  *Id.*

15  at 977.  Further, incentive awards may recognize a plaintiff's "willingness to act as a private attorney

16  general."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

17         A.      **Actions taken to benefit the class**

18         The class representatives report they assisted counsel with a wide-range of tasks. Both Ms.

19  Corza and Ms. Rosales had their depositions taken.  (Doc. 191 at 3, Corza Decl. ¶ 6; Doc. 193 at 3,

20  Rosales Decl. ¶ 6)  Angel Lopez Cruz and Angelica Alvarez became involved in the litigation when

21  they gave declarations in support of class certification in *Rosales.*  (Doc. 190 at 2, Cruz Decl. ¶ 3; Doc.

22  192 at 2, Alavarez Decl. ¶ 3)  Further, each of the plaintiffs report they assisted with discovery,

23  provided documents to the attorneys, and reviewed documents produced by El Rancho and Garza.

24  (Doc. 190 at 3, Cruz Decl. ¶ 5; Doc. 191 at 3, Corza Decl. ¶5; Doc. 192 at 3, Alvarez Decl. ¶ 5; Doc.

25  193 at 3, Rosales Decl. ¶ 5).

26         Notably, Plaintiffs would have likely submitted to depositions and assisted with discovery

27  whether the action was brought on behalf of the class.  On the other hand, Plaintiffs sacrificed any

28  additional claims that they may have had against the Defendants whether they were related to the

45

claims raised in the case or not as a condition of the settlement.  Thus, the actions taken by Plaintiffs

weigh in favor of an incentive payment.

**B.     Time expended by Plaintiffs**

The *Rosales* plaintiffs estimate they spent between 91 and 96 hours related to this action by

providing assistance with discovery, submitting to depositions, attending two of the mediation sessions

in person, and being available by phone for the third mediation.  (Doc. 191 at 3, Corza Decl. ¶¶5-7;

Doc. 193 at 3, Rosales Decl. ¶¶ 5-7)  In contrast, Mr. Cruz estimates he spent 12 hours on actions

related to the litigation, including reviewing documents and being available by phone for the final

mediation session.  (Doc. 190 at 3, Cruz Decl. ¶¶ 5-6)  Ms. Alvarez attended the final mediation

session in person, and estimates she spent 31 hours on tasks related to this litigation.  (Doc. 192 at 3,

Alvarez Decl. ¶¶ 5-6) Therefore, this factor weighs in favor of incentive payments to both the *Rosales*

and *Cruz* plaintiffs.

**C.     Fears of workplace retaliation**

Ms. Rosales reports that when the "Doe" action was filed, she was "afraid that if [she]

participated in the lawsuit [she] might be blacklisted and never get another agricultural job." (Doc. 193

at 2, ¶ 3)  Similarly, Ms. Corza and Ms. Alvarez report they feared being unable to find work if they

participated in the lawsuit.  (Doc. 191 at 2, Corza Decl. ¶ 3; Doc. 192 at 2, Alvarez Decl. ¶ 3) Mr. Cruz

asserts that after he became a named plaintiff, he was "harassed by [his] supervisor at El Rancho . . .

and chose to quit rather than keep working."  (Doc. 190 at 2, Cruz Decl. ¶ 3) Thus, this factor supports

incentive payments to Plaintiffs.

**D.     Reasonableness of Plaintiff's request**

Considering the actions taken by Plaintiffs, an incentive award is appropriate.  In determining

the amount to be awarded, the Court may consider the time expended by the class representative, the

fairness of the hourly rate, and how large the incentive award is compared to the average award class

members expect to receive.  *See, e.g., Ontiveros*, 303 F.R.D. at 366 (evaluating the hourly rate the

plaintiff would receive to determine whether the award was appropriate); *Rankin v. Am. Greetings, Inc.*,

2011 U.S. Dist. LEXIS 72250, at *5 (E.D. Cal. July 6, 2011) (observing that the incentive award

requested was "reasonably close to the average per class member amount to be received); *Alvarado*,

46

1  2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).

2          1.      Time expended

3       In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to

4  Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims

5  alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced

6  evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL

7  1883188 at *11.  Further, the Court noted the plaintiffs "undertook the financial risk that, in the event

8  of a judgment in favor of Defendant in this action, they could have been personally responsible for the

9  costs awarded in favor of the Defendant." *Id.*  In light of these facts, the Court found an award of

10  $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.

11       Here, the *Rosales* plaintiffs seek an award equal exceeding the incentive awards approved in

12  *Alvarado*.  However, because the actions taken by the *Rosales* are similar to those by the plaintiff in

13  *Alvarado*, this factor supports authorizing an enhancement of $7,500 to the *Rosales* plaintiffs.

14          2.      Fairness of the hourly rate

15       Recently, this Court criticized a requested award of $20,000 where the plaintiff estimated "he

16  spent 271 hours on his duties as class representative over a period of six years," because the award

17  would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D.

18  at 366. The Court explained that "[i]ncentive awards should be sufficient to compensate class

19  representatives to make up for financial risk . . . for example, for time they could have spent at their

20  jobs." *Id.* at (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

21       Here, the *Rosales* Plaintiffs estimate they spent between 91 hours and 96 hours on this action.

22  Thus, the requested award of $10,000 would compensate the plaintiffs at rates ranging from $104.17 to

23  $109.89 per hour.  The *Cruz* plaintiffs estimate they spent between 12 and 31 hours on this action,

24  which would provide compensation to Angel Cruz at the rate of $625 per hour and Anglica Alvarez

25  would receive a rate of $208 per hour.  Because these rates are excessive, this factor supports an

26  enhancement lower than that requested. *See Ontiveros*, 303 F.R.D. at 366.

27          3.      Comparison of the award to those of the Class Members

28       In *Rankin*, the Court approved an incentive award of $5,000, where the "[p]laintiff retained

1  counsel, assisted in the litigation, and was an active participant in the full-day mediation." *Id.*, 2011

2  U.S. Dist. LEXIS 72250, at *5.  The Court found the amount reasonable, in part because "the sum is

3  reasonably close to the average per class member amount to be received." *Id.*

4          Here, the estimated average settlement share is $1,336.58.  (Doc. 199-5 at 2, McGill Decl. ¶ 3)

5  Thus, the *Rosales* plaintiffs request enhancement payments that are nearly $8,300 more than the

6  average, while the *Cruz* plaintiffs request enhancements more than $6,000 than the average.  Thus, this

7  factor favors lower enhancements for both the *Rosales* and *Cruz* plaintiffs.

8          **E.      Amount to be awarded**

9          Given that the hourly rates sought by the class representatives are excessive, and that the

10 enhancements sought are significantly out of proportion to the average awards anticipated by class

11 members, the Court finds the requested incentives are inappropriate.  However, Plaintiffs clearly

12 expended efforts on behalf of the class.  As such, the Court finds an incentive award is appropriate, and

13 recommends the request be **GRANTED** in the modified amount of $7,500 for the *Rosales* plaintiffs

14 and $4,000 for the *Cruz* plaintiffs.

15                    <u>**FINDINGS AND RECOMMENDATIONS**</u>

16         Based upon the foregoing, the Court finds the proposed class settlement is fair, adequate, and

17 reasonable, and the factors set forth by the Ninth Circuit weigh in favor of final approval of the

18 settlement agreement.  *See* Fed. R. Civ. P. 23(e)(2); *Staton*, 327 F.3d at 959.

19         Accordingly, **IT IS HEREBY RECOMMENDED**:

20         1.       Plaintiff's motion for final approval of the Settlement Agreement be **GRANTED**;

21         2.       Plaintiffs' request for certification of the Settlement Class be **GRANTED** and defined

22                  as follows:

23                          All persons who have been employed or jointly employed by Garza
                            Contracting at El Rancho Farms facilities between November 9, 2001
24                          and June 11, 2014.

25         3.       The unclaimed fund be distributed on a pro rata basis to Class Members who filed

26                  claims on or before July 17, 2015 as follows:

27                          The Settlement Share for each Claimant will be based on (a) that
                            Claimant's total pay periods (or if necessary, the number of Months of
28                          Employment) during the Class Period (b) divided by the aggregate
                            number of pay periods (or if necessary, the number of Months of

                                                48

Employment) of all Participating Class Members (all class member claims) during the Class Period (with the division rounded to four decimal places) (c) multiplied by the value of the Net Settlement Amount;

4.    Plaintiffs' request for class representative incentive payments be **GRANTED** in the amount of $7,500 for the *Rosales* plaintiffs and $4,000 for the *Cruz* plaintiffs

5.    Class Counsel's motion for attorneys' fees is **GRANTED** in the modified amount of $**690,089.65**, which is approximately 30% of the gross settlement amount;

6.    Class Counsel's request for costs of $36,620.54 be **GRANTED**;

7.    The request for fees for the Settlement Administrator in the amount of $57,500 be **GRANTED**; and

8.    The California Labor Code Private Attorney General Act payment to the State of California in the amount of $30,000 be **APPROVED**;

9.    The action be dismissed with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court; and

10.   The Court retain jurisdiction to consider any further applications arising out of or in connection win the Settlement.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days after being served with these Findings and Recommendations, any party may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

///
///
///
///
///

49

The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   **July 21, 2015**                    **/s/ Jennifer L. Thurston**
                                       UNITED STATES MAGISTRATE JUDGE